UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Crim. No. H-04-25 (Lake, J.) |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD A. CAUSEY, JEFFREY K. | ) | |
| SKILLING, and KENNETH L. LAY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT JEFFREY SKILLING'S MEMORANDUM IN SUPPORT OF
## JOINT MOTION TO TRANSFER VENUE

**TABLE OF CONTENTS**

<b>Page</b>

PRELIMINARY STATEMENT ............................................................................................. 1

I.    THE LEGAL PRINCIPLES GOVERNING VENUE MOTIONS AND THE
      SALIENT VENUE FACTS THAT INFORM A COURT'S ANALYSIS ....................... 7

II.   HOUSTON HAS FAR TOO GREAT A STAKE IN THIS CASE, MAKING IT
      IMPOSSIBLE FOR SKILLING TO RECEIVE A FAIR TRIAL ................................. 14

      A.    Skilling and His Co-Defendants Have Been Demonized in Houston................ 14

      B.    Enron's Rise and Fall Had a Special Symbolic and Cultural Importance
            for Houston and Its Surrounding Communities ................................................. 25

      C.    Enron's Bankruptcy Had Serious Economic Effects on the Economy of the
            Houston Area ..................................................................................................... 33

      D.    The Houston Jury Pool Has an Emotional and Potentially Economic
            Interest in Supporting the Victims of Enron and Making Them Whole............. 38

      E.    Prejudicial and Inadmissible Information Has Infected and Will Infect the
            Trial Process Unless Venue Is Transferred........................................................ 48

III.  VOIR DIRE WILL NEITHER BE AN EFFECTIVE NOR EFFICIENT MEANS
      OF IDENTIFYING AND EXCLUDING JUROR PREJUDICE ................................... 58

IV.   PHOENIX, DENVER, AND ATLANTA ARE VIABLE ALTERNATIVE
      VENUES .................................................................................................................... 63

CONCLUSION................................................................................................................... 64

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Application of Cohn,*
   332 F.2d 976 (2d Cir. 1964)........................................................................ 13

*Associated Press v. United States District Court,*
   705 F.2d 1143 (9th Cir. 1983) ...................................................................... 8

*Beck v. Washington,*
   369 U.S. 541, 82 S.Ct. 955 (1962)............................................................. 12

*Busby v. Dretke,*
   359 F.3d 708 (5th Cir. 2004) ................................................................ 9, 13

*Calley v. Callaway,*
   519 F.2d 184 (5th Cir. 1975) .................................................................... 13

*Coleman v. Kemp,*
   778 F.2d 1487 (11th Cir. 1985) ........................................................ passim

*Columbia Broad. Sys. v. United States District Court,*
   729 F.2d 1174 (9th Cir. 1984) .................................................................. 13

*Exxon Corp. v. Heinze,*
   32 F.3d 1399 (9th Cir 1994) ...................................................................... 63

*Gladhill v. General Motors Corp.,*
   743 F.2d 1049 (4th Cir. 1984) .................................................................. 62

*Groppi v. Wisconsin,*
   400 U.S. 505, 91 S.Ct. 490 (1971)............................................................... 1

*Irvin v. Dowd,*
   366 U.S. 717, 81 S.Ct. 1639 (1961)..................................................... passim

*Johnson v. Beto,*
   337 F. Supp. 1371 (S.D. Tex. 1972) ................................................... passim

*Marshall v. United States,*
   360 U.S. 310, 79 S.Ct. 1171 (1959).................................................... 7, 10

*Mayola v. Alabama,*
   62 F.2d 992 (5th Cir. 1980) .................................................................. 8, 13

*Murphy v. Florida,*
   421 U.S. 794, 95 S.Ct. 2031 (1975)...................................................... 7, 10

*Nevers v. Ellinger,*
   990 F. Supp. 844 (E.D. Mich. 1997)................................................... passim

*Pamplin v. Mason,*
   364 F.2d 1 (5th Cir. 1966) ..................................................................... 8, 10

*Patton v. Yount,*
   467 U.S. 1025, 104 S.Ct. 2885 (1984).................................................... 12

*People v. Boss,*
   261  A.D.2d 1 (NY App. Div. 1999) ................................................... 60, 62

*People v. Manson,*
   61 Cal. App. 3d 102 (1976) ...................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Rideau v. Louisiana,*
  373 U.S. 723, 83 S.Ct. 1417 (1963).................................................. 7, 8, 9

*Sheppard v. Maxwell,*
  384 U.S. 333, 85 S.Ct. 1507 (1966)................................................. passim

*Singer v. United States,*
  380 U.S. 24, 85 S.Ct. 783 (1965) ............................................................ 9

*Smith v. Phillips,*
  455 U.S. 209, 102 S.Ct. 940 (1982) ...................................................... 59

*Slaubaugh v. Slaubaugh,*
  499 N.W. 2d 99 (N.D. 1993) ................................................................. 48

*State v. Hoover,*
  594 S.W. 2d 743 (Tenn. Crim. App. 1979)...................................... 10, 11

*United States v. Abrahams,*
  466 F. Supp. 552 (D. Mass. 1978) .................................................. passim

*United States v. Allsup,*
  566 F.2d 68 (9th Cir. 1977) ................................................................... 59

*United States v. Anguilo,*
  497 F.2d 440 (1st Cir. 1974) ................................................................. 10

*United States v. Bakker,*
  925 F.2d 728 (4th Cir. 1991) ................................................................. 13

*United States v. Bletterman,*
  279 F.2d 320 (2d Cir. 1960).................................................................. 12

*United States ex. rel. Bloeth v. Denno,*
  313 F.2d 364 (2d Cir. 1963).................................................................. 10

*United States v. Brown,*
  250 F.3d 907 (5th Cir. 2001) ................................................................... 8

*United States v. Capo,*
  595 F.2d 1086 (5th Cir. 1979) ........................................................... 8, 13

*United States v. Chagra,*
  669 F.2d 241 (5th Cir. 1982) ................................................................. 13

*United States v. Dozier,*
  672 F.2d 531 (5th Cir. 1982) ................................................................... 9

*United States v. Ebens,*
  654 F. Supp. 144 (E.D. Mich. 1987).............................................. passim

*United States v. Engleman,*
  489 F. Supp. 48 (E.D. Mo. 1980).................................................... passim

*United States v. Faulkner,*
  17 F.3d 745 (5th Cir. 1994) ................................................................... 10

*United States v. Florio,*
  13 F.R.D. 296 (S.D.N.Y. 1952) ...................................................... passim

*United States v. Gorel,*
  622 F.2d 100 (5th Cir. 1980) ................................................................... 9

**TABLE OF AUTHORITIES**

(continued)

**Page**

*United States v. Haldeman,*
   559 F.2d 31 (D.C. Cir. 1976) ........................................................................... 9, 13

*United States v. Harrellson,*
   754 F.2d 1153 (5th Cir. 1985) ...................................................................... 13, 62

*United States v. Hoffa,*
   205 F. Supp. 710 (S.D. Fla. 1962) ...................................................... 9, 12, 32, 48

*United States v. Holder,*
   399 F. Supp. 220 (D.S.D. 1975) .................................................................... 9, 11

*United States v. Houlihan,*
   962 F. Supp. 14 (D. Mass. 1996) ....................................................................... 15

*United States v. Lea Fastow,*
   292 F. Supp. 2d 914 (S.D. Tex. 2003) ............................................................... 33

*United States v. Lindh,*
   212 F. Supp. 2d 541 (E.D. Va. 2002) ................................................................ 13

*United States v. Maad,*
   75 Fed. Appx. 599, 2003 WL 22098002 (9th Cir. Sept. 10, 2003) ........ 10, 11, 33, 51

*United States v. Maldonado-Rivera,*
   922 F.2d 934 (2d Cir. 1990) ............................................................................ 13

*United States v. Malmay,*
   671 F.2d 869 (5th Cir. 1982) ........................................................................... 13

*United States v. Marcello,*
   280 F. Supp. 510 (E.D. La. 1968) ............................................................... passim

*United States v. Mazzei,*
   400 F. Supp. 17 (W.D. Pa. 1975) ......................................................... 9, 11, 12, 32

*United States v. McDaniels,*
   379 F.Supp. 1243 (E.D. La. 1974) .................................................................... 63

*United States v. McVeigh,*
   918 F. Supp. 1467 (W.D. Okla. 1996) .......................................................... passim

*United States v. Moody,*
   762 F. Supp. 1485 (N.D. Ga. 1991) ............................................................. passim

*United States v. North,*
   713 F. Supp. 1444 (D.D.C. 1989) .................................................................... 13

*United States v. O'Keefe,*
   722 F.2d 1175 (5th Cir. 1984) .................................................................... 13, 19

*United States v. Parker,*
   877 F.2d 327 (5th Cir. 1989) ........................................................................... 13

*United States v. Parr,*
   17 F.R.D. 512 (S.D. Tex. 1955) ..................................................................... 9, 12

*United States v. Polchemi,*
   219 F.3d 698 (7th Cir. 2000) ........................................................................... 11

*United States v. Rossitter,*
   25 F.R.D. 258 (D.P.R. 1960) ................................................................... 9, 38, 51

**TABLE OF AUTHORITIES**
(continued)

**Page**

*United States v. Salameh,*
  Case No. S5 93 Cr. 0180 (KTD), 1993 WL 364486
  (S.D.N.Y. Sept. 15, 1993) ........................................................................................... 13

*United States v. Saya,*
  980 F. Supp. 1157 (D. Hi. 1997) ......................................................................... passim

*United States v. Smith-Bowman,*
  76 F.3d 634 (5th Cir. 1996) ....................................................................................... 13

*United States v. Tokars,*
  839 F. Supp. 1578 (N.D. Ga. 1993) ..................................................................... passim

*United States v. Walker,*
  890 F. Supp. 954 (D. Kan. 1995) ................................................................................ 12

*United States v. Williams,*
  523 F.2d 1203 (5th Cir. 1975) ............................................................................. passim

*United States v. Wright,*
  Case No. 401CR3040, 2002 WL 842208 (D. Neb. May 3, 2002) ............................... 7

*Wansley v. Miller,*
  353 F. Supp. 42 (E.D. Va. 1973) ......................................................................... passim

*Ward v. Monroeville,*
  409 U.S. 57, 93 S.Ct. 80 (1972) ................................................................................. 11

*Washington Pub. Util. Group v. United States District Court,*
  843 F.2d 319 (9th Cir. 1987) ............................................................................. 11, 48

## OTHER AUTHORITIES

2 CHARLES A. WRIGHT, FEDERAL PRACTICE & PROCEDURE:
  CRIMINAL § 342 (3d ed. 1999) ............................................................ 1, 10, 38, 63

ABA STANDARDS FOR CRIMINAL JUSTICE FAIR TRIAL & FREE PRESS,
  Standard 8-3.3 (3d ed. 1991) ...................................................................................... 7

FED. R. CRIM. P. 21(a) ..................................................................................................... 7

## Preliminary Statement

Houston, we have a problem.

Over "'200 years of human experience in the endless quest for the fair administration of criminal justice' teaches that there are cases in which only a change of venue is constitutionally sufficient to assure an impartial jury."[1] This is one such case. We respectfully submit that Jeffrey Skilling's trial must be transferred to another metropolitan venue, such as Phoenix, Denver, or Atlanta. Absent a change in venue, Skilling and his co-defendants cannot receive a fair trial because:

- unlike any other venue, residents of Houston and its surrounding communities have a personal, emotional, and economic stake in this case resulting from Enron's dramatic rise and fall and the profound effect the company had on the region's recent history;

- unlike any other venue, the media in Houston has covered the demise of Enron and the ensuing criminal prosecutions with a fervent, inflammatory, and demonstrably prejudicial point of view;

- unlike any other venue, Skilling and his co-defendants have been so uniformly vilified and demonized in the Houston area that they are widely presumed to be guilty until proven innocent; and

- unlike any other venue, voir dire and other lesser remedies will be wholly inadequate to eliminate the pervasive latent biases that exist in Houston against Skilling and his co-defendants.

Rarely, if ever, has there been a more compelling case for a change of venue. In 2001, Enron Corporation—once the seventh largest company in the world, and the shining beacon of Houston's economic resurgence—suddenly, surprisingly, and spectacularly collapsed. The effect on Houstonians and those in the surrounding counties was immediate and devastating. Thousands lost their jobs; many more lost their savings; local business owners suffered;

---

[1] 2 CHARLES A. WRIGHT, FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 342, at 383-84 (3d ed. 1999) (quoting *Groppi v. Wisconsin*, 400 U.S. 505, 510-11 (1971)).

1

hundreds of creditors, large and small, went unpaid; employees in related or dependent businesses were laid off; the commercial real estate market collapsed; spending plummeted; local charities lost their funding. Nearly everyone felt a sense of betrayal.[2] In good times, Enron was a deep source of pride to the Houston community. In the shadow of its bankruptcy, Enron became a badge of dishonor and object of public opprobrium.

Citizens of this venue and the media that serve them have erected metaphoric and psychological divides between the "evil" executives at Enron and the "good" people they betrayed. Hardly a disparaging adjective (opulent, greedy, lying, disgusting, revolting), incendiary characterization (rapist, crook, axe-murderer, terrorist, child molester), comparison to a notorious villain (Satan, Al Qaeda, Hitler, Darth Vader, O.J. Simpson), or analogy to local or national tragedy (1980s oil bust, September 11, the Kennedy Assassination) has been spared when describing Enron, Skilling, his co-defendants, and the collapse of the company they built.[3]

In keeping with their "good versus evil" portrayals, the Houston media has told the human-interest stories of countless Enron victims, documented charitable efforts to aid their recovery, and fostered forums for venting their anger. They have praised the Enron Task Force, describing its lawyers as "premier prosecutors," "smart," "dedicated," "energetic," "handpicked," "up-and-coming," and honest as "Boy and Girl Scouts."[4] The Task Force's cooperating witnesses, though confessed thieves and criminals, are lauded as knowledgeable and unflappable.[5]

---

[2] *See generally* Declaration of Dr. Stephen Klineberg ("Klineberg") (sociologist).

[3] *See generally* Declaration of Russell Scott Armstrong ("Armstrong") (media expert); Declaration of David J. Marroso ("Marroso") Exs. 1-4, 6-13 (collecting various sources with statements in parentheticals); Declaration of Dr. Philip Anthony ("Anthony") (polling expert) Ex. 3 at Houston Response Nos. 35, 124, 129.

[4] Marroso Exs. 14-15 (*Houston Chronicle*).

[5] *See* Multimedia DVD Presentation, Armstrong Ex. 26 (for rough abstract, see Marroso Ex. 16); Marroso Ex. 15 (*Houston Chronicle*).

In stark contrast stands Skilling. In the *Houston Chronicle*, the area's dominant newspaper. Skilling's public testimony is described as "unbelievable" and "b.s."[6] The newspaper has shown little restraint in publishing inflammatory stories and letters about Skilling, signaling that the community has already made up their minds:

- "A poll of the American people would find more sympathy for John Walker Lindh than for the senior management of Enron and Arthur Andersen."

- "Skilling is ripping my heart out with his comments . . . . [H]e'll be hard-pressed to find anyone who believes he was that ignorant. I think he was shrewd."

- "From where I sit, Skilling should have been meeting with the 'three serious-looking suits' [his lawyers] in a Huntsville mess hall instead of on the patio at LaGriglia."

- "I become more disgusted daily with the reports on former Enron chief Jeff Skilling and his wife, Rebecca Carter. . . . [They] will find no good will in my household."

- "I hope [Skilling] winds up in jail . . . . My guess is he will be led off in handcuffs, and when that happens the people who worked at Enron will feel that it didn't come soon enough."[7]

At the same time, the media has cheered on the prosecution by such unprecedented devices as the "Prosecution Scorecard," which appears on the *Chronicle* website and tallies which Enron executives have been charged, convicted, or pled guilty.[8]

With a constant flow of one-sided stories and misinformation, the animus is not abating. Just weeks ago, in a poll and survey of venirepersons conducted by jury expert Dr. Philip Anthony, Houstonians offered the following descriptions when asked, "What words come to mind when you hear the name Jeff Skilling?"

---

[6] Marroso Ex. 17-18 (*Houston Chronicle*).

[7] Marroso Exs. 21-25 (*Houston Chronicle*).

[8] Marroso Ex. 19 (*Houston Chronicle* website). Most recently, when the jury's verdict came down in the Nigerian Barges trial, the *Chronicle* noted that the acquittal of mid-level Enron accountant Sheila Kahanek "was the first to appear in the prosecutors' loss column." Marroso Ex. 20 (*Houston Chronicle*).

- "Pig. Snake. A snake is slithery and sneaky. A pig is dirty. Anybody that would do what he did is dirty."
- "Evil. That he is an evil person."
- "Liar. Lecherous. Fraud. Thief. He stole from employees. He stole their pension plans. He is not an honest man. He is a crook and a criminal."
- "Crook, asshole, no good, thief. I think he swindled a lot of people."
- "Jeff Skilling is a crook. All the Enron executives were white collar crooks. Enron was the most deceitful company in US history."
- "I have only two words to explain all of the people involved in Enron and I will not expand further: economic terrorists."[9]

Against this backdrop in Houston, the Task Force seeks to put Skilling on trial for his life.[10] Rightly or wrongly, and whether or not they have heard of the defendants before being empanelled, jurors from this venue will find it exceedingly difficult, if not impossible, to vote to acquit Skilling and his co-defendants without running the risk of being perceived as pariahs among their friends, families, and co-workers. They will be hard-pressed to ignore community pressures, overcome a natural need for community acceptance, and resist their desire to validate community expectations.[11] This is asking too much of them.

Voir dire cannot solve these problems, nor can the most careful jury instructions. The risk of bias and the need to avoid even the appearance of its taint are so obvious that the *entire* U.S. Attorney's office for the Southern District of Texas recused itself from this case—not just

---

[9] Anthony Ex. 3 at Houston Response Nos. 7, 8, 35, 195, 232, 239; *see also generally* Declaration of Dr. Edward Bronson ("Bronson") (social scientist).

[10] The Task Force also plans to ask a Houston jury to strip Skilling of his property so it can be contributed to the Enron Victims' Fund, publicly touted as benefiting local shareholders, employees, and other perceived victims of Enron's collapse. Marroso Exs. 207-208, 213-216 (*Houston Chronicle*).

[11] Klineberg Decl. ¶¶ 16-20. Skilling and his co-defendants are also decidedly unlike the lone Enron defendant acquitted in the Barge trial. While Skilling, Lay, and Causey are viewed as the personification of Enron, Sheila Kahanek was an accountant who was not an Enron executive; worked at Enron a short time, and had minimal involvement in the single transaction at issue in the Barges trial. Anthony Decl. ¶ 29.

those prosecutors with connections to Enron.[12]  If skilled professionals cannot be expected to put aside their prejudices and allegiances, 12 lay jurors, however well intentioned, cannot.

Venue in this case must be transferred to a convenient, comparable major metropolitan venue like Phoenix, Denver, or Atlanta, where public attention has been less frequent, penetrating, and severe.  As Skilling's polling expert, media expert, social scientists, and economist all attest, Enron's collapse had unique effects on Houston, received overwhelming attention there, and engendered far greater and deeper animus toward Skilling and his co-defendants than in any other venue.  In Houston, the trial of Skilling and his co-defendants is the "main event," and the media and public "can't wait."[13]  Elsewhere, Enron and the case have faded to back-page news:



Although transfer of this case would spark local interest in any new venue, the trial will not have the same community significance and impact as in Houston.[14]  Houston has a vested interest in

---

[12] Marroso Ex. 26-27 (press release; *Houston Chronicle*).

[13] Marroso Ex. 28 (Sept. 2004 *Houston Chronicle* story naming Skilling the "Ultimate Enron Defendant"; saying "[w]e can't wait for the trial").

[14] All references to "Houston," "Houstonians," "the Houston area," or the "Houston venire or jury pool" mean the city of Houston and the 13 surrounding counties that collectively comprise the jury pool for the Houston

the outcome of this case.  Polling data, media analyses, social science, and common sense all confirm that Houston stands alone in this regard.

To assist the Court in evaluating the prejudice that exists in Houston, Skilling has provided expert reports from:  (a) Dr. Stephen Klineberg, a renowned Houston sociologist who places Enron's bankruptcy in social and historical context and analyzes the social pressures that necessarily influence Houston jurors; (b) Dr. Philip Anthony, a national polling and jury research expert who conducted a comparative study of relevant community attitudes in Houston, Phoenix, Denver, and Atlanta; (c) Mr. Russell Scott Armstrong, a media expert who qualitatively and quantitatively compares Houston media coverage to the coverage in other venues (we have also included a short DVD for the Court's review, to aid in demonstrating Mr. Armstrong's conclusions); (d) Dr. Edward Bronson, a social scientist and expert on the attitudes and behavior of jurors, who concludes that members of Houston jury pool are significantly more likely than their peers in Phoenix, Denver, or Atlanta to convict Skilling for reasons other than the evidence properly admitted at his trial; and (e) Mr. Roy Weinstein, an economist who discusses the vested economic interest many Houstonians have—or might perceive they have—in convicting Skilling and his co-defendants.

In the remainder of this memorandum, Section I discusses the legal principles governing venue motions and identifies the salient facts on which courts focus in deciding whether to grant such motions.  Section II demonstrates that this is a case where virtually every relevant fact favors a change in venue.  Section III explains why voir dire would be an ineffective and inefficient remedy to cure the prejudice.  Finally, Section IV summarizes the reasons why Phoenix, Denver, and Atlanta are appropriate alternative venues.

---

Division of the United States District Court for the Southern District of Texas.  Similarly, all references to "Denver," "Phoenix," or "Atlanta" likewise mean the jury pools in the respective district court divisions in which those cities lie.

## I. THE LEGAL PRINCIPLES GOVERNING VENUE MOTIONS AND THE SALIENT VENUE FACTS THAT INFORM THE COURT'S ANALYSIS.

Federal courts have three sources of authority to grant an *inter*-district venue change: the Sixth Amendment to the Constitution; Federal Rule of Criminal Procedure 21(a); and the Court's inherent supervisory powers.[15] The Constitution and Rule 21 *mandate* a venue change where outside influences, such as pretrial publicity, operate to prejudice a defendant and prevent him from obtaining a fair trial.[16] Where outside influences might cast doubt on the perceived fairness of a trial—and there is even the possibility that a constitutional violation will occur—the Court has the *discretion* to order such a transfer pursuant to Rule 21 and its supervisory powers.[17]

Prejudice warranting a prospective change of venue can be shown in different ways.[18]

---

[15] Rule 18 governs *intra*-district transfers; we do not request such a transfer at this time.

[16] *See, e.g.*, FED. R. CRIM. P. 21(a) ("Upon defendant's motion the court *must* transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against defendant exists in the transferring district that the defendant *cannot obtain a fair and impartial trial there.*") (emphasis added); *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (right to due process violated where there was "*a reasonable likelihood*" that publicity and other outside influences prevented a fair trial in the venue in which a crime occurred) (emphasis added).

[17] *See, e.g.*, *United States v. Williams*, 523 F.2d 1203, 1209 n.11 (5th Cir. 1975) (comparing Rule 21 standard to the "due process standards [that] place a bottom line on the discretion exercisable by the district court"); *United States v. Moody*, 762 F. Supp. 1485, 1490 & n.6 (N.D. Ga. 1991) (describing the "supervisory powers" test articulated by the Supreme Court as a "more exacting fairness standard on this issue") (citing *Marshall v. United States*, 360 U.S. 310 (1959); *Murphy v. Florida*, 421 U.S. 794 (1975)); *see also United States v. Wright*, Case No. 401CR3040, 2002 WL 842208, at *9-10 (D. Neb. May 3, 2002) (it is "clear error" to evaluate venue change request only under "due process standard"; a court must also evaluate such a motion under the "less stringent" supervisory powers test).

[18] Because voir dire and a trial have yet to occur here, this motion requires a showing of presumed prejudice and a prospective look at the Houston jury pool that Skilling faces. In the case law, there are three ways to show "prejudice" sufficient to warrant a venue change (or reversal on appeal). The first way, which is the standard to be applied here, works *prospectively* and requires a defendant to establish that prejudice can be presumed generally in the venue in which he is to be tried. *See, e.g.*, *McVeigh*, 918 F. Supp. at 1472 (prejudice presumed among Oklahoma jury pool; case transferred to Denver before voir dire and trial occur); *United States v. Abrahams*, 466 F. Supp. 552, 558 (D. Mass. 1978) ("I am, however, concerned that the publicity in the Boston area, once the headquarters of [defendant's company] and now the seat of [a criminal fraud trial] concerning its operations, has been so consistent and pervasive that selection of a fair and impartial jury would be quite difficult . . . ."; case transferred to Phoenix before voir dire); *see also* ABA STANDARDS FOR CRIMINAL JUSTICE FAIR TRIAL & FREE PRESS, Standard 8-3.3, at 35-39 (3d ed. 1991). Other, inapplicable tests are retrospective, and require a defendant to show on appeal that *actual* prejudice infected his trial, *see, e.g.*, *Marshall*, 360 U.S. at 311-13 (jurors' exposure to newspaper articles about defendant, which refuted his defense of entrapment, caused *actual* prejudice; new trial ordered), or that prejudice should be *presumed* among the jury that found him guilty. *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 725-27 (1963)

First, prejudice is presumed if "inflammatory pretrial publicity [has] literally saturated the community in which [defendant's] trial was held," or if a defendant demonstrates "that outside influences affecting the community's climate of opinion as to a defendant are inherently suspect."[19]  Second, prejudice is presumed where a community has decided that, for justice to be done, the defendant must be convicted and punished in a certain way.  Third, as District Judge Matsch explained in the Oklahoma City bombing case, prejudice is presumed where "the repetition of emotionally intense stories of loss and grief and the valiant efforts to overcome the consequences" have engendered the "common belief" that "only a guilty verdict" and a punishment commensurate with the crime (there, death) will bring the community closure to its pain.[20]  Here, of course, all three measuring sticks result in the same conclusion:  the Houston community has been "saturated"; the "climate of opinion *is* suspect"; and stripping Skilling and of his liberty and property are stated goals of many within the Houston venire.[21]

There are scores of cases evaluating venue-change requests and whether outside influences surrounding a trial were prejudicial.  The cases analyze the salient issues from various vantage points: on habeas review; on direct appeal; after a mistrial; after voir dire; and, as here, before voir dire and trial.[22]  The procedural posture of these cases is critical.  By seeking a change of venue *now*, before a lengthy and expensive trial occurs, Skilling's burden is lighter

---

(defendant's due-process rights violated where trial court refused to change venue; local media broadcast video recording of defendant's "confession"; Court does not examine record for actual prejudice, but *presumes* community prejudice; conviction reversed); *United States v. Capo*, 595 F.2d 1086, 1091 (5th Cir. 1979) (defendant must show trial was a "mockery of justice").

[19] *Mayola v. Alabama*, 62 F.2d 992, 997 (5th Cir. 1980); *Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966).

[20] *McVeigh*, 918 F. Supp. at 1472.

[21] *See infra* Part II.

[22] *See, e.g., Rideau*, 373 U.S. at 725 (habeas review); *United States v. Williams*, 523 F.2d 1203 (5th Cir. 1975) (direct appeal); *United States v. Saya*, 980 F. Supp. 1157, 1157 (D. Hi. 1997) (after mistrial); *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1961) (examining voir dire record on habeas review); *United States v. Engleman*, 489 F. Supp. 48 (E.D. Mo. 1980) (before voir dire); *McVeigh*, 918 F. Supp. 1467 (same).  Venue-related issues are also touched upon in cases involving the media's access to court records and proceedings.  *See, e.g., United States v. Brown*, 250 F.3d 907 (5th Cir. 2001) (court order attempting to keep jury anonymous violated First Amendment); *Associated Press v. United States District Court*, 705 F.2d 1143 (9th Cir. 1983) (similar).

than if he were challenging the fairness of his jury after trial. Hence, factors permeating cases in different procedural postures, such as the high thresholds of review accorded to appeals and habeas petitions, are not instructive.[23]

Here, with the opportunity to act prospectively, the Court has a mandate to do everything it can to ensure both the occurrence and the appearance of a fair trial:

> [R]ule [21] is preventative. It is anticipatory. *It is not solely curative as is a post-conviction constitutional attack.* Thus, the rule evokes foresight, always a more precious gift than hindsight, and for this reason *the same certainty which warrants the reversal of a conviction will not always accompany the change of venue.* Succinctly, then, it is the well-grounded fear that the defendant will not receive a fair and impartial trial which warrants the application of the rule. *Singer v. United States*, 380 U.S. 24, 35 (1965). As the Supreme Court recently stated in *Sheppard v. Maxwell*, 384 U.S. at 363, venue should be changed "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial."[24]

That is not to say the burden imposed by Rule 21 and *Sheppard* and its progeny is not heavy.[25] But it is not insurmountable: venue transfers have been approved or mandated in more than 20 reported federal cases. These cases involve venues both small *and* large (including Houston), as well as crimes violent, non-violent, *and* purely economic (as is alleged here).[26]

---

[23] *See, e.g., United States v. Haldeman*, 559 F.2d 31, 62-63 (D.C. Cir. 1976) (discussing the rigid limits on an appellate court's power, as compared to the district court's power, to hold that a venue transfer was warranted); *United States v. Gorel*, 622 F.2d 100, 103 (5th Cir. 1980) (refusing to find that the trial court erred as a matter of law or abused its discretion). *See also Busby v. Dretke*, 359 F.3d 708, 725 (5th Cir. 2004); *United States v. Dozier*, 672 F.2d 531, 545-47 (5th Cir. 1982).

[24] *United States v. Marcello*, 280 F. Supp. 510, 513-14 (E.D. La. 1968) (emphasis added; citations altered).

[25] *See, e.g., Busby*, 359 F.3d at 725; *McVeigh*, 918 F. Supp. at 1469 (limited to "extraordinary cases").

[26] *See, e.g., Rideau*, 373 U.S. 723 (Lake Charles, Louisiana; murder); *Abrahams*, 466 F. Supp. 552 (Boston; financial fraud); *United States v. Abrahams*, 453 F. Supp. 749 (D. Mass. 1978) (*inter alia*, Boston and New York; financial fraud); *Johnson v. Beto*, 337 F. Supp. 1371 (S.D. Tex. 1972) (Houston; "gift" of one marijuana cigarette); *Engleman*, 489 F. Supp. 48 (St. Louis; murder); *Nevers v. Ellinger*, 990 F. Supp. 844 (E.D. Mich. 1997) (Detroit; murder); *United States v. Ebens*, 654 F. Supp. 144 (E.D. Mich. 1987) (Detroit; murder); *United States v. Florio*, 13 F.R.D. 296 (S.D.N.Y. 1952) (New York City; racketeering case); *United States v. Hoffa*, 205 F. Supp. 710 (1962) (Orlando; mail and wire fraud); *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) (rural Georgia town; violent murders); *United States v. Holder*, 399 F. Supp. 220 (D.S.D. 1975) (South Dakota; assaulting federal officer); *Marcello*, 280 F. Supp. 510 (New Orleans; assaulting police officer); *United States v. Mazzei*, 400 F. Supp. 17 (W.D. Pa. 1975) (Pittsburgh; state senator extorts funds); *McVeigh*, 918 F. Supp. 1467 (Oklahoma City; multiple murders/terrorism); *Moody*, 762 F. Supp. 1485 (Atlanta; multiple murders); *United States v. Parr*, 17 F.R.D. 512 (S.D. Tex. 1955) (Corpus Christi; tax fraud); *United States v. Rossitter*, 25 F.R.D. 258 (D.P.R. 1960) (Puerto Rico; unclear); *Saya*, 980 F. Supp. 1157 (Honolulu; drug

Although courts caution that there are no hard-and-fast rules and that each case "must turn on its own special facts," a thorough analysis of the cases in this area gleans certain guiding principles.[27] Courts consistently grant venue motions (or rule that a venue change was improperly denied) where several of the following facts are present—*all of which are present here*:

1. there has been recent, widespread, vilifying media coverage regarding the defendant, his alleged crimes, or other alleged misdeeds distinct from his alleged crimes;[28]

2. "close attention" has been paid to pre-trial "procedural moves" in the defendant's case; the facts of the alleged crime have been "continually repeated"; "every aspect of [defendant's] life [has] become[] grist for the reporter's mill"; there has been pressure from the media to indict and convict the defendant, and the local populace has a unique appetite for detailed stories regarding the case;[29]

---

sales); *United States v. Tokars*, 839 F. Supp. 1578 (N.D. Ga. 1993) (Atlanta; murder); *Wansley v. Miller*, 353 F. Supp. 42 (E.D. Va. 1973) (Lynchburg, Virginia; rape); *United States ex. rel. Bloeth v. Denno*, 313 F.2d 364, 374 (2d Cir. 1963) (en banc) (Suffolk County, New York; murder); *United States v. Maad*, 75 Fed. Appx. 599, 2003 WL 22098002 (9th Cir. Sept. 10, 2003) (unpublished) (Anchorage; fraud); *see also Sheppard*, 384 U.S. 333, 352-53, 355-63 (Cleveland; murder; venue change denied and judge failed to control publicity during trial; conviction reversed); *Irvin*, 366 U.S. 717 (small Indiana community; murder; publicity prejudiced trial; conviction reversed); *Williams*, 523 F.2d at 1208-09 (Atlanta; kidnapping; failure to transfer venue and prosecutor's closing argument "together deprived defendant of fair trial"); *United States v. Faulkner*, 17 F.3d 745, 754-55 (5th Cir. 1994) (Dallas; bank fraud; noting district court transferred venue); *United States v. Anguilo*, 497 F.2d 440, 442 (1st Cir. 1974) (Boston; impeding a federal officer; noting district court transferred venue based on "well-founded reservations about Angiulo's ability to have a fair trial in Massachusetts" and likely "deem[ed] it preferable to hold the trial in a district where there was less risk of reversible error from problems associated with jury prejudice"); *Pamplin*, 364 F.2d at 7 ("The *Irvin v. Dowd* line [of] cases involves capital crimes. We are of the view, however, that the same constitutional safeguard of an impartial jury is available to a man denied his liberty—here two years—for a misdemeanor as for a felony"; granting habeas and ordering venue change hearing).

[27] *Marshall*, 360 U.S. at 312; *see also* WRIGHT, *supra*, § 342, at 380-82 (discussing various factors); *Murphy*, 421 U.S. at 799 (totality of circumstances test); *State v. Hoover*, 594 S.W. 2d 743, 746 (Tenn. Crim App. 1979) (citing 17-factor test in 33 A.L.R. 1).

[28] *See, e.g., Abrahams*, 466 F. Supp. at 557 ("voluminous collection of newspaper articles . . . painted a black and bleak picture of Mr. Abrahams"; defendant named "'Turkey of the Year' for his 'scams against those seeking scams'"); *Abrahams*, 453 F. Supp. at 752 (local newspapers contain "large-type sensational headlines"); *Tokars*, 839 F. Supp. at 1581 (news stories number in thousands); *Coleman*, 778 F.2d at 1538 (stories published regarding defendants' prior convictions).

[29] *See, e.g., Williams*, 523 F.2d at 1205-06 (close attention to procedural moves; grist for mill); *Ebens*, 654 F. Supp. at 146 ("continually repeated factual recitations"); *Sheppard*, 384 U.S. at 341 (newspaper headlines ask

3. the crimes alleged are serious, have a unique effect on the local venue, and were either horrifically violent, affected many, or involved a violation of public trust;[30]

4. the defendant is viewed as the "linchpin" of the alleged crime or conspiracy;[31]

5. a heavy focus of the media coverage is placed on the alleged victims of the crimes;[32]

6. the defendant's name or alleged crimes evoke strong emotional responses;[33]

7. there are other venues where the publicity has been less prominent, pervasive, or prejudicial, and thus, the defendant is less well known or reviled in those places;[34]

8. jurors feel both a personal stake in the outcome of the case (either emotional or economic), and that the defendant deserves a certain punishment;[35]

9. jurors feel a sense of obligation to reach a particular result, and fear not being

---

"Why Isn't Sam Sheppard in Jail?" and urged "Quit Stalling—Bring Him In"); *McVeigh*, 918 F. Supp. at 1471 (Oklahomans want to know every detail of case; public in other venues follow story, but to much lesser degree); *Marcello*, 280 F. Supp. at 517-18 (same).

[30] *See, e.g., McVeigh*, 918 F. Supp. at 1471 (the "Oklahoma family"—not just the victims of the bombing and their families—were united in their anger and vengeance); *Johnson*, 337 F. Supp. at 1375-79 (Houston feels a stake in convicting and severely punishing civil rights activist believed to be responsible for racial unrest); *Nevers*, 990 F. Supp. at 862-64 (Detroit fears race riots if policemen not convicted for murdering suspect); *Mazzei*, 400 F. Supp. at 20 (Pittsburgh's trust betrayed by state politician); *Maad*, 2003 WL 22098002 at *1-2 (Anchorage community betrayed by citizen who faked being the victim of a hate crime attack and then accepted outpouring of public support); *Florio*, 13 F.R.D. at 298 (trial and media coverage related to trial concern "a matter of peculiarly local interest"); *Hoover*, 594 S.W.2d at 746 ("severity of offense charged").

[31] *Abrahams*, 466 F. Supp. at 555; *Johnson*, 337 F. Supp. at 1375-78 (defendant prime source of racial unrest).

[32] *See, e.g. McVeigh*, 918 F. Supp. at 1472 ("repetition of emotionally intense stories of loss and grief"; "sympathy for victims is . . . strong"); *Ebens*, 654 F. Supp. at 144-46 (prominent story regarding bereaved mother of murder victim).

[33] *See, e.g., McVeigh*, 918 F. Supp. at 1472 (defendants "have been demonized"); *Tokars*, 839 F. Supp. at 1583 (defendant selected by smaller local newspaper as "Best Local Villain"; polling shows jury pool prejudiced against defendant); *Holder*, 399 F. Supp. at 228 ("deeply-felt prejudice" toward defendants).

[34] *See, e.g., Marcello*, 280 F. Supp. at 517-18; *Saya*, 980 F. Supp. at 1159; *Florio*, 13 F.R.D. at 299.

[35] *See, e.g., McVeigh*, 918 F. Supp. at 1473-74 (people of Oklahoma "feel a personal stake in the outcome"; believe defendant deserves death penalty); *Irvin*, 366 U.S. at 725 (same); *Washington Pub. Util. Group v. United States District Court*, 843 F.2d 319, 327 (9th Cir. 1987) (court has duty to transfer highly publicized civil case to avoid the financial self interest of potential jurors); *see also United States v. Polchemi*, 219 F.3d 698, 704 (7th Cir. 2000) ("a court must excuse a juror for cause . . . if the juror has even a tiny financial interest in the case"; *Ward v. Monroeville*, 409 U.S. 57, 59-60 (1972) (conviction reversed where fact finder had perceived financial interest in finding defendant guilty of crime).

accepted by their community or their community being harmed if they acquit;[36]

10. local officials or law enforcement officers have helped promote such beliefs;[37]

11. there have been previous trials or highly publicized pleas involving the defendant or his alleged conspirators, and the local media covered those events with particular intensity and speculated how they would negatively affect the defendant's case;[38]

12. there are highly publicized parallel legislative investigations or civil actions being pursued by local citizens against the defendant;[39]

13. the facts of the case are complicated and nuanced, as are the defenses, requiring an especially "clearheaded" jury;[40] and

14. sequestering the jury or ordering a change in venue after voir dire proves fruitless and would be costly, ineffective, and delay the administration of justice.[41]

*Each and every one* of these salient facts is present here, as summarized for the Court's convenience in Appendix A (attached hereto).[42]

---

[36] *See, e.g., McVeigh*, 918 F. Supp. at 1471; *Johnson*, 337 F. Supp. at 1377-89; *Nevers*, 990 F. Supp. at 862-64.

[37] *See, e.g., Moody*, 762 F. Supp. at 1488-90; *Wansley*, 353 F. Supp. at 47-48; *Kemp*, 778 F.2d at 1538-39; *Abrahams*, 453 F. Supp. at 752; *Ebens*, 654 F. Supp. at 146; *Nevers*, 990 F. Supp. at 862.

[38] *See, e.g., Kemp*, 778 F.2d at 1532, 1538 (co-conspirator who pled guilty reported to be "star witness" against defendant; local media reports in great detail regarding star witnesses' testimony in separate trials of other co-conspirators before defendant's trial); *Engleman*, 489 F. Supp at 51 ("The danger is especially acute when reporting extends to such matters as confessions or admissions, interviews of prospective witnesses, and speculation as to testimony or other matters to be introduced at trial."); *id.* at 52 (examples of such stories).

[39] *See, e.g., Mazzei*, 400 F. Supp. at 20; *Marcello*, 280 F. Supp. at 515-16; *Parr*, 17 F.R.D. at 518; *Florio*, 13 F.R.D. at 298; *Hoffa*, 205 F. Supp. at 722-23.

[40] *See, e.g., Williams*, 523 F.2d at 1209 ("The task resting upon the members of the jury called for clearheaded deliberation unencumbered by passion, prejudice, or a confusion of the issues.").

[41] *See, e.g., McVeigh*, 918 F. Supp. at 1470; *Engelman*, 489 F. Supp. at 50; *Ebens*, 654 F. Supp. at 145-46; *Wansley*, 353 F. Supp. at 50.

[42] Conversely, change of venue arguments are typically rejected when the government can establish several of the following facts, *none* of which is present here:

1. there was very little publicity regarding defendant or his crimes or the amount of publicity was small compared with the body of news in which it was injected (*see, e.g., United States v. Walker*, 890 F. Supp. 954, 959 (D. Kan. 1995)); *United States v. Bletterman*, 279 F.2d 320, 322 (2d Cir. 1960));

2. there was heavy coverage initially, but less over time, and a significant amount of time lapsed between an initial spike of publicity and trial (*see, e.g., Beck v. Washington*, 369 U.S. 541, 556 (1962); *Patton v*

Once it decides that a change of venue is necessary, the Court has broad discretion to transfer the case to any other district in the country it believes can afford a fair trial.[43] Courts consider various factors in selecting an appropriate alternative venue, including whether the jury pool in the alternative venue has a similar demographic composition; there are daily non-stop flights between the transferring venue and the alternative venue; and the alternative venue has modern courthouses equipped to accommodate the case.[44] As demonstrated below in Section IV (and summarized in Appendix B), Phoenix, Denver, and Atlanta, among other large metropolitan areas, meet these criteria.

---

*Yount*, 467 U.S. 1025, 1032-35 (1984); *Capo*, 595 F.2d at 1091);

3. the media coverage was not extensive, emotional, or condemning, but rather "brief, straightforward, unemotional news" (*United States v. Chagra*, 669 F.2d 241, 251-52 & n.12 (5th Cir. 1982); *see also United States v. O'Keefe*, 722 F.2d 1175, 1181 (5th Cir. 1984); *Haldeman*, 559 F.2d at 61; *United States v. Lindh*, 212 F. Supp. 2d 541, 549-50 (E.D. Va. 2002));

4. there was prejudicial reporting, but defendant could not show that it piqued community interest or poisoned the juror pool (*see, e.g.*, *Mayola*, 62 F.2d at 997-99; *Busby*, 359 F.3d at 726 n.18; *United States v. Smith-Bowman*, 76 F.3d 634, 637 (5th Cir. 1996); *United States v. Salameh*, Case No. S5 93 Cr. 0180 (KTD), 1993 WL 364486, at *1 n.2 (S.D.N.Y. Sept. 15, 1993); *see also Haldeman*, 559 F.2d at 60);

5. community attitudes and media coverage were the same, if not worse, elsewhere (*see, e.g.*, *Lindh*, 212 F. Supp. 2d at 550-51; *United States v. Bakker*, 925 F.2d 728, 733 (4th Cir. 1991));

6. there is little awareness of an individual defendant compared to the broader scandal or crime of which he allegedly was a part (*see, e.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990); *United States v. Malmay*, 671 F.2d 869, 875 (5th Cir. 1982));

7. there are strong favorable attitudes toward defendant to counterbalance negative coverage and perceptions (*see, e.g.*, *United States v. Parker*, 877 F.2d 327, 330-31 (5th Cir. 1989); *Calley v. Callaway*, 519 F.2d 184, 210 (5th Cir. 1975); *see also Sheppard*, 384 U.S. at 340 & n.7);

8. the case is proceeding in a large metropolitan area, and either defendant moves to transfer to a small non-analogous community or another venue where there is equal prejudice, or the alleged crime—though well known—did not impact the city as a whole and does not resonate with veniremen (*see, e.g.*, *Application of Cohn*, 332 F.2d 976 (2d Cir. 1964); *People v. Manson*, 61 Cal. App. 3d 102, 177 (1976); *United States v. North*, 713 F. Supp. 1444, 1444 (D.D.C. 1989); *Columbia Broad. Sys. v. United States District Court*, 729 F.2d 1174, 1181 (9th Cir. 1984); and

9. the court and counsel spent several days conducting individual voir dire, jury questionnaire forms were returned, and little evidence of bias ever surfaced (*see, e.g.*, *Calley*, 519 F.2d at 209; *United States v. Harrelson*, 754 F.2d 1153, 1160 (5th Cir. 1985)).

[43] *See, e.g.*, *McVeigh*, 918 F. Supp. at 1470.

[44] *See, e.g.*, *McVeigh*, 918 F. Supp. at 1474; *Tokars*, 839 F. Supp. at 1584; *Moody*, 762 F. Supp at 1490-91.

## II. HOUSTON HAS FAR TOO GREAT A STAKE IN THIS CASE, MAKING IT IMPOSSIBLE FOR SKILLING TO RECEIVE A FAIR TRIAL.

The Houston community has a unique stake in this case. The impact of Enron's bankruptcy on Houstonians, unlike residents in any other venue, was felt personally, emotionally, and economically. The strong feelings of sympathy and pathos that exist in Houston for Enron's perceived victims are matched in intensity only by Houstonians' open hostility towards Skilling, his co-defendants, and other Enron executives they believe are responsible. As importantly, the Houston media—unlike their counterparts in any other venue—has stoked these flames, fueling the furnace of prejudice. As a result, jurors in Houston—and Houston alone—will feel strong motivation and pressure—indeed, an obligation—to convict Skilling and his co-defendants regardless of the evidence at trial. No remedy short of a venue change, including voir dire, sequestration, or an anonymous jury, can stem the risk that prejudice will subvert this trial.

### A. Skilling and His Co-Defendants Have Been Demonized in Houston.

In Houston, Skilling and his co-defendants are widely presumed to be guilty. For example, in August 2004, the *Houston Chronicle* (which the Task Force concedes is "the largest print publication serving the jury pool in this case") named Skilling the "Ultimate Enron Defendant."[45] Just this September, the editors of the *Houston Press* named him "Best Local Boy

---

[45] Marroso Exs. 28, 30 (*Houston Chronicle*; 9/9/04 Severance Opposition at 58 n.34). The *Chronicle* is the eighth largest daily newspaper in country and serves nearly one-third of occupied households in Houston. *See* Armstrong Ex. 15. It is by far the dominant newspaper in all but three of the 13 counties that comprise the Houston venire. *See id.* Those three counties where the *Chronicle* is not dominant have populations of 158,576 (Brazos), 22,181 (Fayette), and 13,362 (Madison); in the other 10 counties, there are 4,637,853 people. *See id.* Ex. 14. The *Chronicle* website reports that one advertisement in the *Chronicle* reaches more Houston adults than 5 prime-time television or 10 drive-time radio spots. *See id.* Ex. 22. It also touts that its website receives "over 25 million page views, on average, per month." *Id.* The *Houston Press* is an alternative weekly newspaper that reaches 300,000 readers per week. *See* Armstrong Ex. 21. It is distributed freely throughout Houston—most prominently in kiosks on city streets. These kiosks display the front-page of the *Houston Press*. These front-pages, which are readily seen by those who pass by, have occasionally featured inflammatory pictures or descriptions of Enron and defendants in this case. *See* Marroso Exs. 31-32,

Gone Bad," describing him as a "horror show" who "jacked 'em up—shareholders, small-fry workers and anybody else [he] could boost—for a few hundred million."[46] Co-defendant Ken Lay likewise received the 2004 "Best Local Boy Gone Bad" designation from the readers of the *Press*, and was named *Texas Monthly*'s "Bum Steer of the Year" in 2002.[47] In *United States v. Tokars*, 839 F. Supp. 1578 (N.D. Ga. 1993), where the defendant was the subject of similar local press awards, including "Best . . ." "Local Villain," "Scandal," and "Over-Hyped Media Event," the court transferred venue, finding that "the significance of these bits of cynical humor is that they assume public awareness and acceptance of . . . guilt."[48] These suggestions of guilt imbue jurors' decision making—in conscious and unconscious ways.[49]

      1.    <u>Publicity in Houston Has Been Uniquely Inflammatory</u>.

Hostility in the Houston area goes far beyond name-calling and insults. It has deeply infected the overall tone of local media coverage and contaminated popular perceptions about Skilling's defense. In July 2004, the *Chronicle* stated in no uncertain terms its belief that Skilling "ginned up increasingly convoluted mechanisms for concealing [Enron's] financial reality," essentially proclaiming him guilty.[50] In the same story, the *Chronicle* accused Lay of relying on "the doofus defense," and said "Lay's lawyers are among the best in the country. When *their smoke screen clears*, they may have succeed in arguing Lay was not guilty by reason

---

49, 162.

[46] Marroso Ex. 29 (*Houston Press*).

[47] Marroso Exs. 29, 33-34 (*Houston Press*; *Texas Monthly*).

[48] 839 F. Supp. at 1583.

[49] *See, e.g., United States v. Houlihan*, 926 F. Supp. 14, 16-17 (D. Mass. 1996) ("Studies by social scientists suggest that pretrial publicity affects potential jurors in ways of which they may not be aware, which they may not be able to articulate. Publicity, even if it is not strictly speaking, inflammatory, *which suggests culpability*, . . . directly affects the readers' perception of guilt, how likely they are to give weight to negative facts about the defendant at trial, to resolve conflicts in credibility against the defendants.").

[50] Marroso Ex. 35 (*Houston Chronicle*).

of ignorance. *We all know better*."[51]

The *Chronicle* likewise has publicly rejected Skilling's explanations for the cause of Enron's collapse, positing that Skilling's "profound shortcomings" led to the bankruptcy, and concluding "Skilling's move from the trading room to the corporate tower was the beginning of the end for Enron."[52] It also mocked Skilling for saying he had resigned from Enron to spend time with his family, comparing his explanation to "baring [your] breast" at a Super Bowl and blaming it on a "'wardrobe malfunction.'"[53] Yet another article claimed that Enron's flaws "flourished" under Skilling, who supposedly "fostered a grow-at-any-cost culture, drowning out voices of caution and overriding all checks and balances."[54] The *Chronicle* also promoted the existence of a supposed "Skilling fear factor," citing an Enron attorney as saying, "We'd have to send marketing people out after [potential business partners] met Jeff to calm them down and reassure them we were good people."[55]

When Skilling testified before Congress, the *Chronicle* reported in a large headline: "'It's kind of hard to believe' / Ex-Enron workers rip Skilling's story."[56] The lead paragraph asserted that Skilling was known to be "savvy and detail-oriented," but "pleaded memory failure and ignorance" to Congress.[57] The article then criticized his testimony by quoting former Enron employees who watched it: "He is lying; he knew everything. . . . I am getting sicker by the minute." "He's knowledgeable. He's twisting things around. He's not answering things directly." "I don't understand how he could be in the position he was in, and say he didn't know

---

[51] Marroso Ex. 35 (*Houston Chronicle*) (emphasis added).

[52] Marroso Ex. 36-37, 96 (*Houston Chronicle*).

[53] Marroso Exs. 37-39 (*Houston Chronicle*; *Houston Press*).

[54] Marroso Ex. 40 (*Houston Chronicle*).

[55] Marroso Ex. 40 (*Houston Chronicle*).

[56] Marroso Ex. 17 (*Houston Chronicle*).

[57] *See id.*

what was going on.  It's unbelievable."[58]  A companion piece quoted local attorneys:  "I'm glad

he's not my client.  What an idiot.  He's in denial."  "It seems inconceivable that the Powers

report, and what everyone else is saying, is wrong, and he is right."  "It's not credible to say he

knew he left this company in good financial shape.  His story was such b.s."[59]

The examples go on and on.  Since Enron's bankruptcy, all of the following (and much,

much more) have appeared in letters, stories, and columns published in the *Houston Chronicle*:[60]

- While Skilling was once considered "[b]rilliant, innovative, visionary, driven," after the collapse "the adjectives changed:  *arrogant, insensitive, greedy, devious, irresponsible.*"[61]

- "It must be very sad to be Ken, Jeff, Andrew and a few others.  Their reputation will never be salvaged!  In my book they are right up there with child molesters, rapists, embezzlers, terrorists and the like."[62]

- "I hope [Skilling] winds up in jail. . . .  For him to take this approach that he wasn't responsible is ludicrous."[63]

- "[T]he average person's perspective is that he [Skilling] is too smart and too well-connected not to have known what was going on.  Also, stating that no one told him they 'were committing a crime' shows that he cares more about nimbly skirting the laws instead of the ethics."[64]

- "Thank you Ken, Jeff, and Andy and the others who destroyed a great corporation."[65]

- "People [say] that someone should go to jail, but I think someone will go to hell."[66]

- "I have lost my entire friggin' retirement to these people.  They have raped all of us."[67]

- "Lay and his henchmen should feel relieved that I won't be in the jury box when they are

---

[58] *See id.*
[59] Marroso Ex. 18 (*Houston Chronicle*).
[60] Armstrong Decl. ¶¶ 82-84.
[61] Marroso Ex. 2 (*Houston Chronicle*).
[62] Marroso Ex. 9 (*Houston Chronicle*).
[63] Marroso Ex. 25 (*Houston Chronicle*).
[64] Marroso Ex. 21 (*Houston Chronicle*).
[65] Marroso Ex. 41 (*Houston Chronicle*).
[66] Marroso Ex. 42 (*Houston Chronicle*).
[67] Marroso Ex. 43 (*Houston Chronicle*).

called to answer for their actions. Driven by greed, lies and insatiable hunger for money, they ripped off their stockholders for billions and gave their employees half an hour to get off the property. They deserve everything that is coming to them."[68]

- "Am I angry at Andrew Fastow and Jeff Skilling? ABSOLUTELY!"[69]

- "I am totally now disgusted by the mere thought of Enron, of Ken Lay and his Mr. Do-Good image, and of every one in Enron upper management who continue to fail to do the right thing. To me Enron is now a dirty word. A company that stole money from investors, profited from the hard work of its employees, and allowed a few to pocket enormous sums, while sabotaging the lives of many . . . ."[70]

- "Ken Lay says he didn't know. Jeff Skilling says he left the company in great shape. Others have no recollection of anything having been done wrong. Do they think it might have been the janitors, at night, when no one else was there?"[71]

- "I have been just as stunned as everyone else at how the guys upstairs seem to have no shame in taking from this legacy of a company to satisfy their own greediness."[72]

- "I didn't think they'd actually get to Jeff Skilling. I'm glad they're indicting him. Maybe he is innocent, but I don't think so."[73]

- Headline: "Lay's World: All Fantasy, All the Time": "Let's take a trip inside the fantasy world that Ken Lay has created in his defense. . . . You can't work that hard to obscure the truth and then claim to be unaware of it. . . . In Lay's world, federal prosecutors are motivated by politics, and I'm just part of the vast 'media frenzy' that is 'perpetuating myths' about a once-great corporation. When it comes to spinning myths, I'm a piker compared with Lay."[74]

- "I continue to be offended by Jeffrey Skilling's weak defense of his poor leadership skills . . . Enron leaders need to recognize that they have played a huge role in this historical disaster. . . . We owe it to the children . . . to fully punish poor leaders who

---

[68] Marroso Ex. 42 (*Houston Chronicle*).
[69] Marroso Ex. 44 (*Houston Chronicle*).
[70] Marroso Ex. 9 (*Houston Chronicle*).
[71] Marroso Ex. 22 (*Houston Chronicle*).
[72] Marroso Ex. 9 (*Houston Chronicle*).
[73] Marroso Ex. 45 (*Houston Chronicle*).
[74] Marroso Ex. 37 (*Houston Chronicle*).

abuse the system."[75]

- Headline: "Plenty of symbols of greed for all": "Enron was . . . marred by a group of scoundrels who have been labeled by some as the Barons of Bankruptcy."[76]

- "Ken Lay's denial of any knowledge of wrongdoing in the Enron debacle (his own company) was reminiscent of the man who shot his wife eight times and claimed he didn't know the gun was loaded."[77]

- Headline: "Your Tar and Feathers Ready?  Mine Are": "Ari Fleischer . . . urged Thursday that the Enron debacle not be turned into a partisan witch hunt.  OK, Ari, let's make it a bipartisan witch hunt."[78]

- "At every turn, investors who questioned Enron or demanded more information were shouted down.  Jeff Skilling, in particular, preferred epithets to answers."[79]

- "One person who worked there said Skilling arbitrarily dismissed employees in the early 1990s . . . without regard for their performance and qualifications."[80]

- Headline: "The Skilling Indictment / Most Agree: Indictment Overdue."[81]

These accounts are hardly factual: instead, they "tend to arouse ill will and vindictiveness."[82]  And the *Chronicle* was by no means alone in fueling such feelings. Inflammatory accusations, articles that prejudge Skilling's guilt, and editorials that incite scorn are everywhere.  *Houston Press* articles have accused Skilling of "totally blowing smoke" and being in "never-never land" when he asserted that Enron was a success.[83]  It even ran a "perp walk" fashion critique (calling Skilling "[a] bitter, fraudulent penguin"), and branded Skilling and Lay "corporate terrorists," lower in character than the September 11 hijackers:

---

[75] Marroso Ex. 46 (*Houston Chronicle*).

[76] Marroso Ex. 1 (*Houston Chronicle*).

[77] Marroso Ex. 47 (*Houston Chronicle*).

[78] Marroso Ex. 48 (*Houston Chronicle*).

[79] Marroso Ex. 276 (*Houston Chronicle*).

[80] Marroso Ex. 96 (*Houston Chronicle*).

[81] Marroso Ex. 45 (*Houston Chronicle*); *cf. Sheppard*, 384 U.S. at 341 (prejudice found where there was pressure from the media to indict and convict defendant; citing similar headlines and stories).

[82] *O'Keefe*, 722 F.2d at 1181.

[83] Marroso Ex. 7 (*Houston Press*, "Sympathy for the Devil"); Marroso Ex. 49 (*Houston Press*).

Not having the stuff of suicide bombers, Enron's executive pilots took full advantage of golden parachutes to bail out of their high-flying corporate jet after setting the craft on a course to financial oblivion. In a business time frame, Enron pancaked faster than the twin towers. CEO Ken Lay and former top execs Jeff Skilling and Andrew Fastow landed safely at their River Oaks redoubts equipped to hold out indefinitely and in high style.[84]

The *Texas Observer* published "A Primer on CEO Fraud," featuring an interview that called Skilling "unrepentant, and very nasty. The kind that folks love to hate."[85] It called Enron "a Ponzi scheme," "a rogue company," and quipped sarcastically, "[w]hat's next, a seminar by Jeff Skilling on business ethics?"[86] Skilling, Lay, and other executives were also the subject of jokes at the Houston Press Club's annual variety show, which was reported on in the *Chronicle*.[87] A posting on a local website (named "Best Blog" in Houston by the *Houston Press*, indicating a sizeable Houston following) called Skilling's "perp walk" a "lovely sight," "a birthday present," then tellingly said, "We'll find out later just what the indictment is about"—confirming that many people are convinced of Skilling's guilt despite having no idea what crimes he is charged with.[88] The TV-movie "The Crooked E: The Unshredded Truth About Enron" overwhelmingly won its time slot in Houston, and called Skilling a "loose cannon," implied he was responsible for negligent homicide, and depicted Enron as a place where everyone aggressively manipulated earnings as the accountants played video games.[89] Another local television station even ran video of the infamous American Taliban John Walker Lindh during a story on Lay's departure from Enron.[90]

---

[84] Marroso Ex. 8 (*Houston Press*).
[85] Marroso Exs. 50 (*Texas Observer*); *see also* Marroso Ex. 51 (same).
[86] Marroso Exs. 52-54 (*Texas Observer*).
[87] Marroso Ex. 55 (*Houston Chronicle*).
[88] Marroso Ex. 10 (*Houston Press*; www.offthekuff.com).
[89] Marroso Exs. 56-57 (*Houston Chronicle*).
[90] Marroso Ex. 58 (*Houston Press*).

2.      Prejudgment of Skilling's Guilt Has Permeated Houston's Popular Culture.

Nor has the hostility towards Skilling been limited to the local news, business, and editorial coverage.  Anti-Enron and anti-Skilling biases have permeated Houston culture like no other American city.[91]  One *Chronicle* columnist criticized Texas schools for being "[l]ike Enron," "subordinating the mission to the measurement."[92]  Similarly, a *Chronicle* sports page article on the NBA Finals began:

> If statistics do indeed lie, as the old adage tells us, then Shaquille O'Neal's are like former Enron CEO Jeff Skilling in front of a congressional subcommittee.  They tell a good story.  They sound convincing—25.7 points, 8.7 rebounds and 60 percent shooting from the field.  But that's not the whole story.[93]

A football article said:  "If you believe the story about the coach not having anything to do with the end of Emmitt Smith's Cowboys career, then you probably believe in other far-fetched concepts.  Like Jeff Skilling having nothing to do with Enron's collapse."[94]  And other sports stories reported a team was "shredded like a batch of Enron documents," a coach "pars[ed] his words like an Enron executive in front of a Senate committee," and that the "sham" Olympic Committee leadership "showed frightening similarities to Enron officers and CEOs."[95]

Similar references in the Houston media include a music review and a mock interview with the "Pethouse Pet of the Week," a dog who said, "I thoroughly enjoy watching those Enron jerks being led away in handcuffs."[96]  Add to this numerous articles in the *Chronicle*'s Lifestyle and other sections, discussing Lay and Skilling's homes in River Oaks, Lay's real estate holdings in other states, and an "Enron Quiz" question about Causey's golf club membership—always

---

[91] Anthony Decl. ¶¶ 18-19, 22.
[92] Marroso Ex. 59 (*Houston Chronicle*).
[93] Marroso Ex. 60 (*Houston Chronicle*).
[94] Marroso Ex. 61 (*Houston Chronicle*).
[95] Marroso Exs. 62-67 (*Houston Chronicle*).
[96] Marroso Ex. 68-69 (*Houston Press*; *Houston Chronicle*).

accentuating the suggestion that Lay, Skilling, and Causey are living opulent lifestyles while Enron's "victims" suffer.[97]

3.  Houstonians Have Expressed a Desire for Vengeance.

More importantly still, there exists in the Houston area a strong desire for retribution and vengeance against Skilling and his co-defendants that exists *nowhere else*. The *Chronicle* reported that Skilling's picture was being "used as a dart board," and that a reader had suggested that Enron executives should face "the old time 'code of the West.'"[98] *Texas Monthly* reported that Skilling was placed alongside Osama bin Laden on "Wanted" posters.[99] The *Houston Press* quoted a man who cautioned that Skilling and Lay "are wise to take security precautions,"[100] and it was reported in the *Houston Business Journal* that Lay traveled with armed bodyguards and had his car guarded by the police.[101] Especially violent and disturbing imagery comes from a rap album released by a former Enron employee, who goes by the name "N-Run" and hosts a local website. The album, profiled in the *Chronicle*, contains a song entitled "Drop the 'S' Off Skilling" that advocates "street justice," complete with gunshot sound effects:

> Skilling, gonna find you / rain, sleet, or snow / there's nowhere on earth / that you can go / There's more pipeline boys / all across the land / ready to get you / for the Enron scam / Consider yourself / a sacrifice / for all the pipeline workers / who gave their life / . . . . when justice comes around / you gonna get hit. . . .
>
> N-Run's gonna get to the heart of the matter / and we won't give a damn when his blood gets spattered / For everybody out there / who lost a dime / drop a "S" off of

---

[97] *See, e.g.*, Marroso Exs. 229, 256-257 (*Houston Chronicle*). Even the *Houston Business Journal*, hardly a noted source of sensationalism, included a column on possible Enron movies. "Honey, We Shrunk the Company" featured an "Enron Chairman whose name rhymes with 'Fay'" who invents a machine that "reduces the 401(k) plans of employees to microscopic size" while "his stock portfolio and those of his cronies are somehow shielded from the downsizing rays." "Ken and Jeff's Excellent Adventure" feature Ken and Jeff "whimsically concocting a bunch of loony business partnerships and unwittingly disrupt[ing] future cash flows for hordes of investors." Marroso Ex. 70 (*Houston Business Journal*).

[98] Marroso Exs. 71-72 (*Houston Chronicle*).

[99] Marroso Ex. 73 (*Texas Monthly*).

[100] Marroso Ex. 8 (*Houston Press*).

[101] Marroso Ex. 74 (*Houston Business Journal*).

Skilling / it's killing time.[102]

Another song on the album includes this lyric: "Cooperate America / tell me what you think / I feel like Lay's ass / should be in the clink / Oh yeah, by the way, we ain't forgot about Skilling / some of them good old pipeline boys are gonna kill him."[103]

Some of these violent song lyrics—threatening Skilling's death—were republished in the *Chronicle*.[104] In *Tokars*, a similarly inflammatory song about the defendant was found to be a "telling piece[] of evidence" that reinforced the inference "that a widespread bias exists which could interfere with a fair trial."[105]

    4.    <u>Recent Surveys Confirm That Hostility Towards Skilling and His Co-Defendants Has Not Abated Over Time.</u>

This vilifying of Enron and Skilling has saturated Houston and fostered lasting opinions in its community psyche. In polling conducted just last month by Dr. Anthony, a representative sample of Houston Division residents were asked "[w]hat words come to mind when you hear the name Jeff Skilling?" The responses demonstrated extraordinary levels of prejudgment, deep-seated animus, and disinformation about this case, in stark contrast to the opinions of people in other judicial districts. Persons in Houston, for example, evinced their predisposition by offering the following venomous statements (among many, many others):

- "He is the devil. He is a sorry son of a gun who is only out for himself."
- "Jeff Skilling is an arrogant, conniving, pompous, brilliant crook."
- "He is a weasel and he is dishonest. The entire time I was watching him on T.V. he

---

[102] Marroso Exs. 75-78 (lyrics transcription, *Houston Chronicle*; *Texas Monthly*; www.nrunwrekords.com).

[103] Marroso Ex. 75 (lyrics transcription).

[104] Marroso Ex. 76 (*Houston Chronicle*).

[105] *See, e.g., Tokars*, 839 F. Supp. at 1583-82 (citing song and noting: "Using a quantitative approach, the court agrees with the Magistrate Judge that the great bulk of the pretrial publicity in this case is factual, *i.e.*, not inflammatory in nature. However, combining the extraordinary volume of coverage (virtually all of which is highly negative to the Defendants) with the emotional nature of some of the coverage, one may infer that a widespread bias exists which could interfere with a fair trial. Two telling pieces of evidence before the court tend to reinforce this inference [the song and articles referring to defendant as Best Local Villain].").

looked like he was lying.  He looked like he knew about everything that was going on."

- "[U]nscrupulous, despicable and deceiving.  He and others were principal in the demise of Enron."

- "Deceitful, manipulative, smart, amoral . . . ."

- "They should prosecute him to the fullest, they kn[e]w what was going on and should get as much time in the penitentiary as possible."

- "Cheat.  Liar.  Thief. . . .  He needs to pay the price for what he did."

- "I think he was a manipulator, the manipulator who affected the entire company profits for his own gain, for money."

- "I think he was the mastermind. . . . He knew who was involved with Fastow."

- "Jeff Skilling should be in jail for 20 years.  I think the executives deserve to lose whatever financial gain they received and it should be given to the employees that worked all those years to earn it."

- "Jeff Skilling is a bastard."

- "Jeff Skilling is a scoundrel.  He should be held accountable for his crimes."

- "[G]reedy and greedy crook.  Guilty comes to mind because I feel that he did what he did and that deprived elderly people of their pensions. . . .  Hurting that many elderly people so severely is, I feel, the equivalent of being an axe murderer. . . .  If I were on the jury, I would send him to jail because he is so guilty."

- "In my opinion, guilty as sin."[106]

Houston area residents displayed a demonstrably more hostile attitude toward Skilling than did potential jurors in other venues like Phoenix (District of Arizona), Denver (District of Colorado), and Atlanta (Northern District of Georgia).  Roughly *one in three* Houston respondents (31.8%) used negative statements to describe Skilling.  This was *more than three times* as many as in Phoenix (9.0%), approximately *three times* as in Denver (11.0%), and more than *twice* as in Atlanta (13.2%).[107]  Houstonians also used more words—and more "angry"

---

[106] Anthony Ex. 3 at Houston Response Nos. 15, 18, 32, 43, 52, 55, 85, 117, 124, 129, 131, 151, 156, 245.

[107] Anthony Decl. ¶¶ 12, 16-18, 42.

words—than their peers in other venues.[108]  In addition, when asked to name all the Enron

executives whom they believe to be guilty of crimes, without any prompting with a list of names,

Houston respondents were over *five times* more likely to identify Skilling specifically.[109]

Respondents in Phoenix, Denver, and Atlanta as a group were several times more likely *not* to

know Skilling at all.

The fervent and pervasive demonization of Skilling and his co-defendants in the Houston

area is irrefutable proof that a venue transfer is necessary to ensure a fair trial.  But further proof

can be found by examining the extensive roots of this hostility.  As Sections B through E

demonstrate, Houston has deep emotional, economic, and psychological connections to Enron

that simply do not exist in other venues.  While Enron's bankruptcy may have had some national

impact, Houstonians—more so than anyone else—viewed that event as a predominantly *local*

tragedy.  Enron's failure was not just a story about business or finance; it was a powerful and

traumatic event that continues to have profound and lasting effects in Houston.  As a result,

Houstonians are looking for villains, and have overwhelmingly, passionately—and wrongly—

cast Skilling and his co-defendants in that role.

### B. Enron's Rise and Fall Had a Special Symbolic and Cultural Importance for Houston and Its Surrounding Communities.

When Enron's remarkable rise and fall is viewed in its social and historical context, one

of the causes of the emotionally charged atmosphere in Houston immediately becomes clear.

People in Houston feel betrayed.  In a few short weeks, Enron went from the city's most

preeminent corporate citizen to its biggest source of embarrassment, anger, and shame.[110]

Against this backdrop, it is impossible for Skilling, Lay, and Causey to receive a fair trial here.

---

[108] *See id.*

[109] Anthony Decl. ¶¶ 12, 14, 38-39.

[110] *See generally* Klineberg Decl. ¶¶ 8-15.

Unlike the other Enron defendants, these men remain the *personification* of Enron, the company's highest officials. The blame for Enron's betrayal is thus laid at their feet.

    1.    <u>Both Symbolically and Financially, Enron Was Houston's Most Important</u>
                <u>Company</u>.

In Houston, Enron was more than just another company. It was an "icon," a corporate "darling," a "pillar[] of Houston's economy and business leadership" that "enhanced the city's image and stature."[111] Enron "was the most important company in the city, without any question,"[112] because it was the "symbol of a renewed Houston, roaring back from the Oil Bust"; "at the center of Houston's sense of positioning itself for success in the post-oil age"; and proved that the city could be liberated from "more than 20 years [of] swelling and suffering at the caprices of the oil market."[113] Enron's new office tower was the first built downtown in over a decade. It was an emblem of "Houston's biggest company's new-century dominance," complete with a 50,000 square-foot trading floor that was "a single-company answer to the Chicago Board of Trade."[114] In the words of one employee, "[t]he word on the street was [Enron] was the best company to work for . . . . [A]ny time I went somewhere it was, 'Oh, God, you work for Enron? Can I give you my resume?' People admired us, they envied us."[115] University of Houston historian Joseph Pratt described Enron as the kind of company in which "we placed our hopes for the future: where we wanted to work, where we wanted to invest, where we thought the Houston economy would go."[116] Certainly, Houston was home to many successful businesses in the

---

[111] Marroso Exs. 79-80, 119 (*Houston Chronicle, National Public Radio, Christian Science Monitor*).

[112] Marroso Ex. 80 (*National Public Radio*); *see also* Klineberg Decl. ¶¶ 11-13.

[113] Marroso Exs. 81-83 (*Houston Chronicle*; *Los Angeles Times*; *Globe and Mail (Toronto)*); *see also* Klineberg Decl. ¶¶ 10-12.

[114] Marroso Exs. 81, 84-85 (*Houston Chronicle*; *The Economist*).

[115] Marroso Ex. 82 (*Los Angeles Times*).

[116] Marroso Ex. 84 (*Houston Chronicle*).

1990s. But "psychologically, symbolically, Enron had no equal."[117]

As a result, Enron's top executives were "revered," with almost "rock-star status" in Houston.[118] Skilling was approached in public "like a celebrity"; "[o]ut of nowhere people would come up to him and tell him how great he was . . . . He was a god, and Lay was king."[119] Lay, in particular, drew extraordinary praise: He was called a "legend," "a giant in this town," "a political and philanthropic force mentioned for years as a potential mayoral candidate," "the master of the universe" who was quickly becoming a "somewhat mythical force" rivaling "the likes of Jesse Jones and Ben Love as men who could change the course of the city."[120] Enron also supported a wide variety of charitable causes and organizations, prompting one local reverend to note that "there's not a segment of this community that Enron hasn't touched."[121]

The *Houston Chronicle* was at the forefront of boosting Enron and its executives. For example, between January 1 and August 14, 2001, when Skilling resigned as CEO, the *Chronicle* ran 27 stories mentioning Skilling, almost one per week, compared to a grand total of *three* stories in the *Atlanta Journal-Constitution, Arizona Republic, Denver Post* and *Rocky Mountain News* combined.[122] The contrast in number of stories is only outdone by the contrast in content. In 2001 alone, the *Chronicle*:

- Reported that the Texas eComm Association had honored Skilling for his tremendous "contributions to the state's Internet economy";
- Touted Skilling's membership on the "luminous" Greater Houston Community Foundation, which manages and assures proper usage of various community funds;
- Covered Skilling's announcement that Enron donated $1 million for scholarships to

---

[117] Marroso Ex. 82 (*Los Angeles Times*).
[118] Marroso Ex. 12 (www.salon.com).
[119] *See id.*
[120] Marroso Exs. 9, 86-88 (*Houston Chronicle; The Guardian (London)*).
[121] Marroso Ex. 88 (*The Guardian (London)*); *see also* Klineberg Decl. ¶ 13.
[122] Armstrong Ex. 14.

Houston area high school students;

- Observed that Skilling had transformed Enron from a "stodgy" company into a market "player" that "keeps raising [the] bar," and that Skilling's "revolutionary" management philosophy allowed Enron and its thousands of Houston employees to flourish;

- Named Skilling four times in 950-word article headlined "Energy Giants Have a Season to Remember";

- Identified Skilling as one of the "100 Who's Who" of Houston; and

- Likened Skilling and Lay to the exalted, saying their new offices will "hover above, giving the chieftains a heavenly view of their realm."[123]

As a result of their place in Houston society, both Enron and its high executives were sources of civic pride. Enron was an integral part of "Houston's development and sense of self."[124] As Dr. Klineberg explains in his declaration, in Houston, "opposing Enron was a little like being against the city itself."[125]

> 2.   Enron's Bankruptcy Was Perceived as a Betrayal of the Houston Community and a Stain on Its Reputation.

In the wake of Enron's bankruptcy, however, Dr. Klineberg says that precisely the opposite is true. Now, to be *with* Enron or *with* its executives is to be *against* Houston.[126] For Houston, Enron's bankruptcy was much more than a financial collapse—it was a "horrible betrayal of the city."[127] Out of nowhere, "the pride of the town, the greatest example of what a business could do in Houston, woke up dead."[128] In no time, there was a deepening public perception that Enron's promise of a New Houston was a sham all along—a hoax based on

---

[123] Marroso Exs. 89-96 (*Houston Chronicle*). *See also* Armstrong Decl. ¶¶ 18-19.

[124] Marroso Ex. 83 (*Globe and Mail (Toronto)*); *see also* Klineberg Decl. ¶ 13.

[125] Klineberg Decl. ¶ 13.

[126] Klineberg Decl. ¶ 14.

[127] Marroso Exs. 12, 82, 277 (*Los Angeles Times*; www.salon.com; *Atlanta Journal-Constitution*); *see also* Klineberg Decl. ¶¶ 14, 17.

[128] Marroso Ex. 97 (*New York Times*).

"phony profits and concealed billions in debt."[129]  "Façade.  Lies.  House of cards.  Those words are sounding all over Houston."[130]  Skilling, Lay, Causey, and other Enron executives went from being hailed as "corporate geniuses" to being denounced as corporate "crooks."[131]  The company that was once a source of pride for Houstonians became a source of humiliation, embarrassment, and disgrace.  It was "as if something of the city's very image of itself [had] been found fraudulent."[132]

Enron became a black mark on Houston.  Enron's empty tower, which looms over the federal courthouse, is now considered a "testament to the hubris that led to Enron's downfall"—a permanent reminder of how the city was allegedly "fooled by a benefactor."[133]  Its 50th floor, which at one time housed Skilling, Lay, Causey, and the other top executives, "once inspired awe [but] now provokes disgust and anger."[134]  Employee letters published in the *Chronicle* speculated that the company was "all smoke and mirrors," and remarked "I never thought the day would come that I was ashamed to say I 'worked' at Enron."[135]  Even people "who had no connection to the company say they are ashamed of its behavior," and feel that "the city's reputation has been bruised."[136]  When one former worker stood on the side of a Houston road holding a sign that read "Ex-Enron employee . . . .  Seeking a company with integrity," complete strangers "broke into grins, slapped staccato toots from their horns, [and] thrust their thumbs skyward."[137]  Prominent local businessman James "Mattress Mac" McIngvale summarized the

---

[129] *See id.*

[130] Marroso Ex. 82 (*Los Angeles Times*).

[131] Marroso Ex. 98 (*Houston Press*).

[132] Marroso Ex. 12 (www.salon.com).

[133] Marroso Exs. 82, 84 (*Houston Chronicle*; *Los Angeles Times*).

[134] Marroso Ex. 41 (*Houston Chronicle*).

[135] Marroso Ex. 9, 41 (*Houston Chronicle*).

[136] Marroso Ex. 82 (*Los Angeles Times*); *see also* Marroso Ex. 99 (*Financial Times (London)*).

[137] Marroso Ex. 82 (*Los Angeles Times*).

prevailing mood: "This thing with Enron makes me furious . . . . They've hoodwinked the entire city."[138] Although Mattress Mac had no ties to Enron, his reaction, like that of all Houstonians, was *"personal"*—"almost as if he himself had been cheated."[139] These kinds of visceral and deep-seated reactions underscore why Houston jurors cannot be impartial.

Perhaps the most public example of the mindset of Enron as an anathema was the renaming of Enron Field, home to the Houston Astros. When the stadium opened in 2000, Enron agreed to pay $100 million over 30 years for the naming rights; Lay even threw out the first pitch at the inaugural game.[140] After Enron's bankruptcy, however, the Astros *paid Enron* $2.1 million to reclaim the name of their ballpark.[141] In legal briefs, the team argued that "Houston and its residents were all tainted" by the collapse, and that being associated with Enron "tarnished the reputation" of the team, was a "notorious and harmful affiliation," and left the Astros "burdened with considerable baggage" and "a public relations nightmare."[142] The team received daily barrages of phone calls and feared losing fans and corporate sponsors who wanted to distance themselves from the Enron name.[143] Even the players called Enron Field "a black-eye statement," and a local sports radio host said that anything is better "than having your name associated with the most embarrassing, disgusting and revolting bankruptcy in United States history."[144]

Yet while the Astros could attempt to disassociate themselves from Enron, Houston and its surrounding communities cannot. To this day, many Houstonians feel stigmatized by Enron's

---

[138] *See id.*

[139] Marroso Ex. 97 (*New York Times*) (emphasis added).

[140] Marroso Exs. 87, 100 (*Houston Chronicle*).

[141] Marroso Ex. 100 (*Houston Chronicle*).

[142] Marroso Exs. 101-102 (Houston Astros legal brief; *Houston Business Journal*).

[143] Marroso Exs. 82, 101 (Houston Astros legal brief; *Los Angeles Times*) ("If they leave Enron Field named Enron Field this year, I'm not going to a single game. I don't care if they're paid up or not.").

[144] Marroso Exs. 103-104 (*Houston Chronicle* website; www.abc13.com).

collapse. A recent *Houston Chronicle* online poll asked: "These days outsiders know Houston best for ___?" As of late October, "the Enron scandal" was overwhelmingly the top choice, by a margin of 64% to 16% over second-place "NASA."[145] The Enron tower has even become a grim tourist attraction. It is mentioned as a point of interest on city tours, and the *Houston Press* told Super Bowl sightseers, "You can't visit Houston without stopping by the Enron building."[146]

Enron thus remains a symbol of Houston, but for all the wrong reasons. "[I]t tarnishes the entire city, it plays on the psyche . . . . They were so connected. People go, 'Oh, yeah, Enron, that's Houston.'"[147] In September 2002, *Texas Monthly* asked: "Is there a single image that says 'Houston'? How about the Houston skyline with a red X through the Enron building?" In another story, it opined, "Not since the Kennedy assassination has a Texas city been so identified with such a devastating event with such far-ranging consequences."[148] To this day, in this community, "the Enron story continues to enthrall . . . mostly because it is such a Houston story."[149] Prospective jurors could not help but be influenced—consciously or unconsciously— by the perceived stain Enron left on their community and by their collective feelings of betrayal and anger expressed at every turn.

3.    <u>Courts Have Found Venue Transfers to Be Necessary Where, as Here, the Alleged Crime Has Become Closely Associated With the Community</u>.

In cases like this one, where the alleged crimes have become so closely identified with a particular community, its well being, or a violation of its trust, courts find venue transfers to be appropriate, if not mandated:

---

[145] Marroso Ex. 105 (*Houston Chronicle* website).

[146] Marroso Exs. 84, 106-109 (*Houston Chronicle*; *Houston Press*; *San Antonio Express-News*; websites).

[147] Marroso Ex. 82 (*Los Angeles Times*).

[148] Marroso Exs. 13, 110 (*Texas Monthly*); *see also* Marroso Ex. 124 (*Houston Press*).

[149] Marroso Ex. 73 (*Texas Monthly*); *see also* Marroso Ex. 111 (*Houston Chronicle*) (Houston is "the most important character of all" in Enron book).

- In *United States v. McVeigh*, 918 F. Supp. 1467, 1470-74 (W.D. Okla. 1996), Judge Matsch transferred the Oklahoma City bombing case to Denver because Oklahomans came to see the bombing as an event that affected not only those injured or killed, but Oklahoma City and the State of Oklahoma as a whole.

- In *Johnson v. Beto*, 337 F. Supp. 1371, 1376-79 (S.D. Tex. 1972), an African-American civil-rights leader in Houston was publicly associated with racial unrest in the city. After he was convicted and sentenced to 30 years in prison for a minor, non-violent drug offense, his conviction was overturned because city-wide pressures to convict and drastically punish him had obviously infected his trial.

- In *United States v. Mazzei*, 400 F. Supp. 17, 18, 20 (W.D. Pa. 1975), defendant was on trial in Pittsburg for extortion "on a charge that he, as a state senator, extorted funds under color of office." The court transferred his case to Delaware given the "state-wide" perception that he had violated the public's trust.

- In *Wansley v. Miller*, 353 F. Supp. 42, 46-52 (E.D. Va. 1973), local media convinced the people of Virginia town that defendant was a rapist, a threat to the community, and needed to be punished. His conviction was vacated because the venue in which he was tried had been overrun by prejudicial emotions.

- In *Nevers v. Ellinger*, 990 F. Supp. 844, 861-64 (E.D. Mich. 1997), the city of Detroit became convinced that, unless two policemen defendants were found guilty for murdering a suspect, race riots like those following the Rodney King acquittals in Los Angeles would ensue. The trial court's failure to transfer was held to be manifest error.

- In *United States v. Hoffa*, 205 F. Supp. 710, 722 (1962), financial transactions that were put at issue in defendant's indictment were also the subject of civil lawsuits between defendant's union and officers of a local bank, who "were very prominent citizens" in the Orlando venue. To make certain the case was tried "in a locality which is free from prejudice," the court transferred the criminal case to Tampa. Here, of course, numerous civil lawsuits have been filed in Houston by the citizens and businesses of Houston against Skilling, Causey, and Lay.

- In *United States v. Florio*, 13 F.R.D. 296, 297-99 (S.D.N.Y. 1952), the district court transferred venue in a racketeering case from New York City to Washington. The case implicated "conditions on the New York waterfront," which were of a "peculiarly local

32

interest" to New Yorkers. When an avalanche of publicity regarding the trial reached the public on the day jury selection began—as can no doubt be expected here—the court transferred the case to another metropolitan venue where public attention would be far less intense.[150]

In the Lea Fastow case, the court initially denied Ms. Fastow's change of venue motion, citing the fact, among others, that few Enron-related stories in the *Chronicle* or elsewhere mentioned her by name.[151] Soon after issuing this ruling, however, the court reversed its position and ordered an intra-district transfer of the case to Brownsville. The reason: Ms. Fastow was reported in the *Chronicle* to have entered into a plea agreement, but suddenly backed out of the agreement in open court. Given the publicity surrounding Enron generally and Ms. Fastow's plea in particular, the court anticipated "*additional* media prejudice" would be "newly generated," and rather than rely solely on careful voir dire, as was the original plan, *sua sponte* transferred the case.[152]

In these and other cases, courts closely examined community sentiments and recent history and tried to understand how the trial of the accused fit into the context of both.[153] That same searching inquiry is required here and leads to the same conclusion: Houston has too great a stake in this case to be a fair venue for Skilling's trial.

---

[150] *See also* Armstrong ¶¶ 85-92 (discussing media coverage of Nigerian Barges case).

[151] *See United States v. Lea Fastow*, 292 F. Supp. 2d 914, 918 (S.D. Tex. 2003).

[152] Marroso Ex. 112 at 14:4-15:5 (hearing transcript); *cf. Abrahams*, 466 F. Supp. at 555 (transferring case of alleged "linchpin" of conspiracy from Boston to Phoenix; transferring smaller players' case to Springfield, Mass.). Andrew Fastow also filed a venue motion, which was argued December 16, 2003. *See id.* Ex. 113 (hearing transcript). Mr. Fastow pled guilty before the court ruled on his motion. The EBS defendants moved for venue change as well, and a poll they took purports to show that 81.4% of potential jurors in Houston believe Enron executives are guilty. *See id.* Ex. 114 (moving papers; Austin (71.9%), Corpus Christi (67.9%), Albuquerque (71.1%)). That motion is under submission. Defendants in the Nigerian Barge case did not move to transfer venue.

[153] *See, e.g., Coleman*, 778 F.2d at 1538-39 (rural Georgia community shocked by murder of family; conviction reversed), *Maad*, 2003 WL 22098002, at *1 (Anchorage community betrayed by perpetrator fraud that played off the emotions surrounding the September 11 attacks; conviction reversed).

**C.    Enron's Bankruptcy Had Serious Economic Effects on the Economy of the Houston Area.**

In addition to social and psychological effects, Enron's bankruptcy also had serious economic effects on the Houston community.  The losses were much greater, and much more personal, than in other venues.  Although the nation at large was affected through the stock market and other macroeconomic forces, many Houstonians—and their families, friends, and neighbors—lost their jobs, their savings, or a critical source of revenue for their business or charity.  Enron's bankruptcy was a catastrophe that affected everyday life in Houston.  Enduring an experience of this magnitude has shaped community perceptions and opinions against Skilling in this case.

The economic effects were felt in many different ways.  Most obviously, on the day the *Chronicle* refers to as "Black Monday," over 4,000 of the 7,500 Enron employees based in Houston lost their jobs.[154]  Hundreds more were laid off in the months that followed, for a total of 4,700.[155]  Many of the employees also lost significant portions of their retirement funds.

But the economic impacts of the bankruptcy went far beyond Enron employees.  The ripple effect extended throughout Houston, touching virtually every sector of the local economy.  Arthur Andersen laid off 1,600 workers in its Houston offices.[156]  Vinson & Elkins, the city's largest law firm, lost 9.5% of its business between 2001 and 2002, and even began to jettison partners amid concerns that clients would "fear being associated with the taint of Enron."[157]  Other energy companies that had followed in Enron's footsteps were left with massive credit exposure.  According to the *Houston Business Journal*, Enron owed $100 million to Duke Energy, $80 million to Reliant Resources, $70 million to Dynegy, and $50 million to El Paso at

---

[154] Marroso Exs. 71, 174 (*Houston Chronicle*).
[155] Marroso Ex. 115 (*Houston Chronicle*); *see also* Marroso Ex. 278 (*Houston Chronicle*).
[156] Marroso Ex. 116 (*Houston Chronicle*).
[157] Marroso Ex. 117 (*Houston Chronicle*).

the time of the bankruptcy.[158]  The entire energy trading industry suffered a serious downturn, and some companies were forced to lay off hundreds of their own Houston employees.[159]

Enron's dramatic downsizing affected virtually every Houston market.  The company's employees emptied office spaces that were "roughly equivalent to a 30-story building," and there was suddenly no need for the 1.2 million square feet in its brand new skyscraper.[160]  The vacancy rate for downtown "Class A" office space in Houston rose from 2% to 10% by the end of 2002, putting pressure on landlords to "slash rents and make concessions to keep their corporate tenants."[161]  One commercial real estate company cited Enron's collapse as the reason for canceling a planned 34-story office, apartment, and shopping complex across from Enron Field.[162]  Hotel vacancies also increased.  Enron was one of Houston's most "important hotel demand generators for the past decade," accounting for an estimated 15,000 to 20,000 room nights per year in corporate travel.[163]  Through May 2002, the occupancy rate for the downtown hotel market was down 9% from the same period a year before.[164]  The occupancy losses were then compounded as they flowed through to other hotel revenue streams, such as restaurants, lounges, banquets, and retail outlets.[165]

The crunch was also felt by Houston's small business community.  Lunchtime sales at nearby restaurants declined.  Two eateries reported drops of 40%; another lost "dozens" of Enron-related weekday dinners and two Enron Christmas parties.[166]  A local locksmith company

---

[158] Marroso Ex. 74 (*Houston Business Journal*).
[159] Marroso Exs. 84, 120-121 (*Houston Chronicle*).
[160] Marroso Exs. 120, 122-123 (*Houston Chronicle*).
[161] Marroso Exs. 120, 123 (*Houston Chronicle*).
[162] Marroso Exs. 125-126 (*Houston Chronicle*; *New York Times*).
[163] Marroso Ex. 127 (*Houston Chronicle*).
[164] Marroso Exs. 120, 128 (*Houston Chronicle*).
[165] Marroso Ex. 127 (*Houston Chronicle*).
[166] Marroso Exs. 115, 122, 129 (*Houston Chronicle*; *USA Today*).