that was once Enron's "vendor of the year" had its workload cut by roughly 80%, and the owner of the building's vending machines reportedly filed for bankruptcy.[167]  Corporate and Convention Services, a transportation and entertainment company that made $80,000 annually from Enron and Andersen, closed its doors.[168]  Downtown businesses as diverse as a barbershop, dentist's office, bakery, shoeshine stand, coffee shop, and racquet club all expected losses.[169]

Enron's collapse also "left a $10 million crater in the local nonprofit community."[170] Commitments to numerous organizations were left unfulfilled, including the M.D. Anderson Cancer Center ($600,000), Houston's Children's Museum ($65,000), The Alley Theater ($75,000), and Da Camera of Houston ($10,000).[171]  The future of the Enron Boys & Girls Club was threatened when the company backed out of its $200,000-a-year obligation.[172]  Over the years, Enron had made substantial donations to the Houston Grand Opera, the Holocaust Museum, the Houston Symphony Orchestra, the Museum of Fine Arts, the Houston Ballet, the Contemporary Arts Museum, Barbara Bush's "Celebration of Reading" event, the United Way, and many other causes.[173]  One organization called the bankruptcy "terrible, a real blow," and another feared that laid-off Enron employees would have little money left to spend on the arts.[174]

These are just some examples of how Houstonians were uniquely and personally affected by Enron's bankruptcy.  The collective economic impact is deeper and deeply felt to this day. This is dramatically borne out by the polling and survey data.  When asked if their local

---

[167] Marroso Exs. 120, 130 (*Houston Chronicle*; www.click2houston.com).

[168] Marroso Ex. 120 (*Houston Chronicle*).

[169] Marroso Exs. 115, 120, 122, 129 (*Houston Chronicle*; *USA Today*).

[170] Marroso Ex. 131 (*Houston Chronicle*).

[171] Marroso Ex. 131 (*Houston Chronicle*).

[172] Marroso Ex. 132 (*Houston Chronicle*).

[173] Marroso Exs. 131, 133-137 (*Houston Chronicle*; *Houston Press*; *Washington Times*; *The Jewish Journal*; www.arts4all.com; www.andante.com).

[174] Marroso Exs. 133-134 (www.arts4all.com; www.andante.com).

economy was more affected by the collapse of Enron than other cities, *seven out of ten* respondents in Houston (69.7%) answered affirmatively—that is *nine times* as many as in Phoenix (7.6%), *seven times* as many as Denver (9.6%), and *nearly six times* as many as Atlanta (11.7%).[175]  The perception thus matches the reality.[176]

Potential Houston jurors not only may count themselves among those harmed by Enron's collapse, they also are likely to know others who were harmed.  In Dr. Anthony's survey, *one in three* Houston respondents (32.9%) said that they "personally know" others harmed by Enron's collapse.[177]  That is more than *twice* the number of similar affirmative responses from the Atlanta jury pool (16.0%), and approximately *three times* as many in Phoenix and Denver (11.8%, 12.0%).[178]  This disparity is not surprising, as *thousands* of Houstonians lost their jobs; Houston is home to *10 times* more Enron creditors (394) than any other *state* on average (39); and those who lost retirement savings are "overwhelmingly in Houston," according to one group.[179]  The same cannot be said for the residents of Phoenix, Denver, Atlanta, or any other venue.

Finally, the seething anger of Houstonians caused by Enron's failure cannot be underestimated.  When asked about Skilling, potential jurors in the Houston area gave vastly more negative responses than elsewhere:

- "Crook.  Self-indulgent.  No conscience.  I believe he had his own interests at heart and not the interest of the shareholders or employees.  I have a friend who is single and she lost half of her retirement at the age of 64."
- "Jeff Skilling is guilty.  My company went bankrupt because of [Enron]."
- "The words bad person comes to my mind when I hear the name Jeff Skilling.  Those

---

[175] Anthony Decl. ¶¶ 12, 15, 41.
[176] Armstrong Decl. ¶ 52.
[177] Anthony Decl. ¶¶ 12, 15, 40.
[178] *See id.*
[179] Declaration of Roy Weinstein ("Weinstein") (economist) ¶ 19, Ex. 3; Marroso Ex. 138 at 5 (civil venue motion), Ex. 139 (*Houston Chronicle*).

> people with Enron stole a lot of money from us teachers and bought themselves nice
> homes and cars and took from our investments. Now we have [nothing] in the accounts
> we invested in for our retirement. I think that they should all be hanged."[180]

When an entire community feels that its people, businesses, trades, and occupations have all
been harmed by the defendants' alleged crimes, it is not possible for those defendants to receive
a fair trial in that community. A transfer is constitutionally required.[181]

### D. The Houston Jury Pool Has an Emotional and Potentially Economic Interest in Supporting the Victims of Enron and Making Them Whole.

Houston jurors will bring yet another subtle and unique issue into court: they have an
emotional (and potentially economic) interest in making the victims of Enron's collapse whole.
This perceived need of Houstonians to compensate Enron's victims (including potentially
themselves) arises from at least three sources.

First, immediately after Enron declared bankruptcy, Houstonians rallied together as a
community struck by disaster to support former Enron employees who lost their jobs or were
otherwise impacted by the bankruptcy. Second, to a degree unmatched in other media markets,
the Houston press featured detailed stories about the plight of laid-off Enron employees, while at
the same time portraying Skilling and his co-defendants as the responsible culprits.[182] Finally,
both the Task Force and *Chronicle* have frequently emphasized the existence of an "Enron
Victims' Fund," to which convicted defendants must contribute their assets, thus providing a
powerful financial motive to convict.

### 1. After the Bankruptcy, the Houston Community United to Support the Victims of Enron.

In Houston, like nowhere else, people immediately and generously came to their

---

[180] Anthony Ex. 3 at Houston Response Nos. 66, 73, 225.
[181] WRIGHT, *supra*, § 342 n.19, at 385 (discussing *Rossiter*, 25 F.R.D. at 259-60).
[182] *See, e.g.,* Marroso Exs. 120, 122 (*Houston Chronicle*).

neighbors' support in the wake of Enron's bankruptcy. On the employment front, organizations like the Houston Astros sponsored job fairs, where hundreds of prospective employers accepted resumes and conducted interviews with displaced employees.[183] Other companies offered education, networking opportunities, even low-cost insurance and real estate services.[184] The WorkSource, a taxpayer-funded employment service, opened a special job placement center dedicated solely to Enron employees.[185] KPRC-TV provided a forum for job listings on its website, and Enron itself posted employee resumes online.[186] The Texas Workforce Commission set up "rapid response teams" that gave orientation seminars for laid-off workers, offering career development resources, training programs, and information on unemployment benefits.[187] A local technology group called the Techxans promoted networking by throwing a "pink slip party."[188] And one Houston law firm even solicited Enron employees for potential lawsuits on the radio, reporting that it received an "immediate and overwhelming" response.[189]

Direct financial assistance was also forthcoming. The Greater Houston Community Foundation created an "Enron Employee Transition Fund" (along with a 24-hour hotline that provided career counseling "or just a sympathetic ear"), and raised over $1,000,000 in a few short months.[190] Working with organizations like the Houston Area Urban League, Career and Recovery Resources, and Crisis Intervention of Houston, the fund supported grants that helped

---

[183] Marroso Exs. 140-142 (*Houston Chronicle*; www.click2houston.com).

[184] *See id.* Another citywide job fair was held at the George R. Brown Convention Center, and smaller fairs were organized at area churches and a downtown health club. Marroso Exs. 122, 141, 143-144 (*Houston Chronicle*; www.click2houston.com).

[185] Marroso Ex. 145 (*Houston Chronicle*).

[186] Marroso Exs. 142, 143, 146 (www.click2houston.com).

[187] Marroso Exs. 143, 147 (www.click2houston.com; press release).

[188] Marroso Exs. 148-150 (*Houston Chronicle*; www.click2houston.com).

[189] Marroso Ex. 8 (*Houston Press*).

[190] Marroso Exs. 151-152 (*Houston Chronicle*; www.careerandrecovery.org).

laid-off Enron employees pay for utilities, housing, and healthcare.[191]  Another fund, the "Enron Ex-Employee Relief Fund," raised over $160,000; it helped employees with their bills and gave out gift certificates for groceries.[192]  Websites purporting to raise money for relief efforts—with names like "laydoff.com," "crookede.com," "enrage.biz," and "enronx.org"—sprouted up, selling Enron T-shirts with titles like "401KO'd: We Demand a Rematch," "The Execs that Stole Christmas," and "Investigate 'Em, Prosecute 'Em, Incarcerate 'Em".[193]

Charities and businesses all over Houston gave what they could.  Since the bankruptcy came close to the holidays, the Salvation Army distributed gift certificates so employees could buy toys for their children.[194]  FAO Schwarz gave employees the store to themselves for two hours, plus a discount on merchandise.[195]  A radio station donated money for a family to buy a Christmas tree.[196]  Overall, former Enron workers were offered everything from discounts at retail stores to free desserts, savings on haircuts, opera subscriptions, racquet club fees, and membership at the Jewish Community Center.[197]  The reason?  "They are citizens of Houston, and we are concerned," said one general manager.[198]

While rallying behind the victims of Enron, public officials openly blamed Enron's executives.  At a town hall meeting, U.S. Rep. Sheila Jackson Lee told Enron employees:  "We realize your layoffs were a result of *you being victimized*.  People who have acted inappropriately

---

[191] Marroso Ex. 153 (www.ghcf.org).
[192] Marroso Exs. 154-157 (*Houston Chronicle*; www.click2houston.com; *Detroit News*).
[193] Marroso Exs. 103, 150, 158-60 (*Houston Chronicle*; www.click2houston.com; *Houston Press*; *New York Times*).
[194] Marroso Ex. 142 (www.click2houston.com).
[195] Marroso Exs. 148, 161 (*Houston Chronicle*).
[196] Marroso Ex. 162 (*Houston Press*).
[197] Marroso Exs. 122, 136, 163-165 (*Houston Chronicle*; *Houston Business Journal*; *The Jewish Journal*; www.1400smith.com).
[198] Marroso Ex. 122 (*Houston Chronicle*); *see also* Marroso Ex. 161 (*Houston Chronicle*) ("We wanted to help them out . . . . It's our community, too.").

will be b[r]ought to justice."[199]  Rep. Jackson Lee, U.S. Rep. Gene Green, and then-city councilman Chris Bell held another town hall, at which they called for greater corporate accountability.[200]  Green also announced that his concern for Enron employees did not extend to the upper-level executives, "because they all have a golden parachute."[201]  Many local politicians donated campaign contributions from Enron to employee relief funds.[202]  U.S. Rep. John Culberson said he did so because he was "*appalled and outraged* by the apparent conduct of the *Enron and Arthur Andersen executives*, I felt I had to do what little I could."[203]

The Houston Congressional delegation went so far as to write a letter to Enron's interim CEO requesting severance pay for laid-off workers:

> The bankruptcy of Enron and the ensuing employee layoffs *have created a severe economic downturn in Houston*.  We have been working with the various employment agencies and other businesses to address the needs of those affected by the situation.  *The community has moved quickly to extend assistance to displaced workers by offering financial and medical help, but there are still many outstanding issues that must be addressed before the personal hardships created by Enron's collapse have been adequately resolved.*[204]

Other notable press conferences and public events included announcements by the Texas Deputy Attorney General; a rally led by Rev. Jesse Jackson; a press conference by Johnnie Cochran; and an on-location broadcast of the *Donahue* show, which was promoted on KPRC-TV News as an attempt "to put a human face on corporate greed" and an examination of "fraud, arrogance, *and power-hungry C.E.O.'s that drove the company into bankruptcy*."[205]

---

[199] Marroso Ex. 166 (*Houston Chronicle*) (emphasis added).

[200] Marroso Exs. 167-168 (*Houston Chronicle*; http://bell.house.gov).

[201] Marroso Ex. 169 (www.click2houston.com).

[202] Marroso Exs. 170-172 (*Houston Chronicle*); *see also* Marroso Ex. 173 (*Houston Chronicle*) ("My state is suffering the consequences of what has happened to Enron.  These are my constituents, and they have borne the brunt of the problems at Enron.").

[203] Marroso Ex. 170 (*Houston Chronicle*).

[204] Marroso Ex. 175 (DeLay press release) (emphasis added).

[205] Marroso Exs. 176-179 (*Houston Chronicle*; www.click2houston.com; Bacon's Information TV abstract) (emphasis added).

Taken together, these highly publicized events in Houston paint a picture of a community that has suffered a major trauma and is uniting behind the victims to see that they and their community get justice. Enron's collapse has evoked the type of community response normally reserved for the devastation caused by natural disasters and mass violence, and the reporting has mirrored this response. Indeed, in and around Houston, the fall of Enron has been compared to the terrorist attacks of September 11.[206] The Enron tower has been called "a glass tombstone," "ground zero," and a "corpse . . . right out there in the [city's] front yard."[207] The *Houston Press* described Houston as "the epicenter of the Enron blast," and the *Chronicle* said that Enron's fallout sifted over the city "like a gray, dispiriting ash."[208] One employee who did not get laid off said that going to work after the bankruptcy was "eerily like being in a neighborhood devastated by a tornado."[209] He described himself as "one of the few survivors," who even felt "survivor's guilt." "We lost 25 of a 35-member family [in our trading group], and now we mourn for those who are gone!"[210]

For others, such comparisons were more than a matter of metaphor. In the wake of the suicide of Enron executive Cliff Baxter, one woman told the *Chronicle* that many Enron people were in their "darkest hour," and "had that same initial reaction of ending it all, until coming to sense and sensibility."[211] According to Rice University professor Steven Currall, "I'm not sure it's an exaggeration to suggest some of these reactions amount to post-traumatic stress syndrome."[212] As discussed in the following sections, these emotional wounds have yet to heal.

---

[206] Marroso Ex. 12 (www.salon.com).

[207] Marroso Exs. 84, 97 (*Houston Chronicle*; *New York Times*).

[208] Marroso Exs. 180-181 (*Houston Chronicle*; *Houston Press*).

[209] Marroso Ex. 44 (*Houston Chronicle*).

[210] *See id.*

[211] *See id.*

[212] Marroso Ex. 182 (*Houston Chronicle*).

2.      The Houston Media Has Run, and Continues to Run, Countless Emotional Stories Promoting Sympathy for Enron's Victims.

In the immediate aftermath of the bankruptcy, the *Chronicle* ran story after story about employees and pensioners who "lost nearly everything" and "watched helplessly as [their] Enron stock plummeted in value."[213]   Even those who kept their jobs were portrayed as being under stress "so intense and so sustained, my brain could no longer take it."[214]   The articles were often accompanied by poignant photographs, such as one employee sign that read "Jobless Enron USMC Veteran Will Work For Food . . . God Bless."[215]   The *Chronicle* also solicited and prominently featured letters from victims.[216]   One man said "[m]y wife and I are now faced with selling the house, the car, and the dog just to survive"; another spoke of the impact on his three-year-old autistic son; another man, the foreclosure notice he received on his house; and still another man compared the layoffs to painful memories of witnessing the fall of Vietnam.[217]

One feature article called "The Faces of Enron" dramatically probed the impact of Enron's bankruptcy on the day-to-day lives of employees and their families (pictured next to each article), including:

- A father of five facing "possible eviction," who "broke down when he said he had no money to buy his children Christmas gifts."
- A man who said he was "scared," "nervous," living "paycheck to paycheck," and "almost feels like he's failing his children."
- A woman whose home was destroyed by Tropical Storm Allison only months earlier, who was "hurt" and "angry." Her friend, another employee, said "[i]t's like your husband has taken all your money and left you."
- A couple who met at Enron, and were planning to start a family, who lost $575,000 and

---

[213] Marroso Ex. 71 (*Houston Chronicle*). *See also* Armstrong Decl. ¶¶ 67-73.
[214] Marroso Ex. 174 (*Houston Chronicle*).
[215] Marroso Ex. 71 (*Houston Chronicle*).
[216] Marroso Exs. 9, 41, 44, 183 (*Houston Chronicle*).
[217] Marroso Ex. 9 (*Houston Chronicle*).

43

felt "shocked" and "humiliat[ed]."

- A man whose "eyes watered" as he told his young daughter that he had lost his job.

- A family whose "day-to-day reality is that you're worried and scared."

- A man forced to sell his car because he needed money, who felt "empty" because he has "nothing to do."

- A woman, fresh out of college, who felt "a little bit betrayed" and was "almost certain she will have to relocate."

- And a man who felt "helpless," and asked "[H]ow do I explain that to my kids?"[218]

In 2004, the *Chronicle* has published 17 Enron victim stories, while the major print media in Phoenix, Denver, and Atlanta have published a *combined* total of 4 such stories in the same time period. Between 2001 and 2004, the *Chronicle* ran as many as *15 times* more victims stories than did its peers:



In no other venue did there appear in-depth and heart-wrenching profiles like the *Chronicle*'s "Faces of Enron."[219] The existence of *just one* emotional "victim impact" story—let alone scores of them, as is the case here—was cited prominently by one court as grounds to transfer venue.[220] The case for transferring venue here is exponentially stronger.

---

[218] Marroso Exs. 184-192 (*Houston Chronicle*).
[219] Armstrong Decl. ¶¶ 67-73.
[220] *See Ebens*, 654 F. Supp. at 144-46 (prominent story regarding bereaved mother of murder victim that "told

Local television coverage in Houston also has focused on the victims. KPRC-TV hosted "Boom to Bust," an Enron special spotlighting laid-off employees.[221] Other newscasts aired employee interviews that sounded like a call to arms: "We had a tremendous sense of pride about Enron and now we're very sorrowful about it. Now it's time for us to come together and fight back."[222]

The Houston media continues to emphasize victim stories, even as time has passed.[223] When Skilling testified before Congress, Houston coverage included skeptical commentary by victims and noted that groups of Houstonians gathered at Enron Field and bars and restaurants to watch.[224] A year after the Enron stories broke, the *Chronicle* reported on the death of an employee who had been laid off a week after cancer surgery and sold his car and home to pay for insurance.[225] A month after that report, the paper ran a story called "Employees' lives transformed in aftermath of Enron collapse," which updated readers on the plight of several employees. The tone in Houston remained consistent: one employee said she suffered a nervous breakdown and was now on anti-depressants; another had exhausted his unemployment benefits and virtually all his savings; a third recounted how she had been "burned in a big way."[226]

Even in the last few months, the *Houston Press* published "Children of Enron," which purports to tell the story of "Generation E," the children "whose lives were disrupted by the fall." According to the cover of the newspaper, among "Ken Lay's many legacies" are a child who had

---

of the tragic deterioration of her life" since the crime); *see also Coleman*, 778 F.2d at 1508 (lengthy, emotional story about victims of crime).

[221] Marroso Ex. 73 (*Texas Monthly*).

[222] Marroso Ex. 179 (Bacon's Information TV abstract).

[223] Armstrong ¶¶ 72-73.

[224] Marroso Ex. 17 (*Houston Chronicle*); *compare with* Marroso Ex. 193 (*Arizona Republic*). According to a *New York Times* account, gathering at Enron Field "was actually suggested by representatives of a television network." Marroso Ex. 194 (*New York Times*).

[225] Marroso Ex. 195 (*Houston Chronicle*).

[226] Marroso Ex. 182 (*Houston Chronicle*).

to contribute to house payments, a child who was forced to seek out therapy, and children who stopped eating or had to rely on food stamps and gas vouchers.[227]  The *Chronicle*, too, continues to promote the interests of victims and condemn the executives perceived to be responsible:

> [Enron] is dangerously close to suffering one more indignity upon the workers who have hung with the company through the humiliation and uncertainty of the past three years. . . .  These aren't the Enron workers we hear so often about. They are far removed from the perp walks on the courthouse steps, from the special purpose entities, the extravagant parties, the international jet-setting, the swanky mansions. . . .  They are Enron workers who actually worked . . . .[228]

Houston's drumbeat of sympathy for the victims—and blame and disdain for Skilling, Lay, Causey, and others—have joined to create a highly charged environment in which a fair and impartial trial cannot occur.[229]

    3.    The Enron Victims' Fund Will Distort Juror Incentives in Houston.

        Exacerbating the prejudice is the Task Force's role in promoting the Enron Victims' Fund.  In press conferences, press releases, and other public statements, the Task Force has announced that funds forfeited by Enron defendants as a result of convictions, including in this case, will be paid into a relief fund "for the benefit of the victims."[230]  As then-Deputy Attorney General Thompson put it, the Task Force's strategy is "to put the bad guys in prison and take away their money."[231]  When Skilling was indicted, the Task Force drove this point home.  SEC Director Cutler declared that over $400 million had been recovered for the fund so far.[232] Deputy Attorney General Comey publicly called Skilling a "corporate crook," and promised that

---

[227] Marroso Ex. 162 (*Houston Press*).
[228] Marroso Exs. 196-197 (*Houston Chronicle*).
[229] Armstrong Decl. ¶ 78.
[230] Marroso Ex. 198 (1/14/04 press conference); *see also* Marroso Exs. 199-206 (various press conferences, press releases).
[231] Marroso Ex. 198 (1/14/04 press conference).
[232] Marroso Ex. 201 (2/19/04 press conference).

the Task Force would seek $66 million of Skilling's assets as punishment at his criminal trial.[233]

Similarly, the *Chronicle* has kept a running tally of the Victims' Fund, even mentioning the fund when referring directly to Skilling's case.[234] When the Task Force struck deals with Michael Kopper, Andrew Fastow, Ben Glisan, Kevin Hannon, Ken Rice, and Paula Rieker to plead guilty, the *Chronicle* invariably reported that their assets had been seized; in the case of Rieker, it was reported the Victims' Fund had grown.[235] In describing the fund, the *Chronicle* explained that Enron employees and shareholders would likely share in its proceeds.[236] In one editorial, the *Chronicle* called the Sarbanes-Oxley Act, which provides for this restitutionary remedy, "part of Lay's legacy," "a Lay antidote," and "protection against the kind of now-you-see-it, now you-don't accounting that flourished at Enron under his leadership."[237] There is an endless loop—the stories prejudge the defendants' guilt; they reflect and feed community sentiments; and they get re-reported in the press:

- Letter to the Editor: "I want to see them [Andy Fastow, Jeff Skilling, Arthur Andersen, Vinson & Elkins] go to jail and give their assets back."[238]
- News story about growing Enron Victims' Fund: "But for many shareholders and ex-employees, the amount of the check is less important than the identity of the check writer . . . 'If Ken Lay had to give everybody a check for $200, then that would probably give the employees a good feeling.'"[239]

Given the intense, unique sense of victimization in Houston, the repeated emphasis on compensating Enron's victims only serves to make Houston jurors more predisposed to convict Skilling and his co-defendants—for reasons having nothing to do with the evidence. As in

---

[233] *See id.*

[234] *See, e.g.,* Marroso Ex. 207 (*Houston Chronicle*).

[235] Marroso Exs. 208-212, 279 (*Houston Chronicle*).

[236] Marroso Exs. 207-208, 213-216 (*Houston Chronicle*).

[237] Marroso Ex. 217 (*Houston Chronicle*).

[238] Marroso Ex. 218 (*Houston Chronicle*).

[239] Marroso Ex. 216 (*Houston Chronicle*).

*McVeigh*, Houston jurors will feel strong internal and external pressures to convict Skilling and his co-defendants, to force forfeiture of their assets, and to help make their neighbors whole.[240] Other jurors may perceive that they, their family, or friends might benefit by convictions in this case, because it may lead to tens, if not hundreds, of millions of dollars being injected into the Houston economy.[241]  Jurors may likewise believe that convictions in this case will aid the many Houston plaintiffs and stakeholders in their ongoing civil suits, also pending in this venue, against Enron, its executives (including all three defendants in this case), bankers, and others, suits which seek literally billions of dollars in damages.[242]  Indeed, after one defendant pled guilty, Task Force Director Andrew Weissmann made this link explicit when he told the public that criminal convictions make the civil cases "a virtual slam dunk."[243]  Skilling and his co-defendants are entitled to be tried by jurors who have no such interests at stake.

### E.    Prejudicial and Inadmissible Information Has Infected and Will Infect the Trial Process Unless Venue Is Transferred.

As in *McVeigh*, Enron's collapse was a national story, and people all across the country have "wanted to know the 'who, what, where, why, and when.'"[244]  In Houston, however, the interest is not nearly so general or detached.  Houstonians are immersed in the details of the collapse, the ongoing investigations, and the ensuing court proceedings.  In reporting these

---

[240] *See* 918 F. Supp. at 1472 ("repetition of emotionally intense stories of loss and grief" supports finding of presumed prejudice); *see also Coleman*, 778 F.2d at 1489 (community's "friendship and sympathy for the victims and their family" was a factor in showing that the jury was prejudiced against defendant).

[241] Weintstein Decl. ¶¶ 13-21.  *Cf. Wash. Pub. Util. Group*, 843 F.2d at 326-27 ("massive news coverage": potential jurors might perceive their community would have a financial interest in the outcome of civil case involving local utility); *Slaubaugh v. Slaubaugh*, 499 N.W.2d 99, 106 (N.D. 1993) ("wise discretion might require a transfer of a case where it appears that every prospective juror will have a small interest as a taxpayer").

[242] *Cf. Hoffa*, 205 F. Supp. at 722-23 (criminal defendant in parallel widely reported upon civil case against prominent members of the local community).

[243] Marroso Ex. 291 (*Houston Chronicle*, Ben Glisan guilty plea); *Cf. Moody*, 762 F. Supp. at 1488-90; *Wansley*, 353 F. Supp. at 47-48; *Kemp*, 778 F.2d at 1538-39; *Abrahams*, 453 F. Supp. at 752; *Ebens*, 654 F. Supp. at 146; *Nevers*, 990 F. Supp. at 862 (all cases where prejudice was found, in part, because prosecutors or other public officials stoked the flames of bias).

[244] *McVeigh*, 918 F. Supp. at 1471.

48

details, the Houston media has too often publicized prejudicial material, creating and

perpetuating misimpressions in the minds of potential jurors.

1.   The Houston Media Has Dedicated Unprecedented Resources to Assembling the
      Pieces of the "Enron Puzzle" and to Assigning Blame.

When Enron failed, Houstonians understandably demanded answers, and someone to

blame. As media expert Scott Armstrong explains, the *Houston Chronicle*—read by almost two

million Houstonians daily and which for years had praised Enron and its executives—

immediately responded. Under the leadership of a new editor (after dismissing its former

business writer), the *Chronicle* dedicated substantial resources to covering the Enron story.[245]

Between 2001 and 2004, the *Chronicle* published on average between 2 and 7.3 Enron stories a

day, while media in Denver, Phoenix, and Atlanta published hundreds or thousands fewer stories

per year.[246]  Indeed, as the *Chronicle* wrote in a legal brief seeking to unseal transcripts in the

Fastow case:

> Texans in general, and Houstonians in particular, were impacted more
> immediately by the fall of Enron than most Americans. The *Chronicle*'s readers
> follow this proceeding, all other Enron related proceedings, with an
> extraordinarily high level of interest.[247]

The *Chronicle* also launched a unique website devoted to the "Fall of Enron." This

website contains detailed timelines; biographies of "key players"; links to three years worth of

*Chronicle* Enron stories; summaries of evidence; links to purportedly inculpatory documents;

animated diagrams explaining allegedly unlawful transactions; links to court pleadings and trial

transcripts; audio and video files of Skilling testifying, press conferences, and purported

discussions among Enron energy traders discussing the California energy crisis.[248]  All of this

---

[245] Marroso Exs. 124, 219 (*Houston Press*).

[246] Armstrong Decl. ¶¶ 36-40, Ex. 14.

[247] Marroso Ex. 5 (*Houston Chronicle* legal brief).

[248] Armstrong Decl. ¶¶ 45-49; *see also* Multimedia DVD Presentation, Armstrong Ex. 27; *cf. Ebens*, 654 F.

culminates in a sports page-style "Prosecution Scorecard," showing which Enron executives or related defendants have been charged, pled guilty, or on trial.[249] Mr. Armstrong describes this website as "the most intensive, sophisticated interactive media tool devoted to a single event" that he has ever seen.[250]

According to Mr. Armstrong, the *Chronicle* has approached the Enron bankruptcy much like a puzzle, assembling the pieces for its readers. The tone and content of the coverage, however, has preordained the final pieces of the puzzle—the prosecution and convictions of the "big fish" (the *Chronicle*'s own words)—namely, Skilling, Lay, and Causey.[251] In addition to editorials and news stories that assumed their guilt, as Mr. Armstrong details in his report, almost every *Chronicle* story—whether a report on the Task Force's progress, a guilty plea, or the proceedings and verdicts in the recent Nigerian Barges trial—builds toward the conclusion that the Task Force is "steadily closing in on top officers of Enron."[252] To help illustrate Mr. Armstrong's point, we have prepared and filed a DVD containing a brief multimedia presentation reflecting how the *Chronicle* is piecing together the Enron puzzle and telling its readers a story that can only end in the convictions of Skilling and his co-defendants.[253]

As is often the case with major local newspapers, the *Chronicle*'s stories set the tone and

---

Supp. at 146 (transfer where the facts of the alleged crime have been "continually repeated" in local news stories).

[249] Marroso Ex. 19 (*Houston Chronicle* website); Armstrong Decl. ¶¶ 47-49, 84; *cf. Moody*, 762 F. Supp. at 1489 (14-paragraph summary of evidence against defendant that accumulated in *Atlanta-Constitution* cited as reason for transferring venue from Atlanta to Minneapolis).

[250] Armstrong Decl. ¶¶ 47-49.

[251] Marroso Exs. 220-222 (*Houston Chronicle*); Armstrong Decl. ¶¶ 9-14, 51, 80-84.

[252] Armstrong Decl. ¶¶ 9-14, 51, 80-84. Marroso Exs. 223 (*Houston Chronicle*); *see also* Marroso Exs. 224, 255 (*Houston Chronicle*) (Skilling has been "long considered the ultimate target of the broadband investigation;" Barges convictions "bad news" for Lay, Skilling). Typical of the *Chronicle*'s coverage is this recent comment about the convictions obtained in the Nigerian Barges case: "The case was a test of Enron Task Force prosecutors' accusations of earnings manipulations, alleged repeatedly in the bigger upcoming case against ex-Enron Chairman Ken Lay and ex-CEO Jeff Skilling." Marroso Ex. 20 (*Houston Chronicle*).

[253] Multimedia DVD Presentation, Armstrong Ex. 27. While the DVD focuses primarily on the *Chronicle*'s website, Mr. Armstrong's report (and the large number of exhibits submitted with this motion) clearly shows that his point is equally applicable to print and television media in Houston.

frequency for local television coverage.[254]   Based on abstracts of local news segments aired in

the last year in Houston, Denver, Phoenix, and Atlanta, prospective jurors in Houston have been

exposed to upwards of *6,000 more* Enron and Skilling television news stories than their peers in

these alternative venues.[255]



This level of magnitude and disparity in reporting dwarfs the differences found in other cases

where motions to transfer venue were granted or improperly denied.[256]

Indeed, the public focus on "all things Enron" has become such an obsession for

Houstonians, that commentators, including the *Chronicle*'s cartoonist, have expressed the worry

---

[254] Armstrong Decl. ¶¶ 41-44.

[255] *See id.*

[256] *Cf. Johnson*, 337 F. Supp. at 1375 ("Petitioner's name appeared either in one or the other of the two major Houston newspapers 44 times during an 18 month period prior to trial."); *Nevers*, 990 F. Supp. at 855 ("Petitioner includes with his brief over 162 articles" published in the seven month period between his indictment and trial.); *Abrahams*, 453 F. Supp. at 751, 753 ("Abrahams' new counsel have offered an affidavit and 78 photocopied pages of articles drawn primarily from the two daily metropolitan Boston newspapers."; "Defendant also introduced 38 pages of broadcast transcripts."); *Moody*, 762 F. Supp. at 1488 ("The court has read more than 458 representative news articles...as printed in twelve newspapers."); *Rossiter*, 25 F.R.D. 258, 259 ("In support of this allegation" of undue prejudice, the moving defendants "attach to their motion seventeen clippings from daily newspapers . . . in the Spanish language [and] English."); *Tokars*, 839 F. Supp. at 1581 ("During this time frame [nine months], the local newspaper articles and local television reports literally have numbered in the thousands."); *Williams*, 523 F.2d at 1205, 1206 ("Over one hundred articles on the kidnapping and the kidnapper appeared in the *Journal* and the *Constitution* before the hearing."; "[A]t least two specials featuring Murphy were televised prior to the filing of appellant's motion for transfer."); *Wansley*, 353 F. Supp. at 51 (defendant's "cases were indeed a *cause célèbre*" in Lynchburg); *Maad*, 2003 WL 22098002, at *1 ("[Th]e four Anchorage television stations broadcast 124 news accounts . . . [and] the only daily newspaper in Anchorage . . . ran regular front-page stories.").

that Houston's "Enron Fixation" was eclipsing the community's focus on other local concerns:[257]



After three years—and counting—of endless stories condemning Enron and its management, people in Houston cannot help but believe the company's collapse was the product of pervasive criminal conduct at the hands of its highest officials, particularly Skilling, Lay, and Causey. All that remains is to convict and punish them—men once lauded as brilliant visionaries who have now fallen to "crooked," "guilty," "dirty pigs," "evil," "devils," "murderers," and "terrorists," and told they should spend "as much time in the penitentiary as possible," and then be "hanged."[258]

2.   The Houston Media Has Reported False, Inadmissible, and Prejudicial Information That Will Jeopardize Skilling's Right to a Fair Trial.

The Houston community has been inundated with material highly prejudicial to defendants. For example, in referring to the "Raptors," which are a central part of the government's indictment in this case, the *Chronicle* has written that they "were created solely to hide losses," that mark-to-market accounting "was designed to pump up the quarterly reports,"

---

[257] *Houston Chronicle*, Feb. 12, 2002.
[258] Anthony Ex. 3 at Houston Response Nos. 2, 35, 124, 129, 156, 195, 225, 232, 245.

and that "too much of [Enron's] business plan relied on phantom profits."[259] Just two days ago, the *Chronicle* reported that Enron used a "financial smoke screen" to "concoct[] a fake sale" of the Nigerian Barges.[260] Such news stories portray as fact matters that will be hotly disputed at Skilling's trial.

Just in the past six months, the *Chronicle* has run *six* stories (five on the front page, and one on the first page of the Business section) on a single document the *Chronicle* says it obtained from an *unidentified* source. In one front-page story headlined "Enron memo could be big problem for Causey," the *Chronicle* describes the so-called "global galactic" document—which has never been authenticated—as so "damning," according to *unnamed* sources, "that Causey could be pressured to cooperate with the government."[261] It even contains commentary critical of defenses Causey may assert. A full transcription of the document appears on the *Chronicle*'s website.[262] In contrast, the document has *never once* been mentioned in the major Phoenix, Denver, or Atlanta newspapers.[263]

Numerous articles on the guilty pleas of Enron defendants are rife with prejudicial speculation about prosecution "evidence" that will be introduced at Skilling's trial. When former Enron executive Paula Ricker pled guilty, the *Chronicle* speculated that "Skilling seems a particularly likely target of Rieker's testimony."[264] When EBS defendant Ken Rice later pled, the *Chronicle* further speculated his testimony "could be used by prosecutors to corroborate the charges against Skilling."[265] As another court observed in similar circumstances:

---

[259] Marroso Exs. 40, 84 (*Houston Chronicle*).
[260] Marroso Ex. 290 (*Houston Chronicle*).
[261] Marroso Ex. 225 (*Houston Chronicle*).
[262] Marroso Ex. 226 (*Houston Chronicle* website).
[263] Armstrong Decl. ¶¶ 82-84, Ex. 14.
[264] Marroso Ex. 212 (*Houston Chronicle*).
[265] Marroso Ex. 211 (*Houston Chronicle*); *see also* Marroso Ex. 210 (*Houston Chronicle*).

Publicized facts may be untrue, confessions obtained may be inadmissible into evidence, and witnesses may substantially modify their stories under oath or after confrontation and cross examination. Thus, the right to a fair trial may be substantially endangered by reporting prior to trial. The danger is especially acute when reporting extends to such matters as confessions or admissions, interviews of prospective witnesses, and speculation as to testimony or other matters to be introduced at trial.[266]

This danger is best exemplified by an article on the guilty plea of former Enron executive Mark Koenig. The front-page *Chronicle* article claimed that Koenig's plea papers said he was "prodded to answer questions falsely by . . . Skilling."[267] An examination of his plea papers reveals he said *nothing* of the sort. When Skilling's counsel demanded a retraction, the *Chronicle* was forced to print a correction (in small print, out of context, incomplete, and after the harm had been done).[268]

In just the past several months, in stories, chronologies and biographies on its website, the "Enron Quiz," and its "Ultimate Houston" edition, the *Chronicle* has continued to publicize false information about an incident in New York involving Skilling earlier this year. One piece claimed that Skilling was "arrested" in New York. Skilling was *not* arrested. Again, the *Chronicle* was forced to print a correction in response to Skilling's demand.[269] Moreover, the *Chronicle*'s online "Prosecution Scorecard" contains a profile on Skilling that has only *one link* in its text: to a story on what it calls Skilling's "'irrational' drunken scuffle."[270] In asking about

---

[266] *Engleman*, 489 F. Supp. at 50-51; *see also Sheppard*, 384 U.S. at 360 ("The prosecution repeatedly made evidence available to the news media which was never offered in the trial. Much of the 'evidence' disseminated in this fashion was clearly inadmissible.") *Irvin*, 366 U.S. at 725-26; *Coleman*, 778 F.2d at 1540 ("In some respects, the instant conviction is even more vulnerable than *Rideau*. Many of the widely publicized facts were not admissible at Coleman's trial . . . .").

[267] Marroso Ex. 227 (*Houston Chronicle*).

[268] *See id.*; *cf. Wansley*, 353 F. Supp. at 47 (defendant prejudiced by publicity where, *inter alia*, newspapers published false reports that he had been convicted of two prior crimes).

[269] Marroso Ex. 28 (*Houston Chronicle*). Even then, the correction only stated that "no one was arrested," not "Skilling was not arrested," so it was essentially meaningless unless read side-by-side with the original article.

[270] Marroso Ex. 228 (*Houston Chronicle* website); *cf. Williams*, 523 F.2d at 1208 & n.8 (media's attempts to analyze defendant's behavior and comments on his character cited as evidence of prejudice); *see also* Multimedia DVD Presentation, Armstrong Ex. 27.

allegations against Skilling, the *Chronicle*'s "Enron Quiz" goes so far as to report that the "correct" answer to one of its questions is that Skilling "pull[ed] up a woman's shirt to search for a wiretap," when no such thing ever occurred.[271]  No legitimate purpose exists for disseminating such prejudicial accusations as Skilling awaits his trial.[272]  It only serves to poison the Houston jury pool.  As one Houston respondent recently surveyed said about Skilling: "The words are corruption and a little off the center mentally [that come to mind].  He would do anything to line his own pockets.  I just heard that he has some mental problems."[273]

The extensive coverage of the recent Nigerian Barges trial has added greatly to the prejudice.  On the eve of jury selection, the *Chronicle* ran a story titled "Enron trial gives a nod to the absurd," which all but argued the Task Force's case.  It called the Barges transaction a "sham," "one more cooking of the books in a very busy corporate kitchen," and made jokes (alluding to Monty Python) about the Barges defendants' claim that no accounting rules were violated because no explicit guarantees were made with respect to the repurchase of the barges— "Nudge, nudge, wink, wink, say no more."[274]  In the *Chronicle*'s report on the testimony of Michael Kopper, a convicted government cooperator who stole millions from Enron and is a witness in this case, Kopper was described as "unflappably enduring the efforts of a line of defense attorneys to make him out to be a liar . . . ."[275]  In contrast, the defense's cross-examination of a prosecution witness was described as so poor, it put the reporter "and at least

---

[271] Marroso Ex. 229 (*Houston Chronicle* website).  While the Task Force alleged this was true, it refused to disclose its evidence in response to Skilling's demands.  *See also* Marroso Exs. 280-281 (*Houston Chronicle*).

[272] *See, e.g., Saya*, 980 F. Supp. at 1158 ("damaging publicity" on collateral matters—violence background and the filing of altered—cited as grounds for venue transfer; "this publicity is highly damaging").

[273] Anthony Ex. 3 at Houston Response No. 33.  By way of contrast, while the *Chronicle* has published six separate articles concerning the New York incident, the *Atlanta Journal-Constitution* published only two, and the primary papers in Denver and Phoenix did not cover the story at all.  *See* Armstrong Decl. ¶ 56. Unsurprisingly, none of the people we polled in Denver and Phoenix mentioned the New York incident.  *See* Anthony Ex. 3 Denver and Phoenix Responses.

[274] Marroso Ex. 230 (*Houston Chronicle*).

[275] Marroso Ex. 15 (*Houston Chronicle*).

one juror to sleep."[276]

The local television coverage mirrored these one-sided reports. For example, after the testimony of Ben Glisan, another convicted government cooperator who stole money from Enron and others and is a witness in this case, one local news station ran a three-minute segment reporting on the event. Not only is this amount of time unusual by nightly news standards, so, too, was the commentary. The reporter gushed about the former Enron treasurer being "so smart, he sounded like an accounting professor," concluding that "when Glisan spoke, the jury was definitely listening."[277]

When the Barges verdict was reached just last week, the *Chronicle* gave it front page headline coverage, sharing space only with the announcement of President Bush's re-election, undoubtedly the only paper in the country to have done so.[278] Although the Barges trial involved four Merrill Lynch employees and two lower-level Enron employees, in the fourth paragraph of its front page article, the *Chronicle*, as it consistently reported throughout the trial,[279] directly linked the case to Skilling and Lay:

> The case was a test of Enron Task Force prosecutors' accusations of earnings manipulation, alleged repeatedly in the bigger upcoming case against ex-Enron Chairman Ken Lay and ex-CEO Jeff Skilling.[280]

Another article stated that the Barges convictions were "bad news" for Skilling and Lay, and claimed they were "left with the defense that, although they were lavishly paid corporate chieftains, they didn't know what was going on at work and take no responsibility for it."[281]

---

[276] *See id.; cf. Coleman*, 778 F.2d at 1512, 1532 (prejudice found where, *inter alia*, the local media described in flattering terms and, in blow-by-blow detail, describes the testimony of defendant's alleged co-conspirators in other trials).

[277] Marroso Ex. 16 (KPRC-TV newscast); *see also* Multimedia DVD Presentation, Armstrong Ex. 26.

[278] Marroso Ex. 20 (*Houston Chronicle*).

[279] *See, e.g.*, Marroso Ex. 252 (*Houston Chronicle*).

[280] Marroso Ex. 20 (*Houston Chronicle*).

[281] Marroso Ex. 255 (*Houston Chronicle*). There are other examples of prejudicial reporting of the Barges trial. At the close of the Task Force's case-in-chief, the *Chronicle* ran the headline "Criminal *intent* likely in barge

Other papers around the country ran stories on the verdict in their business sections, with at most a "teaser" appearing in small type on the front page.[282] This comes as no surprise. Phoenix, Denver, and Atlanta barely reported on any of this. As the charts below indicate, while extensive in Houston, press coverage of the Barges trial has been virtually non-existent elsewhere:




As to the "showdown" in this case, the "meatier courtroom battle," the *Chronicle* has confessed "We can't wait for the trial."[283] To prepare, the paper has dedicated resources to covering every single event in this case, no matter how routine, including scheduling conferences, discovery motions, forfeiture proceedings, a motion for access to grand jury records, defendants' legal budgets, a court order banning Skilling from drinking alcohol, and a story on the Court's recent severance rulings carrying the sensational front-page headline "For

---

trial, judge rules," mischaracterizing a ruling as if the most contested issue in the case had been decided by the judge. The paper soon changed the title of this story on its website—substituting the word "conspiracy" for "intent"—but, again, the damage already was done. On the day closing arguments were scheduled to begin, the *Chronicle* published evidence about the defendants' finances that the Court was still deciding whether to admit. The *Chronicle* detailed the disputed evidence in its article. Later that day, the Court found much of the evidence to be *inadmissible*—yet any juror who happened upon the paper would already have been exposed. Marroso Exs. 234-237 (*Houston Chronicle*).

[282] The verdicts were not covered at all in Phoenix or Denver, received only one paragraph in Atlanta, and were covered with only short stories in the business or finance sections of the *New York Times* and *Washington Post*.

[283] Marroso Exs. 28, 230 (*Houston Chronicle*). Just two weeks ago, the *Chronicle* reported that the smaller Enron trials, such as the Barges trial, have "drawn little of the media attention that's enveloped the cases of top Enron executives such as Ken Lay and Jeff Skilling." Marroso Ex. 237 (*Houston Chronicle*).

Ken Lay, His 'Worst Nightmare.'"[284]

Given the unprecedented attention devoted to the Enron story and the particular focus on Skilling and his co-defendants, it is understandable that Houston's leading sociologist, who has studied this community for 20 years, believes Skilling cannot receive a fair trial here.[285]

## III. VOIR DIRE WILL NEITHER BE AN EFFECTIVE NOR EFFICIENT MEANS OF IDENTIFYING AND EXCLUDING JUROR PREJUDICE.

The need for a venue transfer in this case cannot be obviated through the voir dire process. *First*, voir dire procedures are not effective where, as here, a substantial number of jurors harbor a conscious or subconscious bias.[286]  Given the impact of Enron and its collapse on Houstonians, latent biases pervade the jury pool in Houston that do not exist anywhere else.  For example, Dr. Anthony found that potential Houston jurors are *nine times* more likely than potential Phoenix jurors, and *four times* more likely than potential Denver and Atlanta jurors, to have prejudged Skilling as guilty.[287]  Moreover, in contrast with their peers in Phoenix, Denver, and Atlanta, Houstonians are *three times* more likely to articulate a decidedly negative view of Skilling, and *four times* more likely to express their views of him using "words of anger."[288]  Where such conditions exist, latent biases are undeniably present and voir dire cannot be

---

[284] Marroso Exs. 207, 238-248 (*Houston Chronicle*).  Even before defendants filed this motion, the *Chronicle* already was speculating about (and soliciting "expert" opinions on) whether the acquittal of Barges defendant Sheila Kahanek would undermine Skilling and his co-defendants' venue arguments.  Marroso Exs. 20, 290 (*Houston Chronicle*) (the "acquittal will make it difficult for other defendants, former Chairman Ken Lay and former chief executive Jeff Skilling among them, to argue an impartial jury can't be found here.").  *Cf. Williams*, 523 F.2d at 1205-06 (prejudice where, *inter alia*, "close attention" has been paid to "procedural moves" in defendant's case and "every aspect of [defendant's] life [has] become[] grist for the reporter's mill"); *Tokars*, 839 F. Supp. at 1581-83 (same).

[285] *See* Klineberg Decl. ¶¶ 16-20.  An online *Houston Chronicle* poll recently asked: "Can defendants in an Enron trial get a fair hearing in Houston?"  As of June 28, 2004, roughly 350 votes had been cast, and as much as 46% of those responding said "no."  *See* Marroso Ex. 253 (*Houston Chronicle* website).  Cases have cited such measures of community sentiment in holding that a venue was biased.  *See, e.g., Wansley*, 353 F. Supp. at 46 (citing, as evidence of bias, an open letter to the community critical of prejudicial pre-trial publicity); *Coleman*, 778 F. 2d at 1533-34 (considering testimony from locals regarding public sentiment); *Johnson*, 337 F. Supp. at 1374, 1377-78 (same).

[286] Anthony Decl. ¶ 20; Bronson Decl. ¶¶ 84-100.

[287] Anthony Decl. ¶ 19.

[288] *Id.* at ¶¶ 16-18.

expected to root them out.[289]   Some biased jurors may be motivated even to lie to get on the jury for publicity purposes, financial motivations, or to exact retribution from the defendants.[290] Other well-meaning and honest jurors may *believe* themselves impartial, but in reality harbor subconscious prejudices that will govern their views and votes rather than the judge's instructions, evidence, and law.[291]   As importantly, even those potential jurors who are honest and aware of their biases will feel pressure not to disclose those biases in group or individual voir dire settings because they do not want to give a "socially unacceptable" response in front of others or "displease" the judge.[292]   These problems are a major impediment to selecting a fair jury in Houston, but are far less present in any other venue.

   *Second*, in light of the deep, widespread feelings of betrayal, anger, and victimization throughout Houston, Dr. Klineberg opines that jurors—even if they have not formed a preconceived opinion of guilt—will be under intense pressure from their peers and their

---

[289] Anthony Decl. ¶ 20; Bronson Decl. ¶¶ 86-94.

[290] Anthony Decl. ¶¶ 24-28 (discussing "stealth jurors").  According to one reporter, Enron's executives "have left the fourth-largest city in the United States bitter, broken and eager for revenge." Marroso Ex. 83 (*Globe and Mail (Toronto)*); *see also* Marroso Ex. 78 (www.nrunwrekords.com) (website of former Enron worker: "So, to all you SOBs involved in the Enron collapse that took advantage of our belief, our work ethic, and our loyalty – Beware!  We have not forgotten.  We're just waiting for the right Time, the right Opportunity, the right Method for payback.").

[291] Anthony Decl. ¶¶ 26-28; Bronson Decl. ¶¶ 97-100; *see, e.g., Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it").

[292] Bronson Decl. ¶¶ 86-94; *see United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977) ("[F]requently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence").  Perhaps the best example of a voir dire technique that encourages otherwise honest jurors to conceal their biases is the often used "Can you put aside whatever you have read or heard about this case before you came to court, and render an impartial verdict based solely on the evidence you hear in court?" When posed by the judge (the most powerful person in the courtroom), and after being repeatedly told that to be a good citizen and a good juror they must try to be fair and impartial, virtually every person asked such a question feels great compulsion to answer it "yes" even if the answer should be "no."  Bronson Decl. ¶ 95. Moreover, social scientists recognize that even jurors who do not feel that compulsion may answer "yes" anyway simply because they cannot recognize latent biases that would be apparent to any observer in full possession of all of the facts. *Id.* ¶¶ 97-100.

community to convict:[293]

> Extensive publicity before trial does not, in itself, preclude fairness. . . . Properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness. *Trust in their ability to do so diminishes when the prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome.* That is also true when there is such identification with a community point of view that jurors *feel a sense of obligation to reach a result which will find general acceptance in the relevant audience.*[294]

In other words, although the jury pool may start with four million people, all eyes in Houston will be focused on just the 12 people serving on Skilling's jury. This creates intense pressure on these jurors, knowing they will have to live with the verdict they bring back to their homes, jobs, friends, and communities. Each such juror is far more likely than a juror in Phoenix, Denver or Atlanta to hesitate to acquit out of fear of being stigmatized as someone who "let Skilling and Lay get away."[295] No amount of voir dire can cure this problem:

> The subject of potential pressure upon jurors would be particularly difficult to deal with in voir dire. This is not a simple matter of asking the jurors if they could put aside any opinions they may have formed. Instead, *it would also be necessary to ascertain whether they could resist a public cry for conviction, and, specifically, whether they could face their friends and neighbors in the event of an acquittal. The very asking of such questions* carries the danger of implanting or reinforcing in the jurors' minds the fear of the consequences of reaching an unpopular verdict.[296]

A transfer of venue completely eliminates this risk; the community pressures at work in Houston are absent in other venues.

*Third*, while there may be some jurors in the Houston jury pool who do not harbor latent biases against Skilling and his co-defendants, it will be exceedingly difficult to identify those who *do*.[297] Courts rightly recognize the psychological fact—accepted in the social sciences and

---

[293] Klineberg Decl. ¶¶ 16-20; *see also* Anthony Decl. ¶ 21; Bronson Decl. ¶¶ 40-42, 75.

[294] *McVeigh*, 918 F. Supp. at 1473 (emphasis added).

[295] Klineberg Decl. ¶¶ 18-20; *see also* Anthony Decl. ¶ 21; Bronson Decl. ¶¶ 40-42, 75.

[296] *People v. Boss*, 261 A.D.2d 1, 6 (N.Y. App. Div. 1999) (emphasis added).

[297] *See, e.g., Tokars*, 839 F. Supp. at 1584 (transferring venue; emphasis added):

recognized by the U.S. Supreme Court—that bias and prejudice also operate at unconscious levels and are all but impossible to identify and weed out.[298] Put another way, the risk is not that the Court will fail to screen out scores of people with obvious predispositions. Rather, the real danger is that two, three, or four biased jurors get through. Given the nature and magnitude of Houston's stake in this case, such a result is demonstrably more likely to occur here than anywhere else. Nor does Houston's large size does not make the process of elimination any easier. Regardless of whether the Houston jury pool includes 4,000,000, 400,000, or 40,000 persons, the venire itself will always be but a few hundred (or, at most, a few thousand) at a time. The efforts to identify and exclude Houston jurors with latent biases would be inefficient, time-consuming, and inadequate to guarantee accurate results: in the end, they may even create additional prejudice in the venire.[299]

*Fourth*, implementing intermediate safeguards against prejudice—such as orders sequestering the jury or trying to preserve its members' anonymity—are often unsuccessful,

---

The strongest argument against a finding of presumed prejudice sufficient to warrant transfer of this case to another venue is the fact that the Northern District of Georgia contains Atlanta, Georgia—a very large metropolitan, populous city. Even the Defendants' own poll reveals that at least 30% of the citizenry have no opinion whatsoever about this case. Therefore, it does not take a sophisticated mathematician to figure out that sufficient unbiased jurors exist in the Northern District of Georgia from which to select a jury panel. *Of course, the difficult task would be ascertaining which prospective jurors in fact are unbiased. Where the negative publicity has been so intense, the court's task would be made more difficult by prospective jurors' subconscious recollection of news coverage.*

[298] *See, e.g., Irvin,* 366 U.S. at 727 ("The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental process of the average man."); *Nevers,* 990 F. Supp. at 864 ("[A]dverse pretrial publicity can create such a presumption of prejudice that the jurors' claims that they can be impartial should not be believed. . . . The torrent of prejudicial pretrial publicity surrounding [this case] commands such a holding."); *McVeigh,* 918 F. Supp. at 1473 (same); *Florio,* 13 F.R.D. at 298 (same); Marcello, 280 F. Supp. at 514 (citing studies); Robert L. Kerr et al., *On the Effectiveness of Voir Dire in Criminal Cases with Pretrial Publicity: An Empirical Study,* 40 AM. U. L. REV. 665, 695-97 (1991); *see generally* Anthony Decl. ¶¶ 18-20, 22; Bronson Decl. ¶¶ 84-100.

[299] *See, e.g., Ebens,* 654 F. Supp. at 144 ("Effective and economic judicial administration is not well served by calling an inordinate and unwieldy number of veniremen to see if an unbiased jury might be obtained, especially when it is already apparent that a substantial chance of intolerable prejudice exists. . . . It would be extremely unfortunate to make the attempt and after calling such a large number of citizens, to be forced to change venue"); *McVeigh,* 918 F. Supp. at 1470 (a "failed attempt to select a jury would, itself, cause widespread public comment creating additional difficulty in beginning again at another place for trial").

create a greater aura of intrigue and interest, and do nothing to protect jurors when they render a "not guilty" verdict and have to return home.[300] No court order can undo the inescapable fact that Houston is deeply infected with bias and animus against Skilling and his co-defendants.

*Fifth*, the Court cannot reasonably expect more of its jurors than of court professionals. Houston's federal prosecutors recognized years ago that the connections between Enron and the local community run so deep that the specter of latent or perceived prejudice cannot be avoided by lesser remedies. Indeed, the rare blanket self-recusal of the *entire* U.S. Attorney's Office from this case is similar to what occurred in *Moody* and *McVeigh*.[301] In *Moody*, the court granted a change of venue from Atlanta to Minneapolis, noting that all of the judges in the Eleventh Circuit and the Northern District of Georgia had recused themselves from a case involving the murder of a judge.[302] In *McVeigh*, the federal courthouse in Oklahoma City was damaged by the bombing, and the judges in the Western District of Oklahoma recused themselves.[303] Here, an entire office of federal prosecutors—many with no direct connection to Enron and all of whom are sworn to uphold the law—believed it would be inappropriate to continue in this case. To expect lay jurors to be more impartial and impervious to external pressures than officers of the court is not plausible.[304]

Houston jurors may *say* and *believe* they can set aside their opinions and ignore

---

[300] *See, e.g., Ebens*, 654 F. Supp. at 145; *Saya*, 980 F. Supp. at 1158-59; *Boss*, 261 A.D.2d at 6.

[301] Marroso Exs. 26-27 (press release; *Houston Chronicle*).

[302] *See* 762 F. Supp. at 1486-1488.

[303] *See* 918 F. Supp. at 1470; *but see Harrelson*, 754 F.2d at 1158, 1164-65, 1159-61 (federal judge murdered; judges in district did not recuse themselves; prejudicial publicity argument rejected on appeal).

[304] *Cf. Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1051 (4th Cir. 1984) ("[A] judge who is a stockholder in a party to a case [is required] to disqualify himself from participation in the case even when he is not the fact-finder. *We would find it difficult to say . . . that a less rigorous rule should apply to laymen who are chosen as jurors when they lack a lifetime of training in objectivity in the disposition of lawsuits.*") (emphasis added).

community pressures. But they are simply too close to the Enron tragedy.[305] A refusal to transfer this case will tarnish the legitimacy of the trial—something the law must seek to avoid.[306]

## IV. PHOENIX, DENVER, AND ATLANTA ARE VIABLE ALTERNATIVE VENUES.

Phoenix, Denver, and Atlanta meet all of the criteria for a venue transfer. We do not argue for one venue or another, given the Court's discretion to choose an alternative venue; but based on the polling and media analyses we have submitted, each of these venues promises "a substantially better panel" than the Houston venire. As set forth in paragraphs 37-42 of Dr. Anthony's declaration, Phoenix is the least exposed to prejudicial publicity and the least affected in terms of community beliefs, among the three alternative venues studied.[307]

Moreover, as detailed in Appendix B, each city also qualifies as a permissible alternative venue, based on comparability and convenience measures. Each is a major "metropolitan, cosmopolitan" area, with jury demographics not unlike Houston's.[308] Each venue has an abundance of hotel accommodations; myriad legal support services; modern, secure court facilities; and has been the site for complex, high-profile trials.[309] (Indeed, Phoenix and Denver were the chosen new locales in *Abrahams* and *McVeigh*.[310]) There are several "daily non-stop flights" from Houston, Washington D.C., New York, and Los Angeles to each of these venues.[311]

---

[305] *Cf. Irvin*, 366 U.S. at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father.").

[306] *See Exxon Corp. v. Heinze*, 32 F.3d 1399, 1403 (9th Cir. 1994) ("the Constitution is concerned not only with actual bias but also with the 'appearance of justice'"); *United States v. McDaniels*, 379 F. Supp. 1243, 1249 (E.D. La. 1974) ("Justice must not only be done; it must be seen to be done.").

[307] WRIGHT, *supra*, § 342, at 382; Anthony Decl. ¶¶ 37-42; *see generally* Bronson Decl.

[308] *Tokars*, 839 F. Supp. at 1584; Marroso Ex. 254 (census data).

[309] *Moody*, 762 F. Supp. at 1491; *see* Appendix B.

[310] *Abrahams*, 466 F. Supp. at ; *McVeigh*, 918 F. Supp. at 1474.

[311] *Moody*, 762 F. Supp. at 1491; *see* Appendix B.

## **Conclusion**

Defendant Jeffrey Skilling respectfully submits that a change of venue is essential to a fair trial in this case. As other jurists have said, "[i]t is doubtful that any literate venireman [in Houston] is not aware of this case."[312] "With his life at stake, it is not requiring too much that [Skilling] be tried in an atmosphere undisturbed by so huge a wave of public passion."[313] Indeed, "[i]f there were no constitutional right to a change of venue in the instant case, then one can conceive of virtually no case in which a change of venue would be a constitutional necessity."[314] Absent a change of venue, this case will "begin with built-in grounds for reversal."[315] Neither Jeffrey Skilling, nor Houston, can afford that.

Dated: November 8, 2004

Respectfully submitted,

By: _____

Of Counsel:

Ronald G. Woods
Texas State Bar No. 21964000
Federal Bar No. 657
5300 Memorial, Suite 1000
Houston, TX 77007
Office: 713-862-9600
Facsimile: 713-864-8738

Daniel M. Petrocelli
M. Randall Oppenheimer
Mark Holscher
Carla J. Christofferson
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys in Charge for Jeffrey K. Skilling*

---

[312] *Engleman*, 489 F. Supp. at 49.
[313] *Irvin*, 366 U.S. at 728.
[314] *Coleman*, 778 F.2d at 1538.
[315] *United States v. Marcello*, 423 F.2d 993, 1004 (5th Cir. 1970).



# APPENDIX A

## Summary Application of Case Law Factors

| Case Law Factors | Facts of This Case |
|---|---|
| Recent, Widespread, and Vilifying Media Coverage | ▪ From 2001-2004, the *Houston Chronicle* published on average between 2 and 7.3 Enron stories/day, while papers in other cities (such as Denver, Phoenix, and Atlanta) published far less. *See* Memorandum ("Memo") at § II.E.1; Charts at pp. 5, 44, 51.<br>▪ *Chronicle* maintains a unique website devoted to the "Fall of Enron" that is updated daily with information about these defendants, other trials, and related information. *See* Memo at § II.E.1.<br>▪ Press coverage in recent months continues to brand Skilling and his co-defendants with inflammatory titles such as "Best Local Boy Gone Bad" and the "Ultimate Enron Defendant." *See* Memo at Preliminary Statement, §§ II.A.1-.2.<br>▪ Recent media coverage in Houston continues to deride Skilling's and his co-defendants' defenses and explanations for events. *See* Memo at § II.A.1.<br>▪ Press coverage continues to reprint vituperative letters, stories, and opinion pieces vilifying and demonizing Skilling and his co-defendants. *See* Memo at § II.A.1.<br>▪ *Chronicle* and *Houston Press* articles demonstrate prejudgment of Skilling's and his co-defendants' guilt not only in news stories, but also in other contexts such as sports stories. *See* Memo at § II.A.2.<br>▪ *Chronicle* maintains a "Prosecution Scorecard" tallying Enron-related convictions like box scores on its website. *See* Memo at § II.E.2. |
| Close Attention Paid by the Media to the Case | ▪ Enron-related articles continue to dominate the front page of the *Chronicle*, a situation not present in other cities. *See* Memo at § II.E.1; Charts at pp. 5, 57.<br>▪ *Chronicle* receives and publishes a multitude of hostile letters, stories, and columns. *See* Memo at §§ II.A.1, II.A.3.<br>▪ Local media in Houston reports on Enron-related prosecutions and this case in minute detail – scheduling conferences, discovery motions, defendants' legal budgets, and the potential impact of events on the procedural posture of this case and the defendants' chances for acquittal. *See* Memo at §§ II.A.1, II.E.1-.2.<br>▪ Unlike the media outlets in other venues, the *Chronicle* |

| Case Law Factors | Facts of This Case |
|---|---|
| | maintains a website dedicated to Enron that contains inadmissible and prejudicial documents and other information that jeopardize the defendants' fair trial rights. *See* Memo at § II.E.2. |
| Alleged Crimes Have a Serious Effect on the Local Venue | ▪ Enron was the most important company Houston had seen since the oil-bust. Enron's fall devastated Houston's economy, resulting in thousands of lost jobs and a downturn in almost every significant economic area. *See* Memo at §§ II.B.1, II.C. <br> ▪ Houstonians' attitudes and perceptions reflect the severe economic impact felt by the city. Nearly 70% of Houston area residents think their local economy was affected more by the collapse of Enron than economies in other U.S. cities. *See* Memo at § II.C. <br> ▪ More so than in any other venue, Houston area residents were harmed and believe that they know people who were harmed by Enron's collapse. *See* Memo at § II.C. <br> ▪ Before Enron's collapse, Houston residents and the local media showered Lay and Skilling with praise; afterwards, a keen sense of betrayal caused both residents and media to heap scorn and condemnation upon Lay and Skilling. *See* Memo at § II.B.1. |
| Defendant Is Viewed as Linchpin of the Alleged Crime | ▪ Government's indictment pins blame for Enron's collapse directly on Lay, Skilling, and Causey. ("Lay, Skilling, and Causey were among the principal operators of the scheme, which Skilling spearheaded until his sudden departure in August 2001, at which point Lay took over leadership of the conspiracy.") *See Superseding Indictment* ¶ 18. <br> ▪ Houstonians blame Skilling and his co-defendants for Enron's collapse and the damage to their city's economy. *See* Memo at § II.C. <br> ▪ Jurors in Houston are more hostile to Skilling than in any other venue. *See* Memo at § II.A.4. <br> ▪ Houston's animosity for Skilling has reached a dangerous and even life-threatening level. *See* Memo at § II.A.3. |
| Heavy Focus by Media on Alleged Victims of Crimes | ▪ Houston media produced scores of emotional, heart-wrenching victim impact stories after Enron's fall, including some recent ones focusing solely on children. *See* Memo at § II.D.2. <br> ▪ From 2001-2004, the *Houston Chronicle* ran as many as 15 times more "victims" stories than other comparable |

| Case Law Factors | Facts of This Case |
|---|---|
| | venues' press (such as the *Rocky Mountain News*, *Denver Post*, *Atlanta Journal-Constitution*, and the *Arizona Republic*). *See* Memo at § II.D.2; Chart at p. 44. |
| Defendant's Name or Alleged Crimes Evoke Strong Emotional Response | ▪ Houstonians have a decidedly negative view of Skilling and will articulate their view using "words of anger" four times more often than their peers in comparable venues. *See* Memo at § III.<br>▪ Houston's local community has demonized Skilling.  His name evokes the following, emotion-laden descriptions and/or comparisons:<br>➢ "child molester"<br>➢ "axe-murder"<br>➢ "pig"<br>➢ "snake"<br>➢ "evil"<br>➢ "crook, a**hole, no good thief"<br>➢ "criminal"<br>➢ "cheat"<br>➢ "liar"<br>➢ "bastard"<br>➢ "scoundrel"<br>➢ "greedy and greedy crook"<br>➢ "thief"<br>➢ "crooked"<br>➢ "guilty"<br>➢ "filthy pigs"<br>➢ "evil-doers"<br>➢ "devil"<br>➢ "economic terrorists"<br>➢ Satan<br>➢ Al Qaeda<br>➢ Hitler<br>➢ Darth Vader<br>➢ OJ Simpson<br>*See* Memo at Preliminary Statement, §§ II.A.4, II.C, II.E.1. |
| Other Venues Exist Where the Publicity Has Been Less Prominent | ▪ Comparable venues (such as Phoenix, Denver, Atlanta) have far less media coverage and more importantly, much less sensationalistic, inflammatory, and detailed case coverage than Houston.  *See* Memo at § II.E.1; Charts p. 51. |

| | |
|---|---|
| Jurors Feel a Personal Stake in the Outcome (Economic or Emotional) and That the Defendant Deserves a Certain Punishment | ▪ Unlike potential jurors in other venues, Houston residents perceive themselves to have suffered great and personal losses due to the rise and fall of Enron. *See* Memo at § II.C.<br>▪ Potential Houston jurors are two to three times more likely than jurors in comparable venues to personally know someone who was harmed. *See* Memo at § II.C.<br>▪ Repeated disclosures of potential payouts from an Enron Victims Fund, which will be fueled by assets forfeited as a result of convictions, has distorted Houston jurors' perceptions and affects their capacity to be impartial. *See* Memo at § II.D.3. |
| Jurors Feel an Obligation to Reach a Particular Result and Fear Being Harmed If They Acquit | ▪ Out of fear of being stigmatized by family, friends, colleagues, and neighbors, a Houston juror is more likely to convict than jurors in other comparable venues. *See* Memo at § III.<br>▪ The emotionally charged atmosphere in Houston creates an environment where jurors feel great pressure to convict. *See* Memo at § II.B.2.<br>▪ Beliefs about compensation from an Enron Victims Fund create strong pressures for jurors to convict. *See* Memo at § II.D.3. |
| Local Officials or Law Enforcement Officers Have Helped to Promote the Sense of Obligation Felt by the Jurors | ▪ Politicians and local officials—such as U.S. Rep. Sheila Jackson, Rep. Jackson Lee, U.S. Rep. Gene Green and Councilman Chris Bell—have made public declarations calling for "justice" and have cast blame on Enron executives. *See* Memo at § II.D.1.<br>▪ Enron Task Force's promotion of the Enron Victims Fund creates perceived reward for Houstonians in exchange for convictions. *See* Memo at § II.D.3. |
| Previous Trials or Highly Publicized Pleas Involving the Defendant or His Alleged Conspirators/Local Media Covered Those Events with Particular Intensity and Speculated How They Would Negatively Affect the Defendant's case | ▪ *Chronicle* maintains a "Prosecution Scorecard" tallying convictions on its website. *See* Memo at § II.E.2.<br>▪ In Houston, media coverage of the Nigerian Barges trial has been extensive, unlike any other venue. *See* Memo at §§ II.E.1.-.2; Charts at p. 57.<br>▪ Local media in Houston speculates on how key Enron defendants' pleas and acquittals could negatively effect Skilling's case. *See* Memo at § II.E.2.<br>▪ Houston media coverage has a prosecutorial bias (by, among other things, reporting facts from the Government's point of view and by praising the performance of cooperating prosecution witnesses who |

| | |
|---|---|
| | are confessed felons), while coverage in alternative venues is more neutral.  *See* Memo at § II.E.2. |
| Highly Publicized Parallel Legislative Investigations/Civil Actions | ▪ Parallel SEC investigation and enforcement actions are pending in Houston. (*SEC v. Skilling, et. al.*, S.D. Tex. Civil Action No. H-04-0284).<br>▪ Repeated Congressional investigations have taken place.<br>▪ The primary civil case against the defendants, *Newby vs. Enron Corp.* (S.D. Tex. Civil Action No. H-01-3624), is pending in Houston.<br>▪ Enron Task Force Director Andrew Weissmann publicly has linked the criminal cases to the civil cases, asserting that criminal convictions make the civil cases "a virtual slam dunk."  *See* Memo at § II.D.3. |
| Trial Requires a "Clearheaded Jury" to Understand the Case Complexities and Nuances | ▪ Complex nature of financial transactions, earnings management and disclosure allegations requires that a jury be untainted and unemotional.  *See Superseding Indictment* ¶¶ 19-85. |
| Sequestering the Jury or Ordering a Change in Venue After Voir Dire Would Be Fruitless and Costly | ▪ Houstonians are already significantly more likely to believe Skilling is guilty.  *See* Memo at § III.<br>▪ Voir dire or sequestering the jury will not be adequate to identify biased jurors and will not relieve intense pressures felt by jurors, even though honest and well-meaning, to return to homes and communities with convictions.  *See* Memo at § III.<br>▪ A transfer of venue before voir dire is the only 100% certain and efficient option to eliminate the risk of prejudice. *See* Memo at  § III. |

## APPENDIX B

## Comparison of Alternative Venue Characteristics

| Case Law Factors | Houston | Phoenix | Denver | Atlanta |
|---|---|---|---|---|
| **Major Metropolitan Area** | | | | |
| *Total population[1]* | 4,345,372 | 3,451,120 | 2,199,468 | 4,327,437 |
| *Demographics[2]* | White 62.6%<br>Black 16.9%<br>Asian 4.9%<br>Hispanic 28.9% | White 77.0%<br>Black 3.7%<br>Asian 2.1%<br>Hispanic 25.1% | White 79.4%<br>Black 5.5%<br>Asian 3.0%<br>Hispanic 18.8% | White 63.0%<br>Black 28.9%<br>Asian 3.3%<br>Hispanic 6.5% |
| *Counties included in demographic data* | Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, San Jacinto, Waller | Maricopa, Pinal | Adams, Arapahoe, Broomfield, Clear Creek, Denver, Douglas, Elbert, Gilpin, Jefferson, Park | Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, Walton |
| **Abundance of Hotel Accommodations** | | | | |
| *Places to stay[3]* | 175 | 215 | 119 | 278 |

[1] MSA Rezide, 2003
[2] U.S. Census Bureau website 2000
[3] Hotel data obtained from AAA's website (www.aaa.com)

1

| Case Law Factors | Houston | Phoenix | Denver | Atlanta |
|---|---|---|---|---|
| **Legal Support Services** | | | | |
| *Available litigation support vendors* | Bowne-Decision Quest, Dataflight, Merrill Corp., Lex Solutio, National Litigation Support | Bowne-Decision Quest, Dataflight, Lex Solutio (Corp. HQ) | Bowne-Decision Quest, Dataflight, Merrill Corp., TechLaw | Bowne-Decision Quest, Dataflight, Lex Solutio, TechLaw, Legal Eagle |
| **Modern & Secure Court Facilities** | | | | |
| *Year courthouse built* | 1961 | 2000 | 2002 | 1979 |
| **Site for Complex, High Profile Trials** | | | | |
| *Recent high-profile trial held in venue* | N/A | *U.S. v. Abrahams,* 466 F. Supp 552 (D. Mass. 1978) | *U.S. v. McVeigh,* 918 F. Supp 1467 (W.D. Okla. 1996) | *U.S. v. Kaplan* (N.D. Ga. 2000)* |
| **Daily Non-Stop Flights** | | | | |
| *Total daily non-stop flights from Houston*[4] | N/A | 9-11 (depending on day) | 16-19 (depending on day) | 9-12 (depending on day) |
| *Non-stop carriers*[5] | N/A | America West, Continental | Continental, Frontier, United | AirTran, Continental, Delta |

* No published decision is available for *U.S. v. Kaplan.*

[4] Flight data obtained from www.travelocity.com by searching for non-stop flights during a sample week (Dec. 6-10, 2004).
[5] *Id*

2