**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

SEP 0 1 2005

Michael N. Milby, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **TO BE FILED UNDER SEAL** |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Crim. No. H-04-25 (Lake, J.) |
| RICHARD A. CAUSEY, JEFFREY K. ) | |
| SKILLING, and KENNETH L. LAY, ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF MICHAEL E. TIGAR IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS, OR OTHER ALTERNATIVE RELIEF,
BASED ON PROSECUTORIAL MISCONDUCT**

444

## DECLARATION OF MICHAEL E. TIGAR

1.  I have been retained as an expert witness in this case by counsel for defendant Jeffrey Skilling.  My expert witness rate is $750 per hour.

2.  I submit this declaration in support of Defendants' Joint Motion to Dismiss, or Other Alternative Relief, Based on Prosecutorial Misconduct.

Summary of Opinion

3.  My ultimate opinion, which I will explain in more detail below and which I would be prepared to support if called as a witness at a hearing on this motion, is that based on nearly 40 years of experience practicing, teaching, and studying criminal law, I have never seen defendants in a major public trial, especially a white-collar trial, so completely ostracized by witnesses with pertinent information.

4.  To put it another way, and to answer a question this Court asked defense counsel at a May 18, 2005 hearing in this case, defendants' inability to interview witnesses or secure assurances that they will testify on their behalf at trial *is* "unusual." *Cf.* Transcript of May 18, 2005 Hearing at 20:17-21 (MR. PETROCELLI: . . . [We intend to file a motion] [d]ealing with the unavailability of witnesses, generally, and our inability to prepare this case for trial.  Nobody will talk to us.  THE COURT:  Well, is that unusual in this type of case?").

Bases for Opinions

5.  I base my conclusions on the facts presented to me by defendants' counsel, which they have set forth in the memorandum supporting their motion.  I understand the motion they have made will be filed under seal and certain of its contents are subject to a protective order.  I

have agreed to be bound by that order and not share with anyone the information I have been provided.

6.  Specifically, I base my conclusions on the following:

    a.  The fact, as reported to me by defense counsel, that defendants sent two rounds of letters to counsel for roughly 140 witnesses, but were but were able to secure only a few private interviews;

    b.  The fact, as reported to me by defense counsel, that defendants have made dozens of telephone calls seeking interviews with similarly unsuccessful results;

    c.  My review of the declarations submitted in support of defendants' joint motion to dismiss (with the names of attorneys and witnesses mentioned in those declarations redacted);

    d.  My review of the May 3, 2005 email from Andrew Weissmann to William Dolan and Dan Cogdell's response to this email;

    e.  My review of the typewritten notes of Rex Shelby, describing his interview with two FBI agents;

    f.  My review of excerpted portions of the testimony of Dr. Larry Ciscon and representations of his attorney, Charles Blau, made at the Enron Broadband Services ("EBS") trial;

    g.  My review of three court orders concerning witness access issues, one entered by the Judge Hoyt in the Andrew Fastow case, one by Judge Gilmore in the EBS case, and one by this Court in this case;

    h.  My review of the transcript of the June 30, 2005 scheduling conference in this case;

i.  My review of correspondence between defense counsel and the Enron Task Force;

j.  My review of the briefing in the EBS and Nigerian Barges cases related to witness access issues;

k.  My review of the plea and cooperation agreements between the Enron Task Force and/or the SEC, and Enron-related defendants David Duncan, Michael Kopper, Timothy Belden, Larry Lawyer, Jeffrey Richter, Ben Glisan, David Delainey, Andy Fastow, Lea Fastow, Paula Rieker, Ken Rice, John Forney, Mark Koenig, Kevin Hannon, Timothy Despain, and Ray Bowen;

l.  My review of the letter agreements between the Enron Task Force and Merrill Lynch, and the Enron Task Force and the Canadian Imperial Bank of Commerce, which contain similar conditions of cooperation;

m.  My review of correspondence between Rusty Hardin and Michael Chertoff regarding allegations of witness interference by the Enron Task Force during the Arthur Andersen trial;

n.  My review of public reports concerning witness access issues in Enron-related cases, including an article by Mary Ashby Morrison entitled "Rush to judgment: the lynching of Arthur Andersen & Co.";

o.  My review of defendants' discovery motions, bail modification motions, and other public filings made by the defendants and the Enron Task Force in this and other related cases; and

p.  My conversations and meetings with defense counsel.

Qualifications

7.  In addition to having my own law practice, I am currently a Research Professor of Law at
    Washington College of Law, American University, Washington, D.C.

8.  I have practiced criminal law for close to 40 years, tried cases in state and federal courts
    across the country, and argued seven cases in front of the United States Supreme Court and
    about one hundred federal appeals.  I have appeared in this court many times, and have tried
    at least three major criminal cases to verdict in this court.

9.  My clients have included notorious defendants, including Angela Davis and H. Rap Brown,
    Terry Nichols, and Lynne Stewart.

10. In addition to being a practicing lawyer, I have been Chair of the 60,000 member Section of
    Litigation of the American Bar Association, held full-time academic positions at UCLA and
    the University of Texas, where I taught criminal law subjects, and authored numerous articles
    and books on a wide range of topics.  I have often been invited to speak to judicial
    conferences and bar groups about topics related to law and justice in the United States and
    several foreign countries.

11. In 1999, I was given a Lifetime Achievement Award by the National Association of Criminal
    Defense Lawyers.  That same year, the California Attorneys for Criminal Justice held a ballot
    for the "Lawyer of the Century."  I was third in the balloting behind Clarence Darrow and
    Thurgood Marshall.

12. My education, employment history, professional activities, honors and awards, and
    publications are listed in my vitae, which I attach hereto as Exhibit 1.

Opinion

13. I have been defense counsel in many criminal cases that, like this case, dominated the headlines, involved important issues of federal or state policy, and were prosecuted by a special task force or team of government lawyers and agents.

14. In each case I try or any criminal lawyer tries, access to witnesses is crucial for at least three reasons.  First, to understand the facts of a case, the meaning of documents, how and when events transpired, whether certain witnesses are credible or not, and whether witnesses will say that your client committed misdeeds, one must interview witnesses.  Documents themselves do not tell the whole story, nor in most cases can one's client.  Second, once you have learned the facts of the case and settled on your defense themes, you need witnesses to testify to the facts that you believe support your arguments.  Unless the witness consents to a pre-trial interview, a lawyer is deprived of the ability to make tactical judgments whether the witness will be effective.  Third, unable to interview witnesses before trial, a lawyer is greatly hampered in his or her ability to cross-examine that witness.

15. As I understand the facts, defendants face all three predicaments.  They are charged under a conspiracy theory of liability for numerous transactions they sometimes knew little or nothing about, not to mention the bedrock principle that they are presumed innocent and must be regarded as ignorant of the facts on which the pleader relies.  Defendants' counsel want and need to interview witnesses so they can better understand the charges being asserted against their clients and how best to defend them.  Defendants need witnesses, many of whom they know possess exculpatory information (based on prior testimony, documents, and government disclosures), to testify on their behalf.  And defendants' counsel need to prepare to cross examine numerous witnesses who will testify against them.

16. It is my understanding that defendants have been able to interview virtually no witnesses in this case, despite the existence of hundreds of witnesses to the alleged events, despite professional relationships and personal friendships with scores of potential witnesses in this case, and despite sending hundreds of letters to witnesses and making dozens and dozens of calls.  It is also my understanding that many attorneys representing these witnesses expressed concern about government reprisal just for being interviewed.

17. In my experience, this level of silence is not normal, particularly in a case of this kind. While witnesses have the right not to consent to an interview, and some do not consent, in my experience, many witnesses are willing to meet with the defense because they are friends, have personal relationships, used to be co-workers with defendants, have respect or admiration for defendants, believe the defendants have been wrongfully charged, feel that if they met with the government they should show the defense the same courtesy, or simply feel, in the criminal justice system, the most important thing is for the truth to be told.

18. Even in the domestic terrorism cases I have defended, where national security and American lives are at stake, I have not seen such a wholesale refusal to meet with the defense.

19. In this case, given the wholesale silence of witnesses, the scores of witnesses who would logically possess relevant percipient knowledge, and the examples of prosecutorial abuse reported in defendants' motion and in the press, I can only conclude that many witnesses who might otherwise have met with defendants are not doing so because they fear government reprisals.

20. Let me be clear about how and why I come to this conclusion, and in doing so use the following analogy:  I have been counsel in, for example, antitrust cases, in which economics experts have looked at market behavior and concluded that a given market has been rigged,

6

or else it would not function as it does.  These experts look at such things as trade association behavior, elasticity of demand and its relationship to price movements, and so on.  In this case, having reviewed thousands of pages of material, I conclude that the government has rigged the market in information.  A clear example of "rigging" appears in, for example, the May 3, 2005 Weissmann email and the many plea agreements that have been shown to me.  The government overtly takes the position that "its" witnesses are subject to "its" control.  Of course, the witnesses do not own their recollections, nor can the government lawfully assert dominion over those recollections.  Equal access to witnesses is the most basic principle of criminal justice, based on the colonists' experience with English political trials.

21. It is true that I have seen prosecutorial misconduct and litigated about it.  However, in all my years handling criminal cases, and in all my experience teaching and working with other lawyers, I have never seen all of these unfair pressures brought to bear on the adversary system in a single case:

    a.  So few witnesses willing to meet with or agree to testify on behalf of defendants;

    b.  Written threats not to meet with defense counsel of the sort documented in Andrew Weissmann's May 3, 2005 email to William Dolan;

    c.  The number and pattern of verbal threats made to witnesses of the sort documented by Dr. Ciscon in his testimony in the EBS case; by counsel in the Arthur Andersen, Nigerian Barges, and EBS cases; or by the attorneys who have submitted the *in camera* declarations discussed in defendants' motion;

d. Prosecutors in a white-collar case naming more than 100 co-conspirators, keeping roughly 90 of them unindicted, and refusing to confirm or deny it intends to prosecute any of them;

e. Prosecutors keeping multiple grand juries working over several years, where the main purpose of the grand jury appears not be to return fresh indictments or start new cases, but to make the threat of indictment real and tangible to these alleged co-conspirators and other witnesses who have been alerted or suspect they may be targets; or

f. Prosecutors using such abusive, overreaching plea agreements that purport to define what facts are "true" and must be testified to at trial, or that so limit witnesses' ability to meet and share information with defendants.

22. Simply stated, defendants' drastic inability to interview witnesses and secure their testimony at trial has seriously impaired their ability to defend themselves at trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Southport, North Carolina on August 2b, 2005

Michael E. Tigar

8

# MICHAEL E. TIGAR

Michael E. Tigar is Research Professor of Law at Washington College of Law, American University, Washington, D.C. He has held full-time academic positions at UCLA and The University of Texas. He has been a lecturer at dozens of law schools and bar associations in the United States, Europe, Africa, and Latin America. He has been a regular visiting professor at the Faculté de Droit et de Science Politique in Aix-en-Provence.

He has authored or co-authored ten books, three plays, and scores of articles and essays. He has argued seven cases in the United States Supreme Court, about one hundred federal appeals, and has tried cases in all parts of the country in state and federal courts. His latest book is Fighting Injustice, a memoir, available on amazon.com.

His clients have included Angela Davis, H. Rap Brown, John Connally, Kay Bailey Hutchison, the Washington Post, Fantasy Films, Terry Nichols, Allen Ginsberg, Leonard Peltier, Fernando Chavez and Lynne Stewart. He has been Chair of the 60,000 member Section of Litigation of the American Bar Association, and Chair of the Board of Directors of the Texas Resource Center for Capital Litigation.

He has made several trips to South Africa, working with organizations of African lawyers engaged in the struggle to end apartheid, and after the release of Nelson Mandela from prison, to lecture on human rights issues and to advise the African National Congress on issues in drafting a new constitution. He has been actively involved in efforts to bring to justice members of the Chilean junta, including former President Pinochet. Of Mr. Tigar's career, Justice William J. Brennan has written that his "tireless striving for justice stretches his arms towards perfection."

In 1999, the California Attorneys for Criminal Justice held a ballot for "Lawyer of the Century." Mr. Tigar was third in the balloting, behind Clarence Darrow and Thurgood Marshall. In 2003, the Texas Civil Rights Project named its new building in Austin, Texas, (purchased with a gift from attorney Wayne Reaud) the "Michael Tigar Human Rights Center."

DETAILED VITA:

Born January 18, 1941, Glendale, California; married to Jane B. Tigar (musician, author, attorney); three children (Jon S. Tigar [Judge of the Superior Court, Alameda County, California], Katherine McQueen, M.D. [Assistant Professor, Baylor College of Medicine], Elizabeth Torrey Tigar [Oberlin college senior]; three grandchildren [William Stanton Tigar, Adam Avery Tigar, and Mary Elizabeth McQueen]

**EDUCATION**
J.D., 1966, Boalt Hall, University of California, Berkeley
B.A., Political Science, 1962, University of California, Berkeley
Public schools in and near Los Angeles, California

**LAW SCHOOL HONORS & AWARDS**
Ranked first in class all three years of law school
Editor-in-Chief, California Law Review, 1965-66
Order of the Coif

**EMPLOYMENT**
Research Professor of Law, Washington College of Law, 2003 –
Professor of Law & Edwin A. Mooers, Sr. Scholar, Washington College of Law, American University, 1998 – 2003
Joseph D. Jamail Centennial Chair in Law, University of Texas, 1987- 98(member of UT law faculty 1983-98)
Of Counsel, Haddon, Morgan & Foreman, Denver, Colorado, 1/1/96 – 6/30/98
Visiting Professor, Faculté de Droit et de Sciences Politique de Aix-Marseille, 1994 – 98
Lecturer, University of the Western Cape, Fort Hare Faculty of Law, and University of Transkei, 1991-92
Member, Tigar & Buffone, P.C., Washington, D.C., 1978-84
Lecturer in Criminal Procedure, State University of New York at Buffalo, 1976-77
Adjunct Professor of Law, Georgetown University Law Center, 1975-76, 1977-78
Attorney, Williams & Connolly, Washington, D.C., 1966-69; 1974-77; partner, January 1, 1976 - December 31, 1977
Of Counsel, Kennedy & Rhine, San Francisco, California, 1971-74 (maintained offices for the private practice of international law in Speracèdes, France)
Visiting Fellow, Center for the Study of Democratic Institutions, Santa Barbara, California, 1971
Acting Professor of Law, University of California, Los Angeles, 1969-71
Editor-in-Chief, Selective Service Law Reporter, 1968-69
Summer Intern, American Civil Liberties Union of Northern California, 1965
Assistant Editor, Civil Liberties Docket, 1963-64
Associate Director of Public Affairs, Pacifica Foundation Radio (KPFK-FM), Los Angeles, 1963
European Correspondent, Pacifica Foundation Radio, 1962-63

Announcer, engineer, reporter, newscaster, Director of Children's Programs, Pacifica
    Foundation Radio (KPFA-FM), Berkeley, California, 1959-62
Apprentice letterpress printer, 1955-58
Restaurant worker, 1956-57
Day camp teacher, 1955-58

## PROFESSIONAL ACTIVITIES AND AWARDS (partial list)

Lifetime Achievement Award, National Association of Criminal Defense Lawyers, 1999
Champion of Justice Award, California Attorneys for Criminal Justice, 1998
Frequent Speaker, Moderator, Panelist, bar organizations, law schools, judicial
    conferences
Frequent appearances on television and radio programs, and interviews with print media
    on legal subjects in the USA, Canada, UK, Mauritius, South Africa, Chile and
    France
Argued seven United States Supreme Court cases and more than 100 other appellate cases
Co-Director, Intensive Trial Advocacy Program, The University of Texas School of Law,
    1984-94
Fellow, American Academy of Appellate Lawyers; Member, Board of Directors, 1993-96
Member, Board of Directors, American Judicature Society, 1992-96
Director, The Fourth Amendment Foundation (founded by Dr. Hunter S. Thompson),
    1991 - present
Letelier-Moffitt Human Rights Award (Sixteenth Annual), September 21, 1992
Member, ABA Task Force on an International Criminal Court, 1991
Consultant, African National Congress Task Force on TVBC States and constitutional
    issues, 1991-92
John Minor Wisdom Public Service and Professionalism Award, American Bar
    Association, Section of Litigation, October 1990
Chair, Section of Litigation, American Bar Association, 1989-90
Member, Board of Directors, Texas Appellate Practice and Educational Resource Center,
    1989- 94 (Chair, 1989-93)
Reporter, Pattern Jury Instructions, Criminal Cases, Fifth Circuit, 1988-90 (published by
    West Publishing Co., 1990)
Trial Advocacy Teacher, Black Lawyers Association of South Africa, 1988, 1989, 1990,
    1991
Chair-Elect, Section of Litigation, American Bar Association, 1988-89
Vice-Chair, Section of Litigation, American Bar Association, 1987-88
Chair, Section of Litigation, Association of American Law Schools, 1988
Co-Chair, Committee on Teaching Litigation, Section of Litigation, ABA, 1984-1987
Member, ABA Litigation Section Task Force on Training the Advocate, 1986-89
Member, Advisory Committee, BNA Civil RICO Report, 1985-89
Chair, Complex Crimes Litigation Committee, Section of Litigation, ABA, 1981-84
Participant (one of 32 lawyers selected from the United States), Smithsonian Institution
    Folklife Festival, 1986, "Trial Lawyers in America."

**PUBLICATIONS (partial list – books in CAPITAL LETTERS, plays in *italics*)**

EXAMINING WITNESSES (2d edition), 2003

The Most Impertinent Question, Litigation, Spring 2003

Tosca: Dangers of Operatic Plea Bargains, lecture November 6, 2001, forthcoming

FIGHTING INJUSTICE (2002)

Litigation as a Faustian Bargain, Litigation, Winter 2002

Lecture, Terrorism and Human Rights, October 17, 2001, on the website of Institute for
        Policy Studies, Washington, D.C.

Essay, Lawyers, Jails and the Law's Fake Bargains, Monthly Review, July/August 2001

Introduction, The Federal Courthouse Door: A Federal Jurisdiction Guide, by James P.
        George (2002)

LAW AND THE RISE OF CAPITALISM (new edition 2000)

Litigators' Ethics, 67 Tenn. L. Rev. 409 (2000)

Essay, Story Within A Story Within A Story – Played Out In The Different Theaters Of
        Different Minds, reflections on Susan Glaspell's play "Trifles," for a conference
        in Israel, Spring 2000

Two Trials in and about Chattanooga – Lynching and Federal Judicial Power, Litigation,
        Spring 2000, p. 49

The Power of Myth: Justice, Signs & Symbols in Criminal Trials, Litigation, Fall 1999,
        p. 25

FEDERAL APPEALS: JURISDICTION AND PRACTICE, West Group, Third Edition,
        2000 [with Jane B. Tigar](with annual supplements)

PERSUASION: THE LITIGATOR'S ART (1999)[ABA Press]

What Would Thomas More Think?, 2 J. Inst. for the Study of Legal Ethics 187 (1999).

Defending: an essay. 74 Tex. L. Rev. 101 (1995)

Paul Touvier and the Crime Against Humanity, 30 Tex. Int'l L. J. 286 (1995)[with Casey,
        Giordani & Mardemootoo]

Columns in National Law Journal, 1995 - 2001 on criminal law and international law
        issues

Review, Lawyers and Social Justice, 78 Judicature 253 (1995)

Review, Revolution in the Balance: Law and Society in Contemporary Cuba, Cuba
        Update, February 1995, p. 33

Pretrial Case Management Under the Amended Rules: Too Many Words for a Good Idea,
        14 Rev. of Lit. 137 (1994)

Letter of the Law: A Reply, Los Angeles Daily Journal, Jan. 11, 1995 (op-ed page)

Old California and New Ideas, California State Bar Morrison Lecture, September 24,
        1994, Anaheim, California

Moving Backward in Sentencing and Intent, Nat'l L. J. 18 (Nov. 29, 1993)

Moderator, The Use and Misuse of Expert Evidence in the Courts (March 6, 1993) 77
        Judicature, September-October 1993

EXAMINING WITNESSES, ABA Press, 1993

Criminal Justice Reform. Sources and Nature of Norms, 63 International Review of
        Penal Law, Criminal Justice and Human Rights 1343 (November 24-December 1,
        1993)

FEDERAL APPEALS: JURISDICTION AND PRACTICE, Shepard's/McGraw-Hill, Second Edition, 1992

The Lawyer Who Broke the Retaining Wall [under name of Edward Michaels] 18 Litigation 27 (Fall 1991)

The Expert Who Walked Off Angry [under name of Edward Michaels], 17 Litigation 27 (Summer 1991)

Cross Examination of Expert Witnesses, in F. Rossi, Expert Witnesses, American Bar Association (1991)

Book Review: Laycock, The Death of the Irreparable Injury Rule, 17 Litigation 49 (Winter 1991)

The Prosecutor Whose Sword Was Taken Away [under name of Edward Michaels], 17 Litigation 6 (Winter 1991)

Academic Freedom, Essay, Oxford Companion to the Supreme Court of the United States, 1990

Conscientious Objection, Essay, Oxford Companion to the Supreme Court of the United States, 1990

Discovering Your Litigator's Voice, 16 Litigation 1 (Summer 1990)

One Man's Freedom, One Man's Faith, 16 Litigation 1 (Spring 1990)

Lawyers and Death Cases, 16 Litigation 1 (Winter 1990)

Query: Judges or Lawyers--Who Are the Keepers of the Flame?, 74 Judicature 125 (October-November 1990)

2020 Vision: A Bifocal View, 74 Judicature 89 (August-September 1990)

Voices Heard in Jury Argument: Litigation and the Law School Curriculum, 9 Review of Litigation 177 (1990)

Book Review, Federal Habeas Corpus Practice and Procedure (J. Liebman), Columbia Law Review, Jan. 1990

The Extradition Requirement of Double Criminality in Complex Cases: Illustrating the Rationale of Extradition, published in proceedings of Instituto Superiore Internazionale de Scienzi Criminali Confernce, Siracusa, Italy

Judges, Lawyers and the Penalty of Death, 23 Loyola L.R. 147 (November 1989)

Lawyers, Money, Race, and Gender, 16 Litigation 1 (Fall 1989)

Videotape, Argument to the Court, ABA Videolaw Seminars, 1989

*The Warrior Bards*, a play in six scenes [with Kevin McCarthy], premiered October 5, 1989, starring Kevin McCarthy

Corporate Liability for Crime, Essay, funded in part by a grant (Summer, 1988) from the Corporate Counsel Section of the State Bar of Texas, 1989, published as It Does the Crime But Not the Time: Corporate Criminal Liability in Federal Law, 17 Am.J.Crim.Law 211 (Spring 1990)

Videotape, Dealing with the S.O.B. Litigator, ABA Videolaw Seminars, 1989

Intending, Knowing and Desiring: The Mental Element in Federal Criminal Law, Lecture, Cleveland-Marshall College of Law, October 27, 1988, published as "Willfullness" and "Ignorance" in Federal Criminal Law, 37 Cleveland State Law Review 525 (1990)

Speaker, Presentation of the Portrait of John V. Singleton (March 18, 1988), to be published

What the Constitution Means by Executive Power, 43 Miami L. Rev. 177
(1988)(informal talk)

Original Understanding and the Constitution, 22 Akron L. Rev. 1 (1988)

Jury Argument: You the Facts, and the Law, 14 Litigation 19 (1988)

Book Review, And We Are Not Saved, The Elusive Quest for Racial Justice (D. Bell),
ABA Journal, Vol. 73, October 1, 1987, p. 146

Constitutional Rights of Criminal Tax Defendants: A Bicentennial Survey and Modest
Proposal, The Tax Lawyer, vol. 41, no. 1, Fall 1987

*Haymarket: Whose Name the Few Still Say with Tears*, a play in eleven scenes, first
performed by Remains Theater, Chicago, Illinois, October 1987

FEDERAL APPEALS: JURISDICTION AND PRACTICE, Shepard's/McGraw-Hill,
1987

Speaker, Presentation of the Portrait of Carl O. Bue, Jr. 680 F. Supp. LXXX (April 28,
1987)

Essay, "Crime-Talk, Rights-Talk and Doubletalk," 65 Tex. L. Rev. 101 (1986)

The Hobbs Act and RICO in Takeover Litigation, BNA Civil RICO Report, vol. 2, No.
13, August 27, 1986, p. 2

*The Trial of John Peter Zenger*, a play in four scenes, commissioned by the Section of
Litigation, American Bar Association, first performed at the Waldorf Astoria
Hotel Starlight Roof, August 10, 1986. Revived at New York Historical Society,
1989.

Book Review, Talk-Show Advocacy, Litigation, vol. 12, No. 1, Fall 1985, p. 61

Book Review, Whose Rights? What Danger, 94 Yale L.J. 970 (1985)

The Right of Property and the Law of Theft, 62 Tex. L. Rev. 1443 (1984)

Mail Fraud, Morals and U.S. Attorneys, Litigation, vol. 11, no. 1, Fall 1984, p. 22

Book Review, Law and Revolution: The Formation of the Western Legal Tradition, 17
U.C. Davis L. Rev. 1035 (1984)

International Exchange of Information In Criminal Cases, 1983 Michigan Yearbook of
International Legal Studies 61 [with A.J. Doyle, Jr.]

The Foreign Sovereign Immunities Act And The Pursued Refugee: Lessons From Letelier
v. Chile, 1982 Michigan Yearbook of International Legal Studies 421

Crime on Camera, Litigation, Vol. 9, No. 1, Fall 1982

Book Review, The Great Fear, 15 Harvard Civil Liberties - Civil Rights Review (1980)

LAW AND THE RISE OF CAPITALISM (published in 1977 by Monthly Review Press)
[with M. Levy]. Spanish and Portuguese translations published 1978; Greek
translation published 1980; Chinese translation published 1997

Can We Be Equal And Free?, in The Unfinished Revolution (C. Snow ed. 1976)

Book Review, Political Criminal Trials: How To Defend Them, Litigation (ABA
Litigation Section Magazine), Vol. 1, No. 1, Winter 1975

Book Review, Psychoanalytic Jurisprudence, 86 Harv. L. Rev. 785 (1973)

Book Review, Kennedy Justice, The New York Review Of Books, June 1972

Judicial Power, the "Political Question Doctrine," and Foreign Relations," 17 U.C.L.A. L.
Rev. 1135 (1970), reprinted in The Vietnam War And International Law, Vol. 3
(R. Falk, ed. 1972)

Socialist Law And Legal Institutions, in Law Against The People (R. Lefcourt ed. 1971)

The Rights Of The Selective Service Registrant, in The Rights Of Americans (1970)
Foreword: Waiver Of Constitutional Rights: Disquiet In The Citadel, 84 Harv. L. Rev. 1
      (1970)
Book Review, Frontiers Of Civil Liberties, 78 Yale L.J. 597 (1969)
Selective Service: Some Certain Problems And Some Tentative Answers, 37 Geo. Wash.
      L. Rev. 433 (1969) [with R. Zweben]
PRACTICE MANUAL, Selective Service Law Reporter (1968)
Book Review, Concerning Dissent And Civil Disobedience, 67 Mich. L. Rev. (1969)
Book Review, Freedom & Order In The University, 56 Calif. L. Rev. 236 (1968)
Book Review, Anti-Politics in America, 77 Yale L.J. 597 (1968)
Book Review, The American Student's Freedom Of Expression, 4 Law in Trans. Q. 163
      (1967)
Introduction To Symposium: Student Rights And Campus Rules, 54 Calif. L. Rev. 1
      (1966)
Book Review, Federal Habeas Corpus, 53 Calif. L. Rev. 911 (1965) [with I. Heyman]
Comment, Automatic Extinction Of Cross-Demands: Compensatio From Rome To
      California, 53 Calif. L. Rev. 224 (1965)

**BAR MEMBERSHIPS - Regular**
District of Columbia (4/1/67); New York (2/11/93)(retired status 2005); Supreme Court
      of the United States; United States Courts of Appeals for the District of Columbia
      Circuit and the Second (9/12/78), Fourth, Fifth, Sixth (7/6/92), Eighth, Ninth,
      Tenth, Eleventh and Federal Circuits; United States District Court for the Western
      District of Texas; United States District Court for the Southern District of Texas;
      United States Tax Court (1980)

**BAR MEMBERSHIPS - Pro hac vice**
Supreme Court of the United States (1969)
Several United States Courts of Appeals, a dozen United States District Courts, and state
      trial and appellate courts in Colorado, Maryland, Florida, California, New York,
      Texas and Illinois