# SEALED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

RS  OCT 1 3 2005

Michael N. Milby, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Cr. No. H-04-25 (S-2) (Lake, J.) |
| | § | **FILED UNDER SEAL** |
| RICHARD A. CAUSEY, | § | |
| JEFFREY K. SKILLING, and | § | |
| KENNETH L. LAY, | § | |
| | § | |
| Defendants | § | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS BASED ON PROSECUTORIAL MISCONDUCT

Defendants have moved to dismiss the indictment, asserting that the government has interfered with their right "to secure and confront witnesses" and deprived them of their ability to prepare a defense. Although the Court has addressed defendants' allegations by sending a letter to dozens of potential witnesses informing them of their right to cooperate with the defense without suffering any consequences from the government, defendants have persisted in their contention that the indictment should be dismissed or that the Court should grant some other form of extraordinary relief, and the Court has directed the government to respond to defendants' motion.

The motion should be denied for two reasons. First, although the government vigorously disputes defendants' contention that it has interfered with their access to witnesses, the Court has remedied any possible harm to defendants by informing each witness identified by the defendants of his or her right to cooperate with the defendants

491

without fear of retribution from the government.  Because any potential prejudice has been remedied prior to defendants' trial, no due process violation has occurred.  Second, and most importantly, the government has not interfered with the defendants' ability to prepare a defense in any way.  The factual showing in support of defendants' motion is replete with errors, unreliable hearsay, and misleading, incomplete, or false information. When stripped of inaccurate or false information, the motion fails to provide anywhere near sufficient justification for the extraordinary remedy of dismissing the indictment, or for granting any other form of relief requested by defendants.  The motion is unfounded and should be denied.

## I.      Defendants' factual allegations fail to support the motion to dismiss

Almost without exception, the serious allegations of government misconduct found in defendants' motion are without direct factual support.  Instead, nearly all of those allegations rely on declarations executed by defendants' own attorneys.  Those declarations repeat hearsay, and sometimes double hearsay, statements made by other attorneys.  When asked to comment on the statements attributed to them, most of the attorneys quoted in defendants' declarations deny the statements outright or state that defendants' lawyers took their off-the-record comments out of context.[1]

---

[1] Defendants filed their motions and declarations *ex parte*, purportedly because they sought to protect their "sources."  *See* September 1, 2005 Hearing Transcript at 23-24. But as the letter from Philip Hilder (Exhibit 11) and the declaration of Reid Figel (Exhibit 14) make clear, defendants' declarations purport to quote attorneys who did not even know they were "sources."  The *ex parte* filing also initially insulated the

In many cases, moreover, the information reported in the declarations submitted by defendants and repeated in defendants' motion is notable for its lack of specificity and supporting detail. Finally, despite defendants' effort to paint each allegation as part of a nefarious effort by the government to deny them access to potential witnesses, many of their allegations involve no misconduct at all, and instead report only purported subjective beliefs and perceptions by attorneys who – even by the defendants' own admission – assert that the government has acted appropriately and done nothing to dissuade them from having their clients speak to the defendants. The flaws and inaccuracies in the factual support for defendants' motion include the following:

### A. Defendants's factual allegations fail to show any misconduct by the government

1.      *Letters to potential witnesses*: Defendants report that in April 2005 they sent 144 letters to attorneys representing people on the government's list of coconspirators. Declaration of Matthew T. Kline Decl. ¶ 2. They received 34 responses, 17 of which conveyed refusals to meet with defendants' counsel. On May 27, 2005, the Court issued an order advising witnesses of their ability to meet with the defense without fear that the government would hold their cooperation with defendants against them. Defendants then sent another letter to 138 potential witnesses. This time, they received

---

defendants' declarations from adversarial testing. Exposed to the light of day, the declarations have been readily shown to contain inaccuracies and misleading information.

42 responses, including 34 in which the potential witness declined to meet with the defense.[2]  On September 14, 2005, this Court sent its letter informing 38 witnesses of their right to cooperate with the government.  Of the responses received, only one witness has agreed to speak with the defendants.[3]  Notably, despite being apprised of defendants' allegations, and receiving relevant portions of defendants' motion and declarations, none of the respondents indicated a desire to discuss the matter further with the Court.

Defendants acknowledge (Motion at 7) that "in criminal or civil cases witnesses sometimes choose not to speak to one side or another," but relying on a declaration from another defense attorney,[4] they claim that there is something abnormal about the potential

---

[2]  Defendants fail to acknowledge that several of these responses were inconsistent with their allegations of prosecutorial misconduct.  For example, in a June 3, 2005 letter, a lawyer for cooperating witness Tim Despain wrote: "As a former prosecutor, I am aware of the rules regarding access to witnesses and recognize that the government cannot preclude [my client] from being interviewed.  Let me assure you that no one on the Task Force with whom I have been in contact has in any way suggested anything to the contrary.  Nonetheless, I do not feel that it is in my client's best interest to meet with you to discuss this case.  This decision is based solely on my own judgment, as [my client's counsel].  I believe this decision to be in his best interest."  See Declaration of Attorney D, Exhibit 2 [June 3, 2005 letter].  See also id., Exhibit 4 (July 5, 2005 letter, indicating "[My client] and I both are familiar with his legal rights and opportunities.  We have considered your request.  Neither my client nor I wish to have such a meeting with you or any representatives of Mr. Lay, Mr. Skilling, and Mr. Causey.").

[3]  This witness, Mark. S. Palmer, has already testified publicly for the defense in the Broadband trial, United States v. Howard et al.  Counsel for another witness, Andrew Fastow, declined to provide an answer to the Court's inquiry.

[4]  Defendants' expert, Michael Tigar, can hardly be called an impartial authority. Mr. Tigar has never been a prosecutor, and he boasts of his opposition to the government and of the controversial defendants he has represented.  See Michael E. Tigar, Fighting Injustice (American Bar Association 2002).  Mr. Tigar has also frequently alleged that the

witnesses' refusal to speak with them.  The more reasonable explanation, confirmed by

the responses to the letters sent by the Court on September 14, is that the witnesses

understood their right to cooperate with the defense and simply do not wish to speak to

defense counsel.[5]

The experienced attorneys who represent these potential witnesses undoubtedly

concluded that it is not in their clients' interest to subject them to defense interviews.  As

this Court suggested at a hearing on May 18, 2005 (*see* Motion at 46), there is nothing

unusual about this fact; indeed, it is quite ordinary in a case in which the vast majority of

witnesses are represented by experienced counsel.[6]  Some witnesses who have a

legitimate fear of self-incrimination may intend to invoke their Fifth Amendment

privilege if called to testify.  Others may believe that interviews with defense counsel

would only create statements concerning the subject matter of the witness's testimony that

defense counsel will sift for every minor inconsistency that can be used, perhaps unfairly,

---

government has engaged in prosecutorial misconduct.  *See United States v. Orena*, 32
F.3d 704 (2d Cir. 1994); *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993); *United
States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004); *United States v. Peltier*, 553 F.
Supp. 890 (D.N.D. 1982).

[5] For example, the letter that attorney Philip Inglima sent on behalf of Mark
Koenig states that Mr. Koenig's decision not to meet with defense counsel "has been
neither constrained nor compelled by the government."  Letter, Philip T. Inglima to Hon.
Sim Lake, Sept. 23, 2005 (attached as Exhibit 17).

[6] In fact, counsel for Mr. Causey expressed the identical concern during the trial of
Bernie Ebbers.  Counsel told the court in that case, "We have all these witnesses we're
considering calling, but no one seems eager to speak to us."  *See* Exhibit 1.

5

to cross-examine the witness if he or she testifies for the government.[7]  Moreover, those

interviews may disrupt the clients' lives and subject them to increased attorneys' fees.

Other witnesses may be hostile to defendants, perhaps because of the extraordinary public

defense that defendants have mounted in an attempt to shift blame to others for Enron's

fraudulent activity and subsequent failure.[8]  In short, there are a host of reasons why

potential witnesses would decline to speak to the defense, and the witnesses' failure to

agree to be interviewed by defense counsel provides no support for defendants'

allegations of misconduct.

     2.   *Lack of specificity*: Defendants' motion relies almost exclusively on

declarations filed by their own attorneys, not by the attorneys with whom their attorneys

claim to have spoken.  Those declarations in turn rely heavily on generalizations and

assertions without supporting detail.  For example, the Declaration of Ron Woods and the

---

[7]  An illustration of this concern played out in the Nigerian Barge trial before Judge Werlein.  There, Eric Boyt, an unindicted co-conspirator, agreed to meet with counsel for two of the defendants in that case prior to trial.  Although Mr. Boyt was cooperating with the government pursuant to a non-prosecution agreement, he did not feel intimidated or inhibited from cooperating with the defense.  Not surprisingly, there was a dispute at trial as to what was said during that meeting.  *See United States v. Bayly*, et al., No. CR H-03-363, Trial Transcript at 2865 (attached as Exhibit 2) (Mr. Cogdell: "Do you remember meeting with myself and Mr. Goodling, Mr. Sorkin, as late as April of this year and saying exactly that; that is, if it's oral, it's not binding, and that's what you, at one time, believed?"; Mr. Boyt: "I remember discussing the deal.  I don't remember exactly saying that, no.").

[8]  One attorney made this reason for not cooperating with defendants clear.  In a response to one of defendants' earlier round of letters, an attorney for one potential witness wrote that his client "does not wish to participate in [defendants'] very public defense."  Defendant Ex. 30.

Declaration of Mark Holscher contain nearly identical assertions that each attorney has "spoken with a number of attorneys representing people involved with Enron-related prosecutions" and that "[a]lmost to a person, lawyers and their clients refuse to meet with the defense in this and other Enron-related cases." Woods Decl. ¶ 4; *see* Holscher Decl. ¶¶ 4-5. Likewise, defendants' motion states, without supporting detail, that "[a] few attorneys" "'empathized' with [defendants'] situation" because the government had made "explicit comments or implicit threats" to them. Mr. Hulkower's declaration merely states that "many" attorneys actually "empathize" with defendants. Declaration of Mark J. Hulkower ¶ 5. Mr. Kline's declaration states that "several of the attorneys to whom [he] spoke were willing to discuss–off the record–instances of Enron Task Force pressure related to government access." ¶ 24. Mr. Ramsey also spoke with "several attorneys," who all said that the Enron Task Force "has sent a message to witnesses and their counsel." Declaration of Michael Ramsey ¶ 5. And Mr. Hulkower's declaration relates that at some unspecified time "a lawyer for a witness possessing what [he] strongly believe[s] to be exculpatory information indicated specifically" to some unknown person "that his client would not meet with Mr Causey or his counsel." Hulkower Decl. ¶ 6.

These assertions are remarkable for their lack of specificity and detail. Mr. Woods and Mr. Holscher spoke with "a number of attorneys"; Mr. Holscher declares that "many" attorneys have a fear of retribution and that an unspecified number of "counsel for clients who have pled guilty" have told him that they fear retribution. Mr. Kline and Mr. Ramsey

7

spoke with "several attorneys." A "few," or perhaps "many," attorneys, "'empathized'" with defense counsel. This lack of specificity allows defendants to attribute whatever significance they wish to their supposed conversations with defense counsel without providing concrete factual support. Generalizations of this nature are not sufficient to find that government prosecutors and law enforcement agents engaged in misconduct, particularly when, as detailed below, the conversations that defendants purport to recount were in many instances inaccurately summarized or taken out of context.

3.    *Irrelevant assertions or assertions that fail to show misconduct*

Many of the conversations that defendants' counsel claim to have had with attorneys for potential witnesses are irrelevant to their claims of government misconduct. First, the attorneys in many of these alleged conversations attribute no words or actions, much less any misconduct, to the government; instead, those attorneys rely solely on their own perceptions or conclusions, for which they provide little or no factual support. Second, many of the attorneys whom defense counsel purport to have contacted do not represent individuals who will be witnesses in this case. Indeed, defense counsel did not even ask the Court to send letters to the attorneys for many of these purported potential witnesses. Those attorneys' attitudes toward the government are thus wholly irrelevant to this case. Finally, other evidence on which defendants rely is either innocuous or does not rise to the level of misconduct.

a. *Charley Davidson*: Charley Davidson represents Mark S. Palmer. Mr. Davidson is the only attorney representing a witness who submitted a declaration in support of defendants' motion. According to Mr. Davidson's declaration, an FBI agent contacted him prior to Mr. Palmer's testimony at the EBS trial and told him that it was not in Mr. Palmer's interest to testify on behalf of one of the defendants in that trial because one of the defendants may try to shift the blame to Mr. Palmer. Mr. Davidson averred that he considered the agent's statements to be "veiled threats." Nevertheless, Mr. Palmer testified for the defendants at the EBS/Broadband trial. During that testimony, he acknowledged previously meeting with the defendants (and the government) on several occasions. *See* Exhibit 16. (Palmer trial testimony). In response to the September 14 letter from the Court, Mr. Davidson agreed to meet with defendants.

Mr. Davidson points to nothing in the statements that he attributes to the agent that would support the conclusion that the agent intended to threaten him or his client, and his client's decision to testify suggests that neither Mr. Davidson nor Mr. Palmer regarded those statements as serious threats. Nor does Mr. Davidson argue that the agent's warning lacked a basis in fact; that is, that one of the Broadband defendants may have tried to shift the blame to Mr. Palmer. Accordingly, the agent's actions, even if accurately reported by Mr. Davidson, do not rise to the level of misconduct. Finally, the agent's alleged statements related to the EBS case, not this one, and as shown by

Mr. Palmer's agreement to speak with defense counsel in this case, had no effect on Mr.

Palmer's decision whether to cooperate with the defense.

b. *Gary Dolan*: Defendants contend that Gary Dolan, a Merrill

Lynch employee, has information that contradicts an allegation of the indictment.  Kline

Decl. ¶ 61.  Yet, defendants failed to identify Dolan as a witness to whom they wished to

speak, and therefore the Court did not send his counsel a letter informing him of his right

to cooperate with the defense.  Accordingly, any alleged interference with Mr. Dolan is

irrelevant to defendant's motion.

In any event, defendants' declarations in support of their motion allege only that

Mr. Dolan's attorney, Ron Minkoff, believed that the government had sought indictments

arising out of the Nigerian barge deal of persons "who publicly defended the deal or gave

public testimony explaining its legitimacy."  Kline Decl. ¶ 63.  As a factual matter, this

assertion is untrue.  None of the indicted defendants in that case ever publicly defended

the deal or explained its legitimacy.  Rather, some of the defendants publicly disputed that

the nature of the deal between Merrill Lynch and Enron was what the government alleged

it to be and what the jury found beyond a reasonable doubt that it was – that is, a

purported sale of an asset that in economic substance was a loan because of an

undisclosed oral commitment to take out Merrill Lynch at a guaranteed rate of return.

Minkoff did not assert, according to Mr. Kline's hearsay recounting, that anyone in the

government had threatened him or told him or his client that Mr. Dolan would be indicted

if he publicly defended the barge deal or gave public testimony explaining its legitimacy.[9]

In short, Mr. Kline's assertions concerning Mr. Dolan say nothing about the government's

actions and therefore provide no evidence that the government engaged in misconduct.

        c.    *Alan Hoffman*: Defendants contend that Alan Hoffman, an

outside attorney for Merrill Lynch, "has not met with defendants or agreed to testify on

their behalf." Kline Decl. ¶ 70. Again, however, defendants did not ask the Court to send

Mr. Hoffman's attorney a letter informing him of his right to cooperate with the defense,

and therefore they apparently have no interest in meeting with him or having him testify

on their behalf. Nor have defendants presented facts supporting the conclusion that Mr.

Hoffman declined to meet with defendants because of something the government did or

threatened to do. Instead, they rely on a hearsay assertion in which Mr. Hoffman's

attorney allegedly said that he was "sure" that the government would "go after" Mr.

Hoffman if he met with or assisted defendants. Even if this hearsay statement was

reported accurately, the government cannot be held responsible for what an attorney

thinks it may do, in the absence of any direct evidence of misconduct. Mr. Hoffman, like

---

[9] It is notable that in the Nigerian barge trial, none of the Merrill Lynch defendants subpoenaed Mr. Dolan, an in-house lawyer at Merrill Lynch, to testify at trial. The defendants did call Katherine Zrike, another in-house lawyer and Mr. Dolan's supervisor. Ms. Zrike – far from publicly defending the deal – testified that the Merrill Lynch defendants did not advise her of the key components of the deal, the oral take-out agreement and the guaranteed rate of return. Ms. Zrike testified that both of these terms rendered the deal illegal and a sham transaction. Portions of Zrike's trial testimony are attached as Exhibit 3.

Mr. Dolan, was not called to testify at trial by any of the Merrill Lynch defendants, where his testimony presumably would have been more pertinent to the particular defendants on trial there.

        d.    *David Delainey*: David Delainey is the former head of Enron North America and Enron Energy Services.  According to Mr. Kline's declaration, defendants sent a letter to Mr. Delainey's attorney, John Dowd, asking to meet with Mr. Delainey.  According to defendants, Mr. Dowd responded that Mr. Delainey "is restricted by his agreement with the United States from disclosing certain information to third parties, and he intends to honor the letter and spirit of this agreement."  Kline Decl. ¶ 21. But defendants fail to note that earlier in the letter, Mr. Dowd expressed Mr. Delainey's principal reason for not meeting with them as follows: "Mr. Delainey does not wish to participate in your clients' very public defense.  Rather, Mr. Delainey has accepted responsibility for his conduct and intends to recount his version of events by testifying under oath, if requested to do so, in the appropriate judicial forum."  Defs. Ex. 30.  By letter to defendants' counsel dated October 11, 2005, Mr. Dowd confirmed that "Mr. Delainey's choice not to meet with defense counsel to discuss the underlying facts was not constrained by any agreement with the United States."  Letter, John M. Dowd to Daniel M. Petrocelli, et al., Oct. 11, 2005 (attached as Exhibit 4).

        In any event, Mr. Delainey's plea agreement restricts him only from disclosing evidence he received from the government, not from meeting with or cooperating with

12

defendants.[10] In response to the Court's September 14 letter, Mr. Delainey has refused to meet with defense counsel. Even assuming, therefore, that defendants have accurately reported Mr. Dowd's reason for not meeting with them, Mr. Delainey's counsel has made clear that he did not feel constrained by the plea agreement in making a decision not to meet with defendants. *See* Exhibit 4.

e.  *Mitch Lansden*: Mr. Lansden is a Houston attorney who represents three former Enron employees, Kelly Boots, David Berbarian, and Mark Haedicke. According to Ron Woods's declaration, these three people have "first-hand knowledge [about the Nigerian Barge and EBS transactions], including exculpatory information relevant to Mr. Skilling's defense." Woods Decl. ¶ 6. Mr. Woods asserts that Ms. Boots asserted her Fifth Amendment privilege in the Barge case, and that Mr. Berberian would have done so if called to testify, but he does not attribute these witnesses' assertion of their constitutional right to any government misconduct. Mr. Woods also asserts that sometime "in recent months" Mr. Lansden refused to make his clients available for an interview because he did not want to do anything that the government would view negatively and that cooperation with the defendants "would possibly get his clients indicted." Woods Decl. ¶¶ 5, 8. Again, however, Mr. Woods does not claim that Mr. Lansden alleges that the government threatened his clients to prevent

---

[10] That provision is discussed at greater length below.

them from cooperating with defendants.  In responses to the Court's September 14 letter,

each of these three witnesses refused to meet with defense counsel.

> f.      *Larry Ciscon*: Dr. Ciscon was a defense witness at the

Broadband trial.  Defendants contend (Motion at 22) that the government tried to

intimidate him into declining to testify for the defense by reminding him that he was a

target of the government's investigation.  Notwithstanding these alleged threats, Dr.

Ciscon testified for the defendants at the EBS trial.  Defendants did not identify Dr.

Ciscon as a potential witness who should receive a letter from the Court informing him of

his right to cooperate with defendants.  Nor have defendants explicitly stated that Ciscon

or his lawyer refused to talk with defense counsel in this case, and it is unlikely that

Ciscon would refuse given his defense testimony in the Broadband case.  For these

reasons, the government's alleged conduct toward Dr. Ciscon is irrelevant to this case.

> g.      *Rex Shelby*: Rex Shelby has been indicted as part of the

Broadband case, *United States v. Howard*, et al., and is awaiting retrial.  Defendants

allege that in late 2002, well before any of the defendants in this case or the Broadband

case had been indicted, government law enforcement agents told Shelby, after a specific

inquiry from Shelby, that it was up to Shelby to decide whether to return a telephone call

from EBS co-defendant Joe Hirko, but that the agents "did not think it was a good idea."

Motion at 12.  Defendants try to connect this alleged advice to Shelby's decision not to

speak with them, but even if the agents' did dispense advice that it is not prudent to talk

14

to another witness about a case during a government investigation, such advice is likely the same as any attorney would have given him.  Nor have defendants explicitly stated that Shelby or his lawyer have refused to talk with defense counsel in this case.  Indeed, defendants did not ask the Court to send its September 14 letter to Shelby's counsel and thus apparently have no wish to speak to him or obtain his cooperation.  In any event, defendants already have the benefit of Shelby's testimony in the EBS trial.

> h.    *Andrew Fastow*: Mr. Kline's declaration alleges that Fastow's attorney, John Keker, told Mr. Kline that Fastow would not meet with defendants, but denied that the government had ever threatened Fastow with repercussions.  Kline Decl. ¶ 84.  According to Mr. Kline, Mr. Keker said that the government "had Mr. Fastow 'compromised'" and "'over a barrel.'" *Id*. at ¶¶ 84-85.  Defendants's motion (at 37-38) and Mr. Kline's declaration suggest that Mr. Keker's statements implied that the government engaged in some improper conduct, but the more natural inference is that the government had substantial evidence against Mr. Fastow and that his most advantageous course was to cooperate with the government.  Whatever the statements attributed to Mr. Keker actually mean, they contain no allegation of misconduct against the government.[11]

Moreover, the prospect that Mr. Fastow would cooperate with defendants borders on the absurd.  In public statements and filed pleadings, Skilling has claimed to be a

---

[11] In any event, any concern that Mr. Keker can be intimidated by the government was dispelled by his answer to the Court's September 14 letter, in which Mr. Keker assured the Court that he and Mr. Fastow understood Mr. Fastow's rights, but declined to answer the Court's inquiry as to whether Mr. Fastow wished to meet with defendants.

scapegoat for abuses at Enron, and both Skilling and Lay have publicly blamed Mr. Fastow for Enron's fraudulent conduct and subsequent downfall. *See* July 8, 2004 Houston Chronicle article (attached as Exhibit 5) (counsel for Mr. Lay referring to Fastow as a "liar' and a "thief."); Memorandum in Support of Defendant's Skilling's Motion to Compel Production of Exculpatory and Rule 16 Materials at 4 (Dkt. 335, 5/17/05) (attached as Exhibit 6) (seeking evidence in support of theory that "the *only* criminal activities at Enron were those committed by Fastow, Kopper, and a handful of their confederates"). In light of Skilling's and Lay's public vilification of Mr. Fastow, Mr. Fastow's decision not to meet with defense counsel is understandable for reasons other than unsupported allegations of prosecutorial misconduct.

i. *The Enron Grand Jury*: As evidence of government misconduct, defendants point to the government's continued use of the Enron grand jury for the last four years. That allegation is a red herring. The government could use any grand jury to investigate conduct by Enron employees and others involved in the Enron debacle, and it could ask any grand jury to return an indictment arising out of the Enron collapse. Because the Enron grand jury is familiar with the investigation, the government renewed the grand jury and empaneled another Special Grand Jury in March 2005. The continued existence of the Enron grand jury adds nothing to the defendants' allegation that the government has engaged in misconduct.[12] In any event, the primary protection for

---

[12] Michael Tigar's reliance on this fact in support of his conclusion that the government has engaged in misconduct is truly far-fetched and revealing of his bias. Mr.

persons who have criminal liability is the statute of limitations, not the expiration of a

particular grand jury.

      4.     *The May 3, 2005 e-mail*

Defendants' assert that an e-mail sent on May 3, 2005, by Andrew Weissmann,

then the Director of the Enron Task Force, to William D. Dolan, III, an attorney for Ken

Rice is sufficient, standing alone, to justify dismissal of the indictment. *See* Motion at 17

("This case should be dismissed based on this single email.").  In fact, the email has little

or nothing to do with defendants' access to witnesses and therefore provides no support

for their motion.  Indeed, before Mr. Weissmann sent the e-mail, Mr. Rice, through

counsel, had already declined to meet with counsel for defendants in the Broadband case,

*United States v. Howard, et al.*  Declaration of Andrew Weissmann ¶ 7 (attached as

Exhibit 7).  Accordingly, there was little prospect that he would meet with defendants'

counsel in this case.  If there were any doubt on that score, it was put to rest when

Skilling's attorney publicly labeled Mr. Rice a liar during Mr. Rice's testimony at the

Broadband trial.  *See* Weissmann Decl. ¶ 7.  Mr. Dolan has since confirmed that neither

Weissmann's e-mail nor any other communication from the government played any role

in Mr. Rice's decision not to be interviewed by defense counsel.  Declaration of William

D. Dolan, III (attached as Exhibit 8).

---

Tigar has absolutely no basis for concluding that "the main purpose of the grand jury
appears not be [sic] to return fresh indictments or start new cases, but to make the threat
of indictment real and tangible to these alleged co-conspirators and other witnesses who
have been alerted or suspect they may be targets . . ."

As Mr. Weissmann's declaration makes clear, Mr. Weissmann wrote the e-mail to address the possibility that one of the attorneys for Ken Rice had a conflict of interest. As the declaration explains, Dan Cogdell, one of Mr. Rice's attorneys, also represents two targets of the Enron investigation, Sheila Kahanek and Jeff McMahon. Mr. Rice's other principal attorney, William Dolan, III, also represents Mr. McMahon. Prior to May 3, 2005, Mr. Weissmann had raised with Mr. Dolan the possibility that he and Mr. Cogdell had a conflict of interest. In particular, shortly before May 3, Mr. Weissmann learned that Mr. Cogdell had made public statements that seemed to be contrary to Mr. Rice's interest, and he again raised the potential conflict with Mr. Dolan. Mr. Weissmann also knew that Mr. Skilling's attorney, Daniel Petrocelli, had publicly accused Mr. Rice of "giving false testimony." Weissmann Decl. ¶ 7. Mr. Weissmann sent the e-mail to Mr. Dolan to raise concerns about Mr. Rice's right to conflict-free counsel.

The government has an obligation to protect a criminal defendant against his attorney's potential conflict of interest, *United States v. Stantini*, 85 F.3d 9, 12 & n.3 (2d Cir. 1996), and that obligation should be discharged "at the earliest possible moment." *United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995). Here, Mr. Rice is represented by two attorneys, and Mr. Weissmann had discussed the potential conflict with Mr. Dolan in the past. Confronted with information that suggested that Mr. Cogdell's representation of two targets in addition to Mr. Rice was giving rise to a conflict of interest that affected his representation of Mr. Rice, Mr. Weissmann properly chose to bring the information to

18

Mr. Dolan's attention. Mr. Weissmann did not, however, threaten Mr. Dolan or Mr. Rice, and he made it clear that the ultimate decision on the proper course of action was up to Mr. Rice and his counsel. Mr. Weissmann's decision to inform Mr. Dolan that he believed that Mr. Cogdell was not acting in Mr. Rice's interest was a necessary first step toward discharging the government's obligation to "protect the record" by raising the issue with the Court. *See Ciak v. United States*, 59 F.3d 296, 306 n.8 (2d Cir. 1995). It does not constitute misconduct. To the contrary, the government may have been subject to criticism if it had not taken steps to address the potential conflict. *See Stantini*, 85 F.3d at 12 n. 3 (noting that the Second Circuit has frequently criticized the government for failing to take action to address defendant's potential conflict of interest).

**B.      Defendants' factual allegations are false or misleading**

1.      *Kate Agnew*: Kate Agnew was an Arthur Andersen employee, who, according to defendants' motion, "is a percipient witness to numerous transactions and accounting decisions challenged in this case." Motion at 20. Defendants complain that Ms. Agnew "has not met with defendants." In an apparent explanation for Ms. Agnew's failure to meet with them, defendants' motion asserts (at 21) that roughly ten days before the *Andersen* trial in 2002, the government informed Agnew's attorney that her status had been changed from witness to "target" and that if she testified inconsistently with the government's theory she would be prosecuted for perjury. The source for this allegation is Mr. Kline's declaration, which purports to recount

information obtained from Ms. Agnew's former attorney, Tim Evans.  Kline Decl. ¶¶ 71-73.

This allegation is misleading or false in a number of respects.  First, as Ms. Agnew's current attorney has informed the Court, "Ms. Agnew was never told that she had been identified as a 'target' by the Enron Task Force in connection with the Arthur Andersen matter or any other matter, and was never told that the Enron Task Force had said she might be prosecuted for perjury."  Letter, Catherine E. Palmer to Hon. Sim Lake, Sept. 28, 2005 (attached as Exhibit 9).  Moreover, according to Ms. Agnew and contrary to defendants' contention, her former attorney never told her that the government had changed her status to target or threatened to prosecute her for perjury.  Declaration of Catherine E. Palmer ¶¶ 10-11 (attached as Exhibit 10).  Second, while it is true that Ms. Agnew has not met with the defendants, it is also true that they have not asked to meet with her.  Declaration of Catherine E. Palmer ¶ 5.  Third, defendants' motion neglects to mention that Ms. Agnew will be deposed in the *Newby* matter and that their counsel is scheduled to depose her for eight and a half hours.  *Id.* at ¶ 7.  And, as Ms. Palmer's declaration makes clear, several other assertions in defendants' motion and its supporting declaration are also inaccurate.  Palmer Decl. ¶¶ 8, 12, 21-23.

2.     *Philip Hilder*: Mr. Hilder is an attorney who represents several former Enron employees.  Mr. Holscher's declaration asserts that "during a court break" in the EBS case, Mr. Hilder told him that "many threats had been made against

20

witnesses in [the] EBS prosecution" and that the government responded to exculpatory information offered by witnesses by asserting that the witnesses "were committing perjury." Tellingly, Mr. Holscher's declaration predicts that Mr. Hilder "would be very upset if I publicly attributed these comments to him." Holscher Decl. ¶¶ 6-7.

Mr. Holscher's prediction was prophetic. In a letter to this Court, Mr. Hilder described Mr. Holscher's declaration as containing "misrepresentations and/or mischaracterizations" concerning the conversation that he had with Mr. Holscher. According to Mr. Hilder, who obviously has a good recollection of the conversation, "[a]t **no** time during the conversation did [Mr. Hilder] ever say or indicate that 'many threats had been made against witnesses in EBS prosecution,'" Mr. Hilder had "no knowledge regarding whether witnesses other than [his] clients have been threatened," and "there have been no 'threats'" to Mr. Hilder's clients. Mr. Hilder's letter adds that "Mr. Holscher attempts to improperly speak for me in his Declaration which I find objectionable." Letter, Philip H. Hilder to Hon. Sim Lake, Sept. 27, 2005 (attached as Exhibit 11) (emphasis in original). In response to the Court's September 14 letter, Mr. Hilder's clients, Andrea Reed and Ryan Siurek, have refused to meet with defense counsel.

3. *Timothy Belden*: Timothy Belden was an Enron employee between 1997 and 2002. He has pleaded guilty to conspiracy to commit wire fraud, but has not yet been sentenced. Mr. Kline asserts that Julie Salamon, an attorney for Mr.

Belden, told him (on some unspecified date) that the government had "instructed Mr.

Belden not to talk to 'anybody'" and made it "'very clear'" that Mr. Belden "would suffer

repercussions, including receiving an unfavorable sentencing recommendation from the

government" if he cooperated with the defendants.  Kline Decl. ¶ 30.

Mr. Kline's hearsay declaration is inconsistent with Ms. Salamon's own sworn

recollection, which is submitted with this response as Exhibit 12.  Ms. Salamon's

declaration states that in the three years that she has represented Mr. Belden, "[n]o

attorney or agent with the Enron Task Force has ever told me that Mr. Belden would

suffer repercussions if he cooperated with any defendant"; nor has any Enron Task Force

agent or attorney "ever told [Ms. Salamon] that Mr. Belden should not speak with any

defendant."  Mr. Salamon also expressly denied making either of these statements to Mr.

Kline.  Salamon Decl. ¶ 2-3.[13]

4. *Larry Lawyer, Wade Stubblefield, Rodney Faldyn*: Messrs.

Lawyer, Stubblefield, and Faldyn are former Enron employees represented by Robert

Sussman.  According to Mr. Kline's declaration, Mr. Sussman "responded orally" to an

unidentified member of the defense team "that he might field questions from the defense,

but he would not let his clients meet with [defense counsel] for fear the Enron Task Force

will ask if they met with us."  Kline Decl. ¶ 49.  The same declaration quotes Mr.

---

[13] Mr. Kline's declaration asserts that "Mr. Belden could be an important witness in this case," but for reasons unknown to the government, defendants did not include Mr. Belden on the list of witnesses who should receive the Court's September 14 letter.

22

Sussman as saying in a later meeting that Enron Task Force attorneys Andrew Weissman

and Linda Lacewell "'made it clear' to him that if witnesses help or meet with defendants,

the Enron Task Force would 'make [them] pay.'" Kline Decl. ¶ 51.  As an initial matter,

the Kline Declaration goes on to say that when contacted at a later time, Mr. Sussman

denied making many of the statements attributed to him in that declaration.  In a letter

responding directly to this declaration, Mr. Sussman states that "neither Linda Lacewell

nor Andrew Weissmann threatened reprisals should my clients speak with defense

counsel."  *See* Exhibit 13.[14]  In response to the Court's September 14, 2005, letter,

Messrs. Lawyer, Stubblefield, and Faldyn all refused to meet with defense counsel.

      5. *Kevin Hannon:*  Kevin Hannon is a former employee of Enron and

EBS.  Defendants assert that Mr. Hannon's attorney, Reid M. Figel, told their counsel that

it was not in Mr. Hannon's interest to meet with defendants.  Mr. Figel denied that the

government had made any explicit or implicit threats not to meet with the defendants or to

testify in their behalf and that members of the Enron Task Force "ha[d] been very careful

with" Mr. Figel, but added that he was "'prevented'" from discussing Mr. Hannon's

possible testimony against Skilling "'at the present time.'" Kline Decl. ¶ 58.

---

[14] Mr. Sussman added that "[t]he only direct limitation put on any of [his] clients
was the prohibition against discussing information gained from the government in
debriefing sessions" and that he is "well aware that the Task Force still considers [his]
clients subjects of the still active grand jury investigation and that the potential threat . . .
is concern enough to be circumspect with both sides."

In the attached declaration, Mr. Figel has clarified a number of facts about the assertions in Mr. Kline's declaration. First, during the conversation, which he had "understood to be an off-the-record conversation . . . that would not be the subject of any filings with the Court," Mr. Figel "intended to communicate [his] belief that [he] did not possess any evidence that would assist the defendants in connection with their motion." Decl. of Reid M. Figel ¶¶ 6, 7 (attached as Exhibit 14). Mr. Figel's declaration makes clear that by saying that the government had been "careful," he meant that the government had acted appropriately, not, as defendants suggest, that the government had been careful not to make overt or explicit threats. Second, Mr. Figel's declaration explains that Mr. Hannon's decision not to cooperate with defendants "has been based solely on [Mr. Figel's] professional judgment as to what is in Mr. Hannon's best interest. It has not been influenced, directly or indirectly by an 'real or perceived fears that the Enron Task Force would retaliate against [his] client if he chose to assist the defense.'" Figel Decl. ¶ 8. Thus, the only thing that "prevented" Mr. Figel from discussing Mr. Hannon's testimony concerning Skilling was his assessment of Mr. Hannon's interest.[15]

> 6. *Michael Andersen*: Defendants assert that Michael Andersen, who worked for the Enron subsidiary Azurix, "could give exculpatory testimony" for defendant Lay. Ramsey Decl. ¶ 7. According to Mr. Ramsey's declaration, Mr. Andersen's attorney, Wendell Odom, told Mr. Ramsey that on July 1, 2004, FBI Agent

---

[15] In response to the Court's September 14 letter, Mr. Hannon has refused to meet with defense counsel.

Paula Schanzle said to Messrs. Anderson and Odom, "You don't want to talk to [the attorneys for Skilling and Lay]. They are bad news." Ramsey Decl. ¶ 12. Notably, defendants have not supplied a declaration from either Mr. Odom or Mr. Andersen. Agent Schanzle has, however, provided a declaration, in which she states that she did not make the statements attributed to her in the Ramsey Declaration. Declaration of Paula Schanzle ¶ 4. (attached as Exhibit 15).

    7. *The government's plea agreements*: Defendants characterize the plea agreements that the government entered into with Canadian Imperial Bank of Commerce and Merrill Lynch as "abhorrent" (Motion at 29) because, defendants assert, the agreements prevent employees of these two concerns from providing exculpatory testimony that is inconsistent with the factual basis for the pleas. This is a willful misreading of the plea agreements. As defendants explain, those plea agreements provide that CIBC and Merrill Lynch "will not, *through* [their] attorneys, board of directors, agents, officers, or employees, make any public statement, in litigation or otherwise, contradicting any of the facts set forth" in the factual statement. Motion at 29 (emphasis added). Plainly, that provision bars CIBC and Merrill Lynch from taking an official position as a corporation that is inconsistent with facts that they have solemnly agreed are accurate. It does not, and the government could not, stop individual employees from testifying as to facts in the employee's knowledge, regardless of whether those facts are inconsistent with the plea agreements.

Notably, the example on which defendants rely rebuts their contention.

Defendants point out that CIBC employee Ian Schottlander testified in the Enron

bankruptcy proceedings in a manner that was allegedly inconsistent with the facts in

CIBC's agreement.[16] Motion at 29. As an initial matter, Mr. Schottlander was no longer

a CIBC employee at the time of his testimony in the bankruptcy hearing (although he

remained a consultant to CIBC), so CIBC's agreement has no bearing on him in any

event. Nor has the government taken any action against either Mr. Schottlander or CIBC

based on this testimony. The government has done nothing, through CIBC or otherwise,

to impede defendants' access to Mr. Schottlander or prevent him from testifying on their

behalf. Accordingly, defendants are simply wrong in alleging that the government's plea

agreements support their allegations of government misconduct or impede their ability to

obtain relevant evidence.

Defendants also complain about a provision in various cooperators' plea

agreements barring the cooperator from revealing information that he or she received

from the government as part of the cooperation. The short answer to this contention is

that the Court's September 14 letter contains a statement that (i) witnesses do not need to

seek the government's consent to meet with defense counsel or inform the government of

any meeting with defense counsel; (ii) to the extent that consent is required by a plea

agreement, the government has given its consent; (iii) witnesses are free to discuss

---

[16] In response to the Court's September 14 letter, Mr. Schottlander has refused to
cooperate with defendants.

whatever they choose to discuss with defense counsel, regardless of any agreement with the government; and (iv) witnesses are free to testify on defendants' behalf at trial. These provisions of the Court's letter are sufficient to rectify any misperception generated by the government's plea agreement.

In any event, on its face, the provision of the plea agreement at issue does not prevent any witness from meeting with defendants and relating everything he or she learned as a participant in the events that form the basis for the indictment. Nor does it prevent a witness from testifying for a defendant.[17] In addition, the government has complied, and will continue to comply, with its discovery obligations, and thus any exculpatory information that is shared with a potential witness will also be shared with defendants. Against this background, defendants' complaint apparently is that the cooperating witnesses' plea agreement bars the witnesses from sharing information they may glean about the government's trial strategy during witness interviews. Plainly,

---

[17] Defendants' heavy reliance on *United States v. Leung*, 351 F. Supp. 2d 992 (C.D. Cal. 2005), is misplaced. There, the district court found that a plea agreement wholly prevented the defendant's accomplice from speaking with defendant's counsel. The court acknowledged that in most cases in which the government has interfered with a defendant's access to a witness, "the harm to the defendant is easily cured" by an "explanation by the judge, or the prosecutor, that the witness is, in fact, free to be interviewed if he wishes." *Id.* at 996. The court found, however, that those measures would be insufficient to reassure the witness that he was free to talk to the defense and that the defense would be prejudiced because the accomplice was "critical to the defense." *Id.* at 997. The government strongly disagrees with the court's reasoning and resolution in *Leung*, and it disagrees with defendants' contention that it engaged in misconduct. But even assuming the validity of the *Leung* court's reasoning and the defendants' allegations, this is a case in which any prejudice can be, and has been, cured by the Court's letter informing the witnesses of their right to cooperate with defendants.

defendants have no right to know what the government believes to be important or what pieces of evidence it discusses with a particular defendant.

## II.     Defendants have failed to show that they are entitled to dismissal of the indictment or other relief.

Defendants allege a due process violation arising out of the government's alleged interference with their access to potential witnesses.  A due process violation occurs only when defendants show that they suffered actual prejudice from the government's actions.  In other words, the defendants "must show that the government's conduct interfered substantially with a witness's free and unhampered choice to testify."  *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997); *see United States v. Bieganowski*, 313 F.3d 264, 1189-90 (9th Cir. 1998) ("A defendant's constitutional rights are implicated only where the prosecutor . . . employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify."); *see also Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (noting that most claims of due process violations require a showing of "identifiable prejudice to the accused")  As these cases make clear, defendants must establish that the government engaged in improper conduct that deprived defendants of access to a witness or improperly prevented the witness from testifying. *See United States v. Hatch*, 926 F.2d 387, 395 (5th Cir. 1991) (Fifth or Sixth Amendment violation may be established if "the government did in fact prevent [a witness] from testifying").  When the government's actions have no effect on a witness's decision to testify, no due process violation occurs. *See United States v. Bieganowski,*

313 F.3d at 292; *United States v. Viera*, 839 F.2d 1113, 1114 (5th Cir. 1988) (en banc)

(finding no due process violation where "[n]o showing has been made that a prospective

witness was intimidated or that he refused to testify"). As the Fifth Circuit has explained,

"No right of a defendant is violated when a potential witness freely chooses not to talk."

*In re United States*, 878 F.2d 153, 157 (5th Cir. 1989).

The government denies that it improperly threatened any witness or undertook any

action that unfairly deprived defendants of their ability to obtain the testimony of a

witness. Moreover, as set forth at length above, the government vigorously disputes most

of the factual allegations underlying defendants' motion and all of the nefarious

inferences defendants draw therefrom. Even if defendants' allegations are accepted as

true, however, no due process violation has occurred in this case because defendants have

not yet been tried and this Court has taken extraordinary action to ensure that they have

access to any witness who wishes to speak to them and that no witness suffers retaliation

for cooperating with defendants. Defendants have made no showing that in the wake of

the Court's September 14 letter any potential witness will refuse to testify on the

defendants' behalf because of some action taken by the government. Because the Court's

actions have inoculated the trial against any possible prejudice that defendants could have

suffered as a result of the government's alleged actions, defendants cannot establish a

violation of the Due Process Clause. For that reason alone, defendants' motion should be

denied.

Defendants may also be arguing argue that dismissal of the indictment is appropriate because the government has engaged in outrageous misconduct. A defendant claiming outrageous government misconduct has "an extremely high burden of proof," *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997), and must show conduct so outrageous that deprives the defendant of fundamental fairness. *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003). Even when the government engages in misconduct, the remedy must be tailored to the injury suffered from the violation. *United States v. Morrison*, 449 U.S. 361, 364, 101 S. Ct. 665, 668 (1981); *see United States v. Laury*, 49 F.3d 145, 150 (5th Cir. 1995). Accordingly, when a court identifies government misconduct prior to trial, its approach should be to "neutralize the taint" from the conduct. *Morrison*, 449 U.S. at 364, 101 S. Ct. at 668. Dismissal of the indictment is "plainly inappropriate." *Ibid*.; *see United States v. Gutierrez*, 343 F.3d at 421 ("dismissal of an indictment for outrageous government conduct is proper only in the rarest circumstances") (internal quotation marks and citation omitted). Dismissing an indictment when other remedies will suffice is a "drastic" remedy that "increase[s] to an intolerable degree interference with the public interest in having the guilty brought to book" *United States v. Blue*, 384 U.S. 251, 255, 88 S. Ct. 1416, 1419 (1966).

Here, defendants' motion wholly fails to carry their "high burden of proof" to establish anything approaching outrageous government misconduct, much less misconduct that would justify dismissal of the indictment. Even taking defendants'

30

supporting declarations at face value, they fail to supply admissible evidence showing that the government engaged in misconduct.[18]  On the present record, therefore, the Court can and should deny defendants' motion outright without the need for any satellite litigation or an evidentiary hearing.  At the least, if the Court were contemplating dismissal based on government misconduct, an evidentiary hearing is necessary to test the veracity of defendant's declarations (and the hearsay they contain) and to determine the circumstances surrounding the actions that, defendants allege, constitute misconduct.

Finally, defendants request that the Court employ such extraordinary measures as requiring the government to grant immunity to witnesses, authorizing depositions of witnesses who refuse to meet with defendants, or precluding the government from calling any witness who refuses to meet with the defense or sit for a deposition.  Defendants have utterly failed to show that the measures taken by the Court are insufficient to inform potential witnesses of their ability to meet with counsel.  Moreover, each of those measures lacks any factual or legal basis.  The Fifth Circuit "has consistently held that a district court does not possess the statutory, common law, or inherent authority either to grant use immunity to a defense witness over the government's objection or to order the government to do so." *United States v. Chagra*, 669 F.2d 241, 258 (5th Cir. 1982), *overruled on other grounds*, *Garrett v. United States*, 471 U.S. 773, 105 S. Ct. 2407

---

[18]  To be clear, the government believes that the only meaningful disputes that exist are between defense counsel and counsel for certain witnesses.  The direct evidence from counsel for the affected witnesses shows that the government has not engaged in any improper conduct.

(1985). Although the court of appeals has suggested that a court may in "some extraordinary circumstances require either defense witness immunity or some remedial action by a district court to protect a defendant's right to a fair trial," *id.*, it has never found the requisite extraordinary circumstances present. In particular, the court of appeals has made clear that a court may not order immunity for a defense witness simply because the "witness has essential exculpatory information unavailable from other sources." *United States v. Thevis*, 665 F.2d 616, 639-640 (5th Cir. 1982); *see also Autry v. Estelle*, 706 F.2d 1394, 1401 (5th Cir. 1983) (rejecting Third Circuit's view that court may grant immunity to defense witnesses in the absence of prosecutorial misconduct). No extraordinary circumstances are present here. Indeed, as set forth above, defendants have shown nothing more than that the potential witnesses in this case have reasonably decided, after consultation with counsel, not to speak with them.

Nor is there any authority in this Circuit allowing a court to order potential witnesses to be deposed. Depositions in criminal cases are governed by Federal Rule of Criminal Procedure 15. That Rule allows a party to seek a deposition of a witness "in order to preserve testimony for trial." A court may grant such a motion only in "exceptional circumstances and in the interests of justice." Fed. R. Crim. P. 15(a). As the Fifth Circuit held in *In re United States*, 878 F.2d at 156, Rule 15 "does not authorize depositions for discovery purposes." As defendants point out (Motion at 50 n.126), the court of appeals has noted that "in certain limited instances the district court in a criminal

case may order discovery not provided for by statute or the Federal Rules of Criminal Procedure." *Id.* at 157. But the court also recognized that even if a court had the authority to order a pretrial deposition, a defendant has no right to order a witness to talk to them "whether or not he freely wished to do so." *Ibid.* Here, the Court has made no finding that the government impeded its access to any witness and has instead taken steps to ascertain whether witnesses wish to cooperate with the defendants or not. Accordingly, there is no basis for taking the extreme step of ordering pretrial "discovery" depositions. Finally, in light of the substantial evidence that the witnesses simply do not wish to meet with defendants (and the absence of any credible or competent evidence of government misconduct), it would be even more extraordinary to grant defendants' request to preclude the government from calling any witness who refuses to meet with them.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

Dated:          October 13, 2005
                Houston, Texas

                                   Respectfully submitted,

                                   SEAN M. BERKOWITZ
                                   Director, Enron Task Force

                                   _____
                                   Kathryn H. Ruemmler
                                   J. Douglas Wilson
                                   John H. Hueston
                                   Cliff Stricklin

                                   Assistant United States Attorneys
                                   Enron Task Force

# CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of October, 2005, I caused a true and correct copy of the foregoing Opposition to Defendants' Motion to Dismiss Based on Prosecutorial Misconduct to be served by electronic mail (without attachments) and Federal Express upon the following counsel of record:

Daniel M. Petrocelli
Matthew T. Kline
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
(310) 246-6850
Dpetrocelli@OMM.com

Ronald G. Woods
5300 Memorial, Suite 1000
Houston, TX 77007
(713) 862-9600
RonWoodsLaw@aol.com

Reid Weingarten
Mark Hulkower
Steptoe & Johnson
1330 Connecticut Ave., NW
Washington, D.C. 20036
(202) 429-6238
Rweingarten@steptoe.com
mhulkower@steptoe.com

Michael Ramsey
Chip B. Lewis
River Oaks/Welch Building
2120 Welch
Houston, TX 77019
(712) 523-7878
mramsey@mramsey-lawyer.com

By: _____

21      Anyway, so that's the ruling.  I see I have left
22   everybody speechless so we can move on to the next.
23      Is there another issue we need to clear up before we
24   go ahead?
25      MR. WEINGARTEN:  Just a scheduling thing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3180

52N8EBB1
1      THE COURT:  Yes.
2      MR. WEINGARTEN:  I have never been in this position
3   before.  We have all these witnesses we are considering
4   calling, but no one seems eager to speak to us before.  So we
5   have a lot of balls up in the air.
6      I think it's conceivable that we could get to
7   tomorrow, late in the morning, early in the afternoon and be
8   sort of left with the decision of whether or not to close it
9   down or call the defendant.  I think that our request will be
10   not to have to make that decision tomorrow.  And then if we are
11   there, and we may not because we may put on more witnesses, but
12   a lot of this will be determined today and tonight, that we
13   represent to the Court that on Monday either we will be
14   prepared to close or we will put him on, and then perhaps the
15   close of business the following day, we will tell the
16   government what we are going to do.
17      THE COURT:  The only thing I am concerned about is
18   when you're going to tell the government between the close of
19   business on Thursday and Monday morning.
20      MR. WEINGARTEN:  Friday.
21      THE COURT:  Fair enough.
22      MR. ANDERS:  That would be obviously what we'd be
23   interested in finding out.
24      THE COURT:  I don't have a problem with that.
25      MR. WEINGARTEN:  It may be that we roll the dice and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3181

52N8EBB1
1   put people on cold and see what happens.
2      THE COURT:  Well, there are very many interesting
3   things that Cynthia Cooper could say.
4      MR. WEINGARTEN:  Judge, she is the easiest.
5      THE COURT:  All right.  Understood.  My empathy is
6   increasing, Mr. Weingarten.
7      MR. JOHNSON:  To continue my broken record, we would
8   request that Lisa Taranto also not be excused.

9          THE COURT:  I think I misspoke and said excused

10    yesterday.  I hope everyone didn't immediately rush to depose

11    her.

12          MR. ANDERS:  You never know.

13          THE COURT:  She is not excused.  She can make that

14    representation.  OK?

15          MR. ANDERS:  Thank you.

16          THE COURT:  Good enough.

17          Once we have a jury, we will be out there.

18          (Continued on next page)

19

**Cross-Boyt-By Mr. Cogdell**

1  binding, it doesn't need to be in the agreement?

2          MR. FRIEDRICH:  Your Honor, asked and answered.

3          MR. COGDELL:  He won't answer the question.

4          THE COURT:  Overruled.

03:10:35PM 5 BY MR. COGDELL:

6  Q.    Did you believe this?

7  A.    No.

8  Q.    Do you remember meeting with myself and Mr. Goodling,

9  Mr. Sorkin, as late as April of this year and saying

03:11:02PM 10 exactly that; that is, if it's oral, it's not binding, and

11 that's what you, at one time, believed?

12 A.    I remember discussing the deal.  I don't remember

13 exactly saying that, no.

14 Q.    I didn't hear you.  Say that again.

03:11:20PM 15 A.    I do not remember exactly saying that, no.

16 Q.    Do you remember meeting with me and Mr. Goodling and

17 Mr. Sorkin and Mr. Horwitz?

18 A.    Yes, sir.

19 Q.    Your lawyer was there?

03:11:40PM 20 A.    Yes, he was.

21 Q.    Was that a professionally cordial meeting?

22 A.    Yes, sir.

23 Q.    Anyone unprofessional to you?

24 A.    No, sir.

03:11:51PM 25 Q.    Anyone threaten you or make any sort of efforts to