IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA       §
                               §
v.                             §       CRIMINAL NUMBER H-04-025-SS
                               §
RICHARD A. CAUSEY, JEFFERY K.  §
SKILLING, and KENNETH L. LAY   §

## MEMORANDUM OPINION AND ORDER

Pending before the court are Jeffery K. Skilling's Motion to Dismiss Counts 42 through 51 (Insider Trading Counts) [Defense Motion No. 5] (Docket Entry No. 389), and Skilling's Joinder in Defendant Richard A. Causey's Motion to Dismiss Counts 21, 22, 24, 25, 26, 28 & 29 for Failure to State an Offense and Failure to Allege an Offense with Specificity [Defense Motion No. 7] (Docket Entry No. 397) in which Skilling moves to strike paragraph 65 of the Second Superceding Indictment ((SSI) Docket Entry No. 97). For the following reasons these motions will be denied.

## I.  Factual Allegations

The SSI alleges that Enron hired Skilling in August of 1990, that Skilling held various executive and management positions at Enron until January of 1997 when he became President and Chief Operating Officer (COO), and that from February to August of 2001 Skilling served as Enron's President and Chief Executive Officer (CEO). (SSI ¶ 7) The offenses charged in the SSI arise from an

alleged scheme to deceive the investing public, including Enron's

shareholders, the Securities Exchange Commission (SEC), and others

> about the true performance of Enron's businesses by:
> (a) manipulating Enron's publicly reported financial
> results; and (b) making public statements and
> representations about Enron's financial performance and
> results that were false and misleading in that they did
> not fairly and accurately reflect Enron's actual
> financial condition and performance, and they omitted to
> disclose facts necessary to make those statements and
> representations fair and accurate.

(SSI ¶ 5)   The SSI charges the defendants with having "enriched

themselves as a result of the scheme through salary, bonuses,

grants of stock and stock options, other profits, and prestige

within their professions and communities."  (SSI ¶ 14)   The SSI

alleges that "between 1998 and 2001, SKILLING received

approximately $200 million from the sale of Enron stock options and

restricted stock, netting over $89 million in profit, and was paid

more than $14 million in salary and bonuses."  (¶ 15)

## II.   Standard of Review

Federal Rule of Criminal Procedure 12(b) authorizes motions to

dismiss that raise "any defense, objection, or request that the

court can determine without a trial of the general issue." Fed. R.

Crim. P. 12(b)(2).   In assessing challenges to the sufficiency of

an indictment the court is required to "take the allegations of the

indictment as true and to determine whether an offense has been

stated." United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004).

Federal Rule of Criminal Procedure 7(c)(1) states that an

indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."

> The test for sufficiency is "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards"; namely, that it "[(1)] contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and [(2)], enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

Kay, 359 F.3d at 742 (quoting United States v. Ramirez, 233 F.3d 318, 323 (5th Cir. 2000), overruled on other grounds by United States v. Longoria, 298 F.3d 367 (5th Cir. 2002)).  See also Hamling v. United States, 94 S.Ct. 2887, 2907 (1974).  "An indict-ment that tracks a statute's words is generally sufficient 'as long as those words fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" United States v. Arlen, 947 F.2d 139, 145 (5th Cir. 1991), cert. denied, 112 S.Ct. 1480 (1992) (quoting United States v. London, 550 F.2d 206, 210 (5th Cir. 1977)).  Evidence outside the indictment is irrelevant to a determination of whether the indictment itself is legally sufficient.  See United States v. Mann, 517 F.2d 259, 266-267 (5th Cir. 1975), cert. denied, 96 S.Ct. 878 (1976).

### III.  Insider Trading Counts Alleged Against Skilling

Skilling seeks dismissal of counts 42 through 51 of the SSI, which charge him with insider trading in violation of 17 C.F.R.

§ 240.10b-5, 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. §§ 2 and 3551, because these counts "fail to allege essential elements of the offenses charged and fail to give sufficient notice of the charges Skilling faces."[1]

## A.    Allegations

Paragraph 119 of the SSI reasserts the allegations made in ¶¶ 1-85.  Paragraph 120 of the SSI alleges that

> [o]n or about the dates set forth below, each such date constituting a separate count of this Indictment . . . defendant JEFFREY K. SKILLING knowingly and willfully used and employed manipulative and deceptive devices and contrivances, by use of means and instrumentalities of interstate commerce, in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that he engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public in connection with the purchase or sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff. Specifically, while in possession of material non-public information, SKILLING sold shares of Enron stock and generated total proceeds of $62,626,401.90.

SSI ¶ 120.

## B.    Applicable Law

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of

---

[1] Jeffrey Skilling's Motion to Dismiss Counts 42 Through 51 (Insider Trading Counts)[Defense Motion No. 5], Docket Entry No. 389, p. 1.

interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Pursuant to this section, the SEC promulgated

Rule 10b-5, which provides that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Although § 10(b) does not use the term "insider trading," a

violation of § 10(b) and Rule 10b-5 occurs "when a corporate

insider trades in the securities of his corporation on the basis of

material nonpublic information."  United States v. O'Hagan, 117

S.Ct. 2199, 2207 (1997).  Insider trading constitutes a "deceptive

device" under § 10(b) because "a relationship of trust and

-5-

confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position in the corporation." Id. (quoting Chiarella v. United States, 100 S.Ct. 1108, 1114 (1980)).  The relationship between corporate insiders and shareholders "gives rise to a duty to disclose [or to abstain from trading] because of the necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders." Id. (quoting Chiarella, 100 S.Ct. at 1115).  This "classical" theory of insider trading "applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation." Id. (citing Dirks v. SEC, 103 S.Ct. 3255, 3262 (1983)).  "The classical theory targets a corporate insider's breach of duty to shareholders with whom the insider transacts." Id.

## C.   Analysis

Skilling argues that the insider trading counts should be dismissed because they allege the wrong mens rea and because they fail to identify the material, nonpublic information underlying each alleged insider trade.[2]

---

[2]Memorandum in Support of Jeffrey Skilling's Motion to Dismiss Counts 42 Through 51 (Insider Trading Counts), attached to Docket Entry No. 389 (Skilling Memorandum), pp. 1-2.

1.   <u>Mens Rea</u>

Skilling argues that all ten insider trading counts,

but especially the first five—which target trades predating the October 23, 2000 effective date of SEC Rule 10b5-1—allege an erroneous <u>mens rea</u> standard. . . [because] the Task Force posits a <u>mens rea</u> standard here (merely "possessing" material, non-public information, Indictment ¶ 120, rather than intentionally "using" such information to defraud) that is contrary to the intent of Congress and effectively eliminates the scienter element of the charged offense.[3]

Citing <u>United States v. Smith</u>, 155 F.3d 1051, 1068 n.25 (9th Cir. 1998), <u>cert. denied</u>, 119 S.Ct. 804 (1999), Skilling argues that "[b]etter reasoned appellate authorities, including the only case to address the 'use' <u>versus</u> 'possession' question in the criminal context, hold that '<u>use</u>' must be proven."[4]   Skilling argues that the charges based on trades that post-date Rule 10b5-1 should be dismissed for the additional reason that they do not reflect the new rule's "awareness" standard.[5]   The Enron Task Force ("ETF") responds that when

[r]ead practically and not technically, the language of the Indictment is sufficient to show [Skilling's] "use" as well as "knowing possession" [of material, nonpublic information].  The sentence construction in paragraph 120 and the placement of "while in possession" before the sale of stock informs Skilling that he is accused of using the [material, nonpublic] information to [sell] stock. . . [Skilling] is thus notified of the charges against him and need not be concerned about an additional

---

[3] <u>Id.</u> at p. 1.

[4] <u>Id.</u> (emphasis in original).

[5] <u>Id.</u> at pp. 2, 5-12.

prosecution under the same facts. . . . Thus, the discussion in defendant's motion on the "use vs. possession" debate is largely academic and raises an issue the Court need not address.[6]

(a)  Use vs. Possession

The Supreme Court's determination that § 10(b) and Rule 10b-5 are violated "when a corporate insider trades in the securities of his corporation on the basis of material nonpublic information," O'Hagan, 117 S.Ct. at 2207, has raised the question of whether the phrase "on the basis of material nonpublic information" requires a showing that an insider actually used material, nonpublic information obtained through his position in deciding to make the securities trade at issue, or whether a showing that the insider merely possessed material, nonpublic information when the securities trade occurred is sufficient to establish liability. See In re Enron Corp. Securities, Derivatives & "ERISA Litig.", 258 F.Supp.2d 576, 591-593 (S.D. Tex. 2003). Considering the issue in the context of a criminal case, the Ninth Circuit held that a conviction could not be had absent proof that the defendant not only possessed material, non-public information, but that the defendant also used that information in deciding to make the securities trade at issue. See Smith, 155 F.3d at 1066-1069.

---

[6]Government's Consolidated Response to Defendants' Pretrial Motions, Docket Entry No. 416, pp. 71-72.

Thus, in the Ninth Circuit a criminal conviction for insider trading cannot be had without proof that a causal connection exists between the material, nonpublic information and the trade at issue. Id.  Considering the issue in a civil enforcement action, the Eleventh Circuit held that the insider defendant's "knowing possession" of material, nonpublic information raises a "strong inference" that the defendant used that information in trading, sufficient to make a prima facie showing of liability that the defendant could rebut with evidence showing that the material, nonpublic information was not a factor in the decision to trade. SEC v. Adler, 137 F.3d 1325, 1337-1339 (11th Cir. 1998).  But see United States v. Teicher, 987 F.2d 112, 120-121 (2d Cir.), cert. denied, 114 S.Ct. 467 (1993) (suggesting that "knowing possession" is sufficient due to the difficulty of establishing actual "use," but finding resolution of the issue unnecessary under the facts of the case).  See also Smith, 155 F.3d at 1069 & n.27 (declining to apply Adler presumption in a criminal case but expressing no view as to its applicability in a civil enforcement proceeding).

     (b)  Rule 10b5-1

In answer to the question of "what, if any, causal connection must be shown between the trader's possession of inside information and his or her trading," the SEC promulgated Rule 10b5-1, which in pertinent part provides that

> (b)  . . . a purchase or sale of a security of an issuer
> is "on the basis of" material nonpublic information about
> that security or issuer if the person making the purchase
> or sale was aware of the material nonpublic information
> when the person made the purchase or sale.

17 C.F.R. § 240.10b5-1(b).  Rule 10b5-1 creates an <u>Adler</u>-type

presumption that a defendant is liable for insider trading upon

proof that he or she was <u>aware</u> of the material, nonpublic

information when the securities trade at issue occurred that can be

rebutted by evidence that the material, nonpublic information was

not a factor in the defendant's decision to trade.[7]

---

[7] <u>See</u> 17 C.F.R. § 240.10b5-1(c):

Affirmative defenses.

(1)(i) Subject to paragraph (c)(1)(ii) of this section,
a person's purchase or sale is not "on the basis of"
material nonpublic information if the person making the
purchase or sale demonstrates that:

> (A) Before becoming aware of the information, the
> person had:  (1) Entered into a binding contract to
> purchase or sell the security, (2) Instructed
> another person to purchase or sell the security for
> the instructing person's account, or (3) Adopted a
> written plan for trading securities;

> (B) The contract, instruction, or plan described in
> paragraph (c)(1)(i)(A) of this Section: (1) Speci-
> fied the amount of securities to be purchased or
> sold and the price at which and the date on which
> the securities were to be purchased or sold;
> (2) Included a written formula or algorithm, or
> computer program, for determining the amount of
> securities to be purchased or sold and the price at
> which and the date on which the securities were to
> be purchased or sold; or (3) Did not permit the
> (continued...)

-10-

(c)  Sufficiency of the Insider Trading Charges

Skilling argues that the insider trading charges asserted against him in Counts 42 through 51 should be dismissed for failure to allege the appropriate <u>mens</u> <u>rea</u> because ¶ 120 of the SSI alleges only that the charged trades occurred while he possessed material, nonpublic information but does not allege that he used that information when he made those trades.  The court is not persuaded that ¶ 120 fails to allege that he used material, nonpublic information when making the charged trades.

---

[7](...continued)
person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not have been aware of the material nonpublic information when doing so; and

(C) The purchase or sale that occurred was pursuant to the contract, instruction, or plan.  A purchase or sale is not "pursuant to a contract, instruction, or plan" if, among other things, the person who entered into the contract, instruction, or plan altered or deviated from the contract, instruction, or plan to purchase or sell securities (whether by changing the amount, price, or timing of the purchase or sale), or entered into or altered a corresponding or hedging transaction or position with respect to those securities.

(ii)  Paragraph (c)(1)(i) of this section is applicable only when the contract, instruction, or plan to purchase or sell securities was given or entered into in good faith and not as part of a plan or scheme to evade the prohibitions of this section.

Paragraph 120 of the SSI alleges that Skilling

knowingly and willfully used and employed manipulative and deceptive devices and contrivances . . . in violation of Rule 10b-5 . . . in that he engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public in connection with the purchase or sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

The deceptive device that Skilling is alleged to have used is described in the final sentence of ¶ 120, which alleges "that while in possession of material non-public information, Skilling sold shares of Enron stock and generated total proceeds of $62,626,401.90." (SSI ¶ 120)  The Supreme Court has stated that insider "[t]rading on" material, nonpublic information "qualifies as a 'deceptive device' under § 10(b)."  O'Hagan, 117 S.Ct. at 2207.  The Supreme Court has also stated that theories of insider trading advanced under § 10(b) and Rule 10b-5 do not "catch all conceivable forms of fraud involving confidential information . . . [but, instead catch only] fraudulent means of capitalizing on [material, nonpublic] information through securities transactions."  Id. at 2209.

Paragraph 120's allegation that Skilling sold Enron stock while in possession of material, non-public information can constitute a deceptive device or contrivance only if the material, nonpublic information was a factor in Skilling's decision to make the charged trades because if it were not a factor, no breach of

his fiduciary duty to the Enron shareholders would have occurred. See Dirks, 103 S.Ct. at 3264 ("insiders [are] forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage"); Teicher, 987 F.2d at 121 (finding it unnecessary to decide whether the existence of a causal connection between nonpublic information and an alleged trade is required to prove liability for insider trading since the jury in that case had found that when the trades occurred the defendant possessed information that he knew to be fraudulently obtained, material, and nonpublic, and had also found that the trades were not made in good faith upon concluding that no reasonable jury could have made these findings without also finding that the defendant had used the nonpublic information to make the trades); SEC v. Lipson, 278 F.3d 656, 660 (7th Cir. 2002) (recognizing that government bears the burden of persuading the jury that the defendant's trades were influenced by the inside information that he possessed). Moreover, since the government admits that the SSI accuses Skilling of having used material, nonpublic information in making the charged trades, and Skilling has not cited any case in which an insider accused of trading securities while in possession of confidential information has been held liable for violation of § 10b and Rule 10b-5 absent evidence that the trades operated as a fraud and deceit upon members of the investing public, or that the insider making the trades did not knowingly and willfully breach a

fiduciary duty owed to the shareholders of his corporation, the court is not persuaded that the allegations of insider trading asserted against Skilling fail to allege the appropriate <u>mens</u> <u>rea</u> (guilty mind).

2.   <u>Non-Public Information at Issue</u>

Skilling argues that the insider trading counts should be dismissed because they fail to identify "any specific material, non-public information" underlying each alleged insider trade.[8] Skilling argues that without notice of which material, nonpublic information he is charged with using in the 40 trades he is unable to defend these counts.[9]  Asserting that the trades at issue took place on different dates over a 17-month period, and that the SSI does not specify what information he allegedly knew at each point in time, Skilling asserts that "[t]his lack of specificity is prejudicial."[10]  Although Skilling acknowledges that the SSI "alleges a wide variety of corporate malfeasance (e.g., the Count One conspiracy, Raptors, Cuiaba, Nigerian Barges, Global Galactic, prepays, EBS, EES business failures, Project Braveheart, McGarret transactions A through V, etc.),"[11] he argues that forcing him to

---

[8]Skilling Memorandum, p. 13.

[9]<u>Id.</u>

[10]<u>Id.</u> at p. 14.

[11]<u>Id.</u> at p. 13.

defend against such a "'litany of actions' — only some of which the Task Force could plausibly claim justify insider trading charges — is impermissible."[12]

As Skilling recognizes, the paragraphs of the SSI incorporated into the insider trading counts identify the types of material non-public information that he allegedly possessed and could have used in connection with his sales of Enron stock.  Each of the insider trading counts alleged against Skilling sets forth the date, the number of shares traded, the price, and the resulting proceeds, and incorporate by reference allegations of his contemporaneous knowledge of efforts to deceive the public about Enron's true financial performance.  (SSI ¶ 120)  For example, ¶ 32 of the SSI alleges that from approximately July 1999 through October 2001 Skilling caused Enron to enter into a series of transactions with special purpose entities that enabled him and his co-conspirators to manipulate Enron's reported financial results by fraudulently omitting poorly performing assets from Enron's balance sheet, by engaging in transactions designed to close gaps between Enron's actual results and its stated financial reporting goals, by manufacturing earnings through sham transactions, and by backdating documents to inflate the value of Enron's investment portfolio.

Paragraph 62 of the SSI alleges that Skilling filed or caused to be filed with the SEC false annual 10-K reports for the years

---

[12]<u>Id.</u> at p. 14.

ending December 31, 1999, and December 31, 2000, and false quarterly reports for the quarters ending September 30, 1999, March 31, 2000, June 30, 2000, September 30, 2000, March 31, 2001, and June 30, 2001.  The SSI alleges that when the trades charged in Counts 42 and 43 occurred on April 25 and April 26, 2000, Skilling knew that Enron's earnings were inflated by use of the LJM special purpose entities (SSI ¶¶ 30-32), the Raptor hedges (SSI ¶¶ 33-35), the Nigerian Barge deal (SSI ¶¶ 39-40), and Project Grayhawk (SSI ¶¶ 50-51); that when the trades charged in Counts 44 through 50 occurred in August, September, and November of 2000 Skilling also knew that in July of 2000 Enron had fraudulently reported an earnings-per-share rate of 34 cents instead of 32 cents (SSI ¶ 54); and that when the trade charged in Count 51 occurred on September 17, 2001, Skilling also knew that Enron had used "Schedule C" reserve funds to conceal EES's losses (SSI ¶ 57) and knew that EBS had failed (SSI ¶ 73).

The court concludes that these allegations are sufficient to place Skilling on notice of material, nonpublic information on which the trades charged in Counts 42 through 51 are based. Accordingly, the court is not persuaded that Counts 42 through 51 should be dismissed for the lack of factual particularity.

3.   <u>Count 51</u>

Skilling argues that Count 51 should be dismissed because it cites a trade made on September 17, 2001, after he resigned as CEO

and fails to allege the duty element of the offense.  Citing <u>Colby</u>
<u>v. Hologic, Inc.</u>, 817 F.Supp. 204, 215 (D. Mass. 1993), Skilling
argues that although the SSI alleges that he served as an employee
or consultant of Enron from the late 1980s to December of 2001, the
SSI "fails to allege facts sufficient to establish that . . . [he
owed a fiduciary duty to Enron's shareholders] after his
resignation based on a consultancy or any other cognizable
theory."[13]

The classical theory of insider trading applies not only to
officers, directors, and other permanent insiders of a corporation,
but also to attorneys, accountants, lawyers, and other consultants
who become temporary fiduciaries of a corporation by entering into
a confidential relationship in conducting the corporation's
business and are given access to nonpublic corporate information
solely for corporate purposes.  <u>See</u> <u>Dirks</u>, 103 S.Ct. at 3262 &
n.14; <u>O'Hagan</u>, 117 S.Ct. at 2207.  For the purposes of its analysis
in <u>Dirks</u>, the Supreme Court treated a former corporate officer as
an insider bound by fiduciary duties owed to the corporation's
shareholders.  <u>Dirks</u>, 103 S.Ct. at 3255.  <u>See also</u> <u>Burlington</u>
<u>Industries, Inc. v. Edelman</u>, 666 F.Supp. 799, 814 (M.D.N.C.),
<u>aff'd</u>, 1987 WL 91498 (4th Cir. June 22, 1987) ("As <u>Dirks</u>
elucidates, a former corporate officer . . . retains the status of

---

[13] <u>Id.</u> at p. 15.

an 'insider' despite the cessation of employment with the corporation.").

Skilling's duty to refrain from trading on material, non-public information flowed from the fiduciary duty that he owed to Enron's shareholders.  Although Skilling no longer worked for Enron on September 17, 2000, when the trade charged in Count 51 occurred, since he is alleged to have possessed material, non-public information about Enron that he acquired while employed as an officer of the company, the fiduciary duty that he owed to Enron's shareholders did not cease upon his resignation but continued to apply to him as a former employee for as long as the information that he acquired as an officer remained material and nonpublic. Accordingly, the court is not persuaded that Count 51 should be dismissed because the government has failed to allege that Skilling owed a duty to Enron or its shareholders on September 17, 2000.

### IV.  Skilling's Motion to Strike Paragraph 65

"For the same reasons set forth in defendant Richard Causey's . . . motion [to dismiss the analyst call counts (Docket Entry No. 378], defendant Jeffrey Skilling moves to strike paragraph 65 of the Indictment."[14]  Paragraph 65 alleges that Skilling "directed"

---

[14]Jeffrey Skilling's Joinder in Defendant Richard A. Causey's Motion to Dismiss Counts 21, 22, 24, 25, 26, 28 & 29 for Failure to State an Offense and Failure to Allege an Offense with Specificity (Defense Motion 7) (Skilling Joinder), Docket Entry No. 397, p. 1.

a "conspirator" to answer a technical earnings-and-accounting-related question posed at an analyst conference that occurred on January 22, 2001, and that the conspirator answered the question in a way that Skilling "'knew . . . misled analysts about the sources of E[nron] B[roadband] S[ervices]' earnings in the fourth quarter of 2000' and supported 'Skilling's claims that EBS continued to be successful and a major positive factor contributing to Enron's stock price.'"[15] Asserting that "liability based on silence[] turns on an analysis of the defendant's <u>own</u> prior statements and whether defendant's silence made his previous statements false or misleading,"[16] Skilling argues that paragraph 65 should be stricken because it "alleges conduct that is not actionable under the

---

[15]<u>Id.</u>  Paragraph 65 alleges that

In support of SKILLING's claims that EBS continued to be successful and a major positive factor contributing to Enron's stock price, a conspirator misled analysts during the call about the source of EBS's earnings in the fourth quarter of 2000.  After being directed by SKILLING to answer a question about the source of EBS's revenues, the conspirator said that one-time, nonrecurring transactions such as sale of "dark fiber" and part of EBS's nascent video-on-demand venture with Blockbuster company accounted for "a fairly small amount" of EBS's revenues. In fact, as SKILLING and CAUSEY knew, the sale of projected future revenues from the Blockbuster video-on-demand venture accounted for $53 million of EBS's fourth quarter 2000 revenues of $63 million.

[16]Jeffrey Skilling's Joinder in Defendant Richard A. Causey's Motion to Dismiss Counts 21, 22, 24, 25, 26, 28 & 29 for Failure to State an Offense and Failure to Allege an Offense with Specificity (Defense Motion 7) (Skilling Joinder), Docket Entry No. 397, p. 1.

securities laws but prejudicially could be confused as such."[17]
Citing <u>Barrie v. Intervoice-Brite, Inc.</u>, 397 F.3d 249 (5th Cir.
2005) (<u>Barrie I</u>), the ETF argues that Skilling's motion to strike
¶ 65 should be denied because Skilling had a duty to correct the
material misrepresentations that the SSI alleges a conspirator made
at his direction.[18]

A.   **Primary Liability Under § 10b and Rule 10b-5**

In <u>Barrie</u> investors brought securities fraud actions against
a software company and its officers alleging fraudulent recognition
of revenue.  <u>Barrie I</u>, 397 F.3d at 249.  The complaint identified
twenty-three   allegedly   fraudulent   statements   of   earnings
projections, only twelve of which were attributed to the company or
one of the individual defendants.  <u>Id.</u> at 259.  The district court
dismissed   six   statements   as   failing   to   satisfy   the   pleading
requirements   of   the   Private   Securities   Litigation   Reform   Act
(PSLRA), 15 U.S.C. § 78u-4(b), because they failed to adequately
identify the speaker.  <u>Id.</u> at 261.  Three statements were dismissed
because they were attributed to "Hammond and Graham."  <u>Id.</u>

On   appeal   the   Fifth   Circuit   issued   conflicting   rulings
regarding the dismissal of the three statements attributed to

---

[17]<u>Id.</u> at pp. 1-2.

[18]Government's Consolidated Response to Defendants' Pretrial
Motions, Docket Entry No. 416, pp. 77-84.

"Hammond and Graham."  See Barrie I, 397 F.3d at 261-263.  First, the Fifth Circuit ruled that the district court properly dismissed claims based on statements attributed to "Hammond and Graham" in paragraphs 38, 59, and 68 because they failed to satisfy the pleading requirements of the PSLRA.  Id. at 261 ("The district court correctly held that 'the allegation that "Hammond and Graham" made a statement does not identify the speaker; it merely narrows the range of possible speakers down to two people.'  '[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud.'  Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353, 362 (5th Cir. 2004). . .  These claims were properly dismissed.").  Then, the Fifth Circuit ruled that the district court did not properly dismiss the claims based on statements attributed to "Hammond and Graham" in paragraphs 38, 59, and 68 because those allegations implied that one defendant spoke the fraudulent statement and that the other defendant failed to correct it.  See id. at 263.

Recognizing that the panel's opinion had "inadvertently made conflicting rulings regarding the allegations contained in paragraphs 38, 59, and 68 of the plaintiffs' complaint" regarding the statements attributed to "Hammond and Graham," the Fifth Circuit modified the opinion published in Barrie I in a subse-quently issued opinion.  See Barrie v. Intervoice-Brite, Inc., 409

F.3d 653, 656 (5th Cir. 2005) (<u>Barrie II</u>).  In pertinent part the

<u>Barrie II</u> opinion states that

> [t]he district court held that "the allegation that
> 'Hammond and Graham' made a statement does not identify
> the speaker; it merely narrows the range of possible
> speakers down to two people."  The plaintiffs argue,
> however, that defendants who silently listened as others
> made statements that they knew were false are liable for
> their omission in failing to correct a falsehood.  They
> claim that whether a particular statement during a
> conference call or a road show was uttered by Hammond or
> Graham, both are liable:  one for the utterance, and the
> other for the omission in failing to correct the
> falsehood.  As one district court held:
>
> > a high ranking company official cannot sit
> > quietly at a conference with analysts, knowing
> > that another official is making false
> > statements.  If nothing else, the former
> > official is at fault for a material omission
> > in failing to correct such statements in that
> > context.  <u>In re SmarTalk Teleservices, Inc.
> > Sec. Litig.</u>, 124 F.Supp.2d 527, 543 (S.D. Ohio
> > 2000).
>
> The defendants argue that this reasoning is inapplicable
> in this case, because the Complaint did not specify
> whether Hammond spoke and Graham failed to correct, or
> vice versa.  They assert that the allegations concerning
> Hammond and Graham are deficient given this Court's
> rejection of the group pleading doctrine . . .
>
> We reject the defendants' argument.  Where it is pled
> that one defendant knowingly uttered a false statement
> and the other defendant knowingly failed to correct it,
> even if it is not alleged which defendant made the
> statement and which defendant did not correct it, the
> fraud is sufficiently pleaded as to each defendant.
> <u>The Complaint's allegations that false statements were
> made by "Hammond and Graham" imply that one of them made
> the statement and the other knowingly failed to correct
> it.</u>  Accordingly, both Hammond and Graham are on fair
> notice of the claims against them.  The district court
> erred in dismissing the claims attributed to Hammond and
> Graham when the allegations sufficiently indicated that

           one had spoken the fraudulent statement, and the other
           had failed to correct it.

Id. at 655-656 (emphasis added).

    Skilling argues that the ETF's reliance on Barrie is misplaced because in that case the Fifth Circuit upheld a civil complaint alleging failure to correct while "[t]he [a]nalyst [c]all [c]ounts [charged] against . . . [him] contain no such allegations (i.e., failure to correct), rendering them constitutionally infirm under this theory."[19]  The court is not persuaded by Skilling's argument because the Fifth Circuit's Barrie II opinion clearly describes the issue before it as arising from "[p]aragraphs 38, 59, and 68 [of the complaint which] attribute statements to "Hammond and Graham," id. at 655, and from the plaintiffs' arguments (not allegations)

           that defendants who silently listened as others made
           statements that they knew were false are liable for their
           omission in failing to correct a falsehood.  They claim
           that whether a particular statement during a conference
           call or a road show was uttered by Hammond or Graham,
           both are liable:  one for the utterance, and the other
           for the omission in failing to correct the falsehood.

Id. at 655-656.

    Since the Fifth Circuit explained that "[t]he [c]omplaint's allegations that false statements were made by Hammond and Graham imply that one of them made the statement and the other knowingly

---

    [19]See Defendant Richard A. Causey's Reply Memorandum in Support of Motion to Dismiss Counts 21, 22, 24, 25, 26, 28 & 29 (the Analyst Call Counts) [Defense Motion 7], Docket Entry No. 422, p. 3 (citing Barrie I, 397 F.3d at 262-263).

failed to correct it," id. at 656 (emphasis added), and held that the complaint's allegations placed "both Hammond and Graham . . . on fair notice of the claims against them, id., the court is not persuaded that the allegations against Skilling in ¶ 65 should be dismissed because they do not expressly allege that Skilling failed to correct allegedly false statements attributed to a conspirator. Paragraph 65 alleges that Skilling violated § 10(b) by directing a conspirator to answer an analyst question, and that Skilling knew the conspirator's answer to the question was false.  The allegation that Skilling knew that the statements attributed to the conspirator were false implies that Skilling knowingly failed to correct the conspirator's false statements.  Moreover, since the allegations contained in ¶ 65 are more specific than those found to satisfy the heightened pleading requirements of the PSLRA in Barrie II, which did not distinguish the vocal from the silent defendant, the court is not persuaded that the allegations asserted in ¶ 65 should be stricken because it alleges conduct that is not prohibited by the securities laws.

**B.   Secondary Liability Under 18 U.S.C. § 2**

Skilling argues that "[a]iding-and-abetting theories similarly do not save . . . [¶ 65] for the reasons explained in Causey's motion."[20]  "Aiding and abetting is not a separate offense, but it

---

[20]Skilling's Joinder, at p. 2.

is an alternative charge in every indictment, whether explicit or implicit." United States v. Neal, 951 F.2d 630, 633 (5th Cir. 1992). Unless Skilling can show unfair surprise, it is not an abuse of discretion to instruct the jury on aiding and abetting regardless of whether the elements of aiding and abetting are expressly alleged in the SSI. Id. See also United States v. Lombardi, 138 F.3d 559, 561 (5th Cir. 1998). Since the aiding and abetting statute, 18 U.S.C. § 2, is cited at the end of the paragraph of the SSI that charges Skilling and his codefendants with the analyst call counts (¶ 103), and since Skilling has not alleged unfair surprise, the court is not persuaded that it should "decline to instruct the jury on an aiding and abetting theory at trial with respect to . . . [the analyst call] counts"[21] without first allowing the government to present evidence at trial.[22]

---

[21]See Defendant Richard A. Causey's Reply Memorandum in Support of Motion to Dismiss Counts 21, 22, 24, 25, 26, 28 & 29 (the Analyst Counts), Docket Entry No. 422, p. 4 & n.3.

[22]To convict Skilling of aiding and abetting under 18 U.S.C. § 2 the government will have to prove that (1) the offense of securities fraud was committed by some person, (2) Skilling associated with the criminal venture, (3) Skilling purposefully participated in the criminal venture, and (4) Skilling sought by his actions to make that venture succeed. See United States v. Garcia, 242 F.3d 593, 596 (5th Cir. 2001). See also Nye & Nissen v. United States, 69 S.Ct. 766 (1949) ("In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'"). "'Associate' means that the defendant shares in the principal's criminal intent." Garcia, 242 F.3d at 596. "'Participate' means that the defendant engages in some affirmative conduct designed to aid the venture or assists the
(continued...)

## V.  Conclusions and Order

For the reasons explained above the court is not persuaded that the insider trading counts (Counts 42 through 51) charged against Skilling should be dismissed for failure to allege the appropriate <u>mens</u> <u>rea</u>.  Nor is the court persuaded that ¶ 65 of the SSI should be stricken for failure to allege facts capable of establishing either primary liability under 15 U.S.C. § 78j(b) or secondary liability under 18 U.S.C. § 2.  Accordingly, Jeffrey K. Skilling's Motion to Dismiss Counts 42 Through 51 of the Second Superseding Indictment (Insider Trading Counts) [Defense Motion No. 5] (Docket Entry No. 389) is **DENIED**, and Jeffery K. Skilling's Joinder in Defendant Richard A. Causey's Motion to Dismiss Counts 21, 22, 24, 25, 26, 28 & 29 (Defense Motion No. 7) (Docket Entry No. 397), in which Skilling moves the court to strike ¶ 65 of the SSI, is **DENIED**.

**SIGNED** at Houston, Texas, on this 28th day of December 2005.

SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[22](...continued)
perpetrator of the crime." <u>Id.</u>  Since the analyst calls alleged in Counts 21 through 30 each constitute an individual offense, the criminal venture alleged in each count is the securities fraud perpetrated by each analyst call, and for Skilling to be convicted for aiding and abetting the securities fraud offenses alleged in any of these counts, "he must have aided and abetted each material element of the alleged offense."  <u>Id.</u> at 561-562 (distinguishing aiding and abetting from conspiracy).